UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEONARD LICHT, et al.,

    Plaintiffs,

    v.                         CIVIL ACTION NO. 24-10447-NMG

BINANCE HOLDINGS LIMITED, d/b/a
BINANCE.COM, et al.,

    Defendants.

REPORT AND RECOMMENDATION ON
DEFENDANTS' JOINT MOTION TO DISMISS (#55)[1]

KELLEY, U.S.M.J.

I. Introduction.

    Plaintiffs are twenty-six United States and foreign citizens residing here and abroad who lost money in "pig butchering" schemes. Generally, in such schemes, scammers lure victims into investing money, often beginning with contact on social media, sometimes after convincing the victims they have mutual friends or business associates and perhaps with the aid of fake photographs and personal information about the victims from the internet. The scammers convince the victims to invest money in supposedly safe and lucrative opportunities. Then, they falsify information showing that the "investments" are increasing in value, luring the victims into

---

[1] Judge Gorton has referred this motion to the undersigned for report and recommendation. (#60.)

investing more money. Eventually, the scammers disappear, along with the money.[2] (#36, First Amended Complaint, ¶ 70.)

The pig butchering schemes at issue in this case involved the purchase and deposit of cryptocurrency into digital wallets, for purposes of the supposed investment opportunities. Plaintiffs assert claims under civil provisions of the Racketeer Influenced and Corrupt Organization Act ("RICO"), *see* 18 U.S.C. § 1964, against Binance Holdings Limited ("Binance") and BAM Trading Services, Inc. ("BAM"), doing business, respectively, as cryptocurrency exchanges Binance.com and Binance.US, and against Changpeng Zhao ("Zhao"), primary founder and the former Chief Executive Officer of Binance, alleged to have been in control of BAM, too. Defendants were not themselves the "butchers." No Binance or BAM employee or executive is purported to have lured a plaintiff, on Instagram, into buying and transferring cryptocurrency, before "laundering" and "cashing out" the cryptocurrency and disappearing. Rather, defendants are alleged to have run a "laundering" facility and made the "cashing out" easier, through Binance's willful failure to comply with United States laws imposing certain requirements on money transmitting businesses. Specifically, Binance, at Zhao's direction, willfully failed to comply with United States laws, while BAM's Binance.US was the alleged "smokescreen" that, at Zhao's direction, diverted regulatory and law enforcement attention from Binance.com, so that Binance could continue operating without having to comply with United States laws. Zhao and Binance allegedly felt that compliance would limit their ability to attract United States-based users important to growth, market share, and profits. If defendants had complied with the laws, plaintiffs allege, the transactions involving plaintiffs' cryptocurrency would have been flagged as suspicious

---

[2] The victim is the "pig," "fattened" and then "butchered" when the scammer disappears. *Song v. Doe*, #6:24-cv-809-JSS-EJK, 2024 WL 4632242, at *1, n.1 (M.D. Fla. Aug. 19, 2024).

by Binance, the scammers' accounts would have been frozen, and the suspicious transactions would have been reported to regulators, allowing law enforcement officials to investigate and then seize the cryptocurrency and return it to plaintiffs, thus stopping the schemes before the "butchering."

Defendants move to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) for the lack of personal jurisdiction, *see* #55 at 1; *see also* #56 at 18-22, and under Fed. R. Civ. P. 12(b)(6) for the failure to state claims upon which relief can be granted, *see* #55 at 1-2; *see also* #56 at 22-43. Plaintiffs oppose. (#57.) Briefing is complete. *See* #61 (reply); *see also* ##62-63 (regarding supplemental authority). Oral argument is unnecessary. The court recommends that the Rule 12(b)(2) motion be allowed as to BAM, without prejudice, but denied as to Binance and Zhao. The court further recommends that the Rule 12(b)(6) motion be allowed as to Binance and Zhao, again without prejudice. The court's recommendations, if adopted, will result in the dismissal of the complaint in its entirety.

II. <u>Standards of Review; Initial Comment on the Scope of the Record</u>.

A. <u>Fed. R. Civ. P. 12(b)(2)</u>.

"It is well-settled that the burden of proving that personal jurisdiction may be exercised in the forum state rests with the party seeking to invoke that jurisdiction," here, plaintiffs. *Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 94 (1st Cir. 2024) (citing *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 121 (1st Cir. 2022)). Plaintiffs must meet their burden as to each defendant. *Nandjou v. Marriot Int'l, Inc.*, 985 F.3d 135, 148 (1st Cir. 2021). In assessing whether plaintiffs have met their burden, this court applies the "classic" prima facie approach. *Rosenthal*, 101 F.4th at 94; *see Motus*, 23 F.4th at 121 (when a Rule 12(b)(2) motion is filed "at the inception of the case and the issue of jurisdiction is not intertwined with the merits, the prima facie approach

controls"); *see also Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st Cir. 1995).[3]

Under the prima facie approach, a court is not a factfinder; rather, it asks "whether the plaintiff has proffered facts that, if credited, would support all findings essential to personal jurisdiction." *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 51 (1st Cir. 2020) (cleaned up) (citation omitted). "Although the burden of proof is light, the plaintiff may not rely on the mere allegations in its complaint, but must point to specific facts in the record that support those allegations." *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 257 (1st Cir. 2022) (cleaned up) (citation omitted); *see also United States v. Swiss Am. Bank Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001) ("the plaintiff must go beyond the pleadings and make affirmative proof") (cleaned up) (citations omitted). The court need not credit conclusory allegations or draw farfetched inferences. *Vapotherm*, 38 F.4th at 257. The facts are ultimately drawn from the pleadings and any supplemental filings in the record, accepting plaintiffs' properly documented evidentiary proffers as true and crediting their version of genuinely contested facts. *Chen*, 956 F.3d at 52. The court must also consider jurisdictional facts proffered by defendants, if they are uncontested. *Id.*[4]

---

[3] Plaintiffs invite application of this approach. (#57 at 12.) A "preponderance of the evidence" approach may apply, for instance, when proffered evidence is conflicting or when a plaintiff's affidavits are patently incredible; this approach requires the court to conduct an evidentiary hearing and make often preclusive findings of fact. *Foster-Miller*, 46 F.3d at 145-146. A "likelihood" approach may apply "when the assertion of jurisdiction is bound up with the claim on the merits…." *Id*. at 146. This case is at its inception, and proffered evidence is not conflicting. The court does not view the issue of jurisdiction to be intertwined with the merits.

[4] Plaintiffs have not requested jurisdictional discovery and thus have waived any such request. *See Swiss Am.*, 274 F.3d at 625 ("a diligent plaintiff…*may* well be entitled to a modicum of jurisdictional discovery…") (emphasis in original) (cleaned up) (citations omitted); *see also Motus*, 23 F.4th at 127 ("If a party anticipates that jurisdictional discovery may be needed, the best way to ensure that a request for jurisdictional discovery is preserved for appeal if denied is to file a timely motion").

B. <u>Fed. R. Civ. P. 12(b)(6)</u>.

A court applies a two-step approach on a Rule 12(b)(6) motion to dismiss for the failure to state a claim upon which relief can be granted. First, it isolates and ignores statements in the complaint that simply offer legal conclusions or merely rehash cause-of-action elements; second, it accepts the complaint's well-pled, that is, non-conclusory, non-speculative, facts as true, drawing all reasonable inferences in the plaintiff's favor, to determine whether the facts "plausibly" state a claim. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7, 12 (1st Cir. 2011)); *see Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) ("we do not credit conclusory legal allegations or factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture") (cleaned up) (citations omitted); *see generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Plausibly" is something more than "possibl[y]," and reviewing for the plausibility of a claim "is a 'context-specific' job that compels [a court] 'to draw on' [its] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679). Ultimately, a complaint must include enough facts, accepted as true, to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. … Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility….'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Dismissal for failure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or circumstantial, respecting each

material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (cleaned up) (citations omitted).

On a Rule 12(b)(6) motion, without converting it to one for summary judgment, a court may consider facts alleged in the complaint and in the exhibits attached to it or documents expressly incorporated by reference. *See Douglas*, 63 F.4th at 57 (citing *Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013) (further citation omitted)); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Under "certain 'narrow exceptions,'" extrinsic documents may be considered. *Douglas*, 63 F.4th at 57 (quoting *Freeman*, 714 F.3d at 36 (further citation omitted)). Such exceptions have been made "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3. The phrase "official public records," in this context, "appears limited, or nearly so," to matters that are properly subject to judicial notice under Fed. R. Evid. 201, *see Freeman*, 714 F.3d at 36, which permits judicial notice of facts that are not subject to reasonable dispute because they are generally known within the district court's jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, *see* Fed. R. Evid. 201(b)(1)-(2).

C. Scope of the Record.

No exhibits are attached to the First Amended Complaint. *See* #36. The complaint does, however, include a section – "Binance's and Zhao's Admitted Violations of United States Criminal Law" – introduced by an assertion that "[n]early every" allegation in the section is a "verbatim or near-verbatim copy" of the statements of facts appended to or included in the plea agreements into which Binance and Zhao entered in the United States District Court for the Western District of Washington. (#36 at 13, n.4.) The *Binance* docket in the Western District of Washington is #23-

cr-178; the *Zhao* docket is #23-cr-179. The *Binance* Plea Agreement, including the appended Statement of Facts, is attached as an exhibit to plaintiffs' opposition to defendants' joint motion to dismiss. (#57-4); *see also* #23-cr-178, #23.[5] The *Zhao* Plea Agreement, including the Statement of Facts, is also attached as an exhibit to the opposition. (#57-5); *see also* #23-cr-179, #18. Defendants do not claim that the plea agreements, including the statements of facts, are not themselves properly before the court, under either Rules 12(b)(2) or 12(b)(6). Nor do they argue that the admissions there should not be considered here or that they should be considered for a limited purpose, *see* #61. Binance and Zhao agreed that their respective statements of facts were true and correct. (#57-4, *Binance* Plea Agreement, ¶ 11; #57-5 ¶ 9.) Binance agreed that it must not, including in litigation through counsel, make any public statement contradicting the facts in its statement of facts. (#57-4, *Binance* Plea Agreement, ¶ 46.) Zhao agreed that he must not, including in litigation through counsel, make any public statement contradicting the facts in either his statement of facts or Binance's. (#57-5 ¶ 18.) As noted, the court's review of a 12(b)(2) motion is not confined to the complaint, and its review of a 12(b)(6) motion includes documents central to plaintiffs' claims, as well as those sufficiently referred to in the complaint. Thus, the court finds the plea agreements, including the statements of facts, are properly before it, under both 12(b)(2) and 12(b)(6).

The parties have submitted more documents extrinsic to the complaint. The court makes other comments regarding the scope of the record, as necessary, below.

III. Relevant Facts; Causes of Action.

    A. Defendants, Generally.

---

[5] Because of duplication of paragraph numbers, when citing to Binance's plea agreement or the appended statement of facts, the court will so specify.

1. <u>Binance</u>.

At relevant times,[6] Binance did business as, and ran, Binance.com, an online exchange platform through which millions of users around the world bought and sold virtual assets, including cryptocurrency. Binance, founded mainly by Zhao in 2017, became the largest cryptocurrency exchange in the world. It is a Cayman Islands corporation.[7] *See* #36 ¶¶ 1, 36, 38; *see also* #57-4, *Binance* Statement of Facts, ¶¶ 1-4; #57-5 ¶ 9d.

When a user opened an account, Binance assigned the user a custodial virtual asset wallet, that is, a digital wallet in Binance's custody, that allowed the user to conduct transactions on the platform Binance.com, including the transfer of assets to other Binance users or to external digital wallets, and to convert cryptocurrency into fiat currency that could then be transferred to traditional

---

[6] In the criminal cases against Binance and Zhao, the relevant period was "at least as early as August 2017 and continuing until at least October 2022." *See* #57-4, *Binance* Statement of Facts, ¶ 1; *see also* #57-5 ¶ 9a. The pig butchering schemes at issue in this case spanned from as early as June 2021 to as late as about October or November 2022, although most of the schemes began later and ended earlier. *See infra*. The court is cognizant that the relevant period for a personal jurisdiction analysis depends on the particular analysis. On the one hand, a court considering specific jurisdiction might limit its consideration to contacts with the pertinent forum before and surrounding the accrual of the cause of action. At least on the "relatedness" prong, discussed *infra*, and in a case involving discrete-in-time tortious conduct, contacts with the forum after the cause of action arose may not be relevant. *Harlow v. Children's Hosp*., 432 F.3d 50, 61-62 (1st Cir. 2005). Yet, on the "purposeful availment" prong, discussed *infra*, and in cases involving continuous tortious conduct, post hoc contacts may be relevant. *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 11 (1st Cir. 2018). On the other hand, "[i]t is settled law that unrelated contacts which occurred after the cause of action arose, but before the suit was filed, may be considered for purposes of the general jurisdiction inquiry." *Harlow*, 432 F.3d at 64. Here, suit was first filed on February 23, 2024.

[7] Binance has referred to itself as "headquarterless," *see* #36 ¶ 36, and admitted in pleading guilty that, in part to make it more difficult to regulate, it was "intentionally vague" about its principal place of business. Around 2017, senior leaders were based in China, but from around 2018 to around 2021, they were based in various places. After 2021, they operated from the United Arab Emirates and other countries in Asia. (#57-4, *Binance* Statement of Facts, ¶ 26.)

bank accounts, including foreign bank accounts, or otherwise withdrawn. *See* #36 ¶ 50; *see also* #57-4, *Binance* Statement of Facts, ¶ 15.

Binance charged its users fees for every transaction. (#36 ¶ 51.) The fees varied based on a user's trading volume, with higher-volume traders typically paying lower fees. (#57-4, *Binance* Statement of Facts, ¶ 16.) Higher-volume traders helped provide liquidity, which is critical to a large cryptocurrency exchange. For any cryptocurrency traded on its platform, Binance needed individuals or entities willing to "make markets" in that cryptocurrency by buying or selling at a relatively predictable price and being able to trade in high volumes and variable amounts. These high-volume traders were often referred to as "market makers." To attract "market makers," Binance rewarded them with "VIP" status, which conferred benefits including lower fees. *Id*. Binance assessed a user's VIP status monthly based on the user's prior 30-day trading volume and holdings in Binance's proprietary coin, BNB. *Id*. ¶ 17. VIP users were an important part of Binance's business model. *Id*. ¶ 18.

2. <u>BAM</u>.

BAM did business as, and ran, Binance.US, a virtual asset exchange platform that was launched in September 2019. *See* #36 ¶ 37; *see also* #57-4, *Binance* Statement of Facts, ¶ 5.[8] Plaintiffs submit Massachusetts Secretary of State documents showing that BAM is a Delaware corporation and registered as a foreign corporation in Massachusetts on January 20, 2020. It had principal offices in California as of that date and for the fiscal years ending in 2021 and 2022 and in Florida for the fiscal years ending in 2023 and 2024. On January 20, 2020, and for the fiscal

---

[8] Plaintiffs allege that BAM "is not a subsidiary of Binance, nor does BAM operate under a unified corporate structure with Binance. Indeed, in prior federal court actions, Binance and BAM have represented that BAM is not even a corporate *affiliate* of Binance." (#36 ¶ 37) (emphasis in original).

years ending in 2021, 2022, 2023, and 2024, BAM designated Boston-based registered agents. (#57-1 at 1, 3, 6-10). The Secretary of State documents identify BAM's activities in Massachusetts as "Digital Asset Marketplace," *see id*. at 2; *see also id*. at 6, 8, and "OPERATION OF DIGITAL ASSET TRADING AND SETTLEMENT PLATFORM," *see id*. at 11, 13.

       3. Zhao.

Zhao is a Chinese-born citizen of Canada domiciled in Dubai. (#36 ¶ 38.) According to the complaint, until around November 2023, he was Binance's CEO, amassing a fortune that made him the sixty-ninth richest person in the world. *Id*. ¶ 1. Moreover, according to the complaint, he was the majority owner of Binance and BAM, and directed and controlled their decisions, strategies, and conduct. *Id*. ¶ 38; *see also* #57-4, *Binance* Statement of Facts, ¶ 3 (Zhao was Binance's primary founder, majority owner, and CEO who, together with senior leaders, made strategic decisions for Binance and exercised day-to-day control over its operations and finances), ¶ 36 (BAM was wholly owned by Zhao who, along with Binance, and others, helped launch Binance.US, including by registering it with "FinCEN"[9]); #57-5 ¶ 9d (Zhao exercised day-to-day control over Binance's operations).

    B. Binance and Zhao's Criminal Convictions.

On November 21, 2023, Binance and Zhao agreed to plead guilty in the Western District of Washington to various offenses. Binance agreed to plead guilty to charges in an information, specifically (1) conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. §§ 1960(a) and (b)(1)(B), by conducting an unlicensed money transmitting business ("MTB"), and to violate the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5318(h) and 5322, by failing to maintain an effective anti-money laundering ("AML") program; (2) conducting an unlicensed MTB; and (3) violation of the

---

[9] United States Department of Treasury, Financial Crimes Enforcement Network.

International Emergency Economic Powers Act, 50 U.S.C. § 1705 and 31 C.F.R. Part 560, *et seq*. (#57-4, *Binance* Plea Agreement, ¶ 2.) Zhao agreed to plead guilty to an information charging him with failing to maintain an effective AML program. (#57-5 ¶ 2.)

As set out in the *Binance* Statement of Facts, Binance qualified as an MTB and, therefore, had to register with FinCEN pursuant to 31 U.S.C. § 5330 and 31 C.F.R. §1022.380 within 180 days of establishment, or risk criminal penalties pursuant to 18 U.S.C. § 1960. As an MTB, it was also required to comply with the BSA, for example by filing reports of suspicious transactions that occurred in the United States, 31 U.S.C. § 5318(g), 31 C.F.R. §1022.320(a), and implementing an effective AML program "that [was] reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," 31 C.F.R. §1022.210. An AML program was required, at a minimum and within 90 days of establishment of the MTB, to "[i]ncorporate policies, procedures, and internal controls reasonably designed to assure compliance" with the requirements that an MTB file reports, create and retain records, respond to law enforcement requests, and verify customer identification, commonly called a "know your customer" or "KYC" requirement, 31 C.F.R. §1022.210(d)(1), (e). (#57-4, *Binance* Statement of Facts, ¶¶ 11-12); *see also* #57-5 ¶ 9b.

Binance's plea agreement required that it pay a fine of more than $1.8 billion and that it consent to entry of a forfeiture order of more than $2.5 billion. *See* #36 ¶ 2; *see also* #57-4, *Binance* Plea Agreement, ¶¶ 14a, 14b. The roughly $2.5 billion subject to forfeiture included over $1.6 billion that Binance "admit[ted] it collected in fees for transactions involving its United States users," representing the proceeds from conducting an unlicensed MTB. As to the other roughly $900 million subject to forfeiture, Binance "admit[ted] [that] [was] the amount of transactions it caused between users who were U.S. persons and persons who resided in Iran…." (#57-4, *Binance*

Plea Agreement, ¶¶ 16-17); *see also* #57-5 ¶ 9o.[10] On April 30, 2024, Zhao was sentenced to four months in prison and ordered to pay a fine of $50 million. *See* #36 ¶ 2; *see also* #23-cr-179, #91 at 2-3.[11]

In pleading guilty, Binance admitted that from at least August 2017 to at least October 2022, it failed to register with FinCEN and operated an unlicensed MTB in part to prevent United States regulators from discovering that it facilitated billions of dollars of cryptocurrency transactions on behalf of users, including United States-based users, without implementing an adequate AML program, including appropriate KYC procedures and transaction monitoring. Binance prioritized its growth, market share, and profits over legal compliance, choosing non-compliance on the belief that compliance would limit its ability to attract United States-based users. Binance and its co-conspirators in the criminal case did not systematically monitor transactions on Binance.com. And compliance employees recognized that Binance's AML program was inadequate and would attract illicit actors. In February 2019, one such employee wrote: "we need a banner 'is washing drug money too hard these days – come to binance we got cake for you.'" Zhao knew that United States-based users were transacting on Binance.com and of

---

[10] The District Judge accepted Binance's guilty plea on December 6, 2023, *see* #23-cr-178, #26, and conducted sentencing and entered judgment on February 23, 2024, the same date that plaintiffs here first filed suit. In addition to the fine and forfeiture order, the parties agreed to a term of three years of probation, *see* #57-4, *Binance* Plea Agreement, ¶ 14d, and the Judge imposed that term, *see* #23-cr-178, #35 at 2. The Judge also imposed the agreed-upon fine and entered the consented-to forfeiture order. *Id*. at 2-4; *see* #23-cr-178, #31.

[11] This sentence was not agreed-to. (#57-5 ¶ 12.) The government advocated for a 36-month term, double the high end of its United States Sentencing Guidelines range calculation. (#57-6, Government's *Zhao* Sentencing Memorandum, at 4.) The fine was agreed-to. (#57-5 ¶ 12.) The government also agreed to credit it against the fine that Zhao paid to the Commodity Futures Trading Commission. *See id*.; *see also* #23-cr-179, #91 at 3. The District Judge accepted Zhao's guilty plea on December 6, 2023. #23-cr-179, #45. Pending sentencing, Zhao was ordered to remain in the United States. #23-cr-179, ##46, 50, 71.

the need to block them, but chose not to block them all, observing in September 2019: "If we blocked US users from day 1, Binance will not [sic] as big as we are today. We would also not have had any US revenue we had for the last 2 years. And further, we would not have had additional revenue from the network effect…better to ask for forgiveness than permission," in what he thought a "grey zone." Due to its willful failure to implement an effective AML program, Binance in fact processed transactions by users who, among other things, "mov[ed] proceeds of…various internet-related scams."[12] In some instances, when illicit actors or high-risk users were identified, Binance and its co-conspirators in the criminal case nevertheless allowed them to continue to access Binance.com, particularly if they were VIP users. (#57-4, *Binance* Statement of Facts, ¶¶ 1, 21, 30-31, 54-56, 59.)

Zhao admitted that from at least August 2017 to at least October 2022, he, among other things, caused Binance to fail to implement and maintain an effective AML program, prioritizing its growth, market share, and profit over legal compliance. He thought that requiring all customers to provide KYC information would mean that some customers would choose not to use Binance.com, and others would be rejected by the compliance process, both of which would interfere with gaining market share. Before August 2021, Binance allowed a significant number of its users to create accounts and transact on Binance.com without providing identifying information. While Binance developed an internal process for flagging suspicious transactions, it never filed a report with FinCEN. As a result of Zhao's willful failure to implement and maintain an effective AML program, Binance in fact processed transactions involving illicit proceeds. On occasion, Binance identified users who appeared to be involved in illicit activity but allowed them

---

[12] A forensics firm found that in 2019, Binance was used as a laundering facility for $770 million. A Reuters investigation found that from 2017 to 2021, Binance processed transactions totaling about $2.35 billion stemming from hacks, investment frauds, and illegal drugs sales. (#36 ¶ 55.)

to continue to access Binance.com because they were VIPs, advising them to avoid transferring funds from sources that it identified as high risk. (#57-5 ¶¶ 9a, 9g-9i.)

    C. <u>Binance and Zhao's Contacts with the United States</u>.

Given their centrality to its personal jurisdiction analysis, the court highlights Binance and Zhao's contacts with the United States.[13] According to the complaint, a FinCEN investigation found that Binance employed more than 100 people based in the United States, including an advisor to Zhao and various executives. (#36 ¶ 40.) Binance.com, moreover, was maintained on Amazon Web Services servers, in Washington. *Id*.; *cf*. #57-4, *Binance* Statement of Facts, ¶ 10.

From at least August 2017 to at least October 2022, Binance "did business wholly or in substantial part within the United States." (#57-4, *Binance* Statement of Facts, ¶ 11); *see* #36, ¶ 36. It intentionally sought and served millions of users in the United States, and intentionally maintained substantial connections to the United States, from which it generated, among other things, web traffic, user base, transaction volume, and profit. (#57-4, *Binance* Statement of Facts, ¶ 27). Zhao knew that United States-based users were essential for Binance's growth and were a significant source of its revenue. (#57-5 ¶ 9f.)

Binance tracked its progress in securing new users from various locations, including the United States. *Id*. ¶ 9d. According to Binance's own data, in August 2017, 23% of its 122,729 users were from the United States, a greater share than any other country. (#57-4, *Binance* Statement of Facts, ¶ 29). In March 2018, three million of its users were from the United States of

---

[13] BAM's contacts with Massachusetts are also central to the court's personal jurisdiction analysis. Yet, the complaint includes only conclusory allegations of contacts between BAM and Massachusetts, which the court does not credit. *See* #36, ¶¶ 40-42, 45. Neither plea agreement discusses BAM's putative contacts with Massachusetts. The Secretary of State documents are the only properly documented evidentiary proffers of contacts between BAM and Massachusetts. But, those documents only get plaintiffs so far, as discussed below.

eight million total. *Id*. ¶ 30. That works out to over 37%. In June 2019, all VIP users accounted for more than 70% of its trading revenue and, of that 70%, VIP users from the United States accounted for about 33%. *Id*. ¶ 37.

Binance and Zhao knew that Binance's substantial United States user base required that it register with FinCEN and comply with the BSA. *Id*. ¶ 32; *see* #57-5 ¶ 9e. In late 2018, Binance engaged a consultant who provided guidance regarding its risk related to United States law enforcement. (#57-4, *Binance* Statement of Facts, ¶ 33.) Binance did not follow the consultant's guidance; instead, senior leaders, including Zhao, decided to create a separate, United States-based exchange that would register with FinCEN and conduct KYC. Binance's United States-based individual retail users would gradually be directed from Binance.com to the new exchange, but Binance would develop and execute various strategies to allow United States-based VIP users to continue to access Binance.com. *Id*. ¶ 34. In June 2019, Binance publicly announced that it would block United States-based users from Binance.com and launch the separate United States-based exchange. Binance and Zhao helped launch that exchange – Binance.US – including by registering it as a money services business with FinCEN. *Id*. ¶ 36.

At instruction from senior leaders, including Zhao, Binance's employees encouraged United States-based VIP users to conceal and obfuscate their United States connections, including by creating new accounts and submitting non-United States KYC information. *Id*. ¶ 38. During a June 25, 2019, call including Zhao, the participants discussed and agreed to implement strategies to keep United States-based VIP users on Binance.com and, as Zhao noted, to "achieve a reduction in our own losses and, at the same time, to be able to have U.S. supervision agencies not cause us any troubles" and to achieve the "goal" of having "US users solely turn into to [sic] other users." *Id*. ¶ 39.

On the June 25, 2019, call, Binance employees and executives told Zhao that they were implementing the plan by contacting United States-based VIP users "offline," through direct phone calls, "leav[ing] no trace." If a United States-based VIP user owned an offshore entity, Binance's VIP team would help the user register a new account for the entity and transfer the user's benefits to that account, while the user transferred the assets. Binance's VIP manager acknowledged that some of the entities were owned by United States-based users. On the call, an individual described a script that Binance employees could use in communications with United States-based VIP users to encourage them to provide non-United States KYC information to Binance by falsely suggesting that the user was misidentified in Binance's records as United States-based. Zhao authorized and directed this strategy, explaining: "[W]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not." *Id*. ¶ 40. Binance and its co-conspirators in the criminal case implemented the strategies to keep United States-based VIP users on Binance.com, as documented in an internal document titled "VIP handling." *Id*. ¶¶ 42-45.

In September 2019, Binance.US went live. Binance blocked some United States-based users on Binance.com and redirected them to Binance.US but, through the above strategies, continued to allow a "substantial" number of its United States-based users to access Binance.com. These included United States-based VIP users that at times conducted transactions equivalent to billions of dollars per day, helping provide the needed liquidity. *Id*. ¶¶ 32, 46. By September 2020, Binance attributed about 16% of its total registered user base to the United States, still more than any other country, according to its internal monthly report. *Id*. ¶ 47. The next month, Binance removed "United States" from the internal report, replacing it with "UNKWN." "UNKWN" users represented 17% of its registered user base. *Id.*

As noted above, Binance consented to the entry of an order of forfeiture involving $1.6 billion, the "fees for transactions involving its United States users." (#57-4, *Binance* Plea Agreement, ¶ 16.) Between August 2017 and October 2022, United States-based users conducted trillions of dollars in transactions. (#57-4, *Binance* Statement of Facts, ¶ 48.)

    D. <u>Plaintiffs and the Pig Butchering Schemes at Issue in this Case</u>.

        1. <u>Lead plaintiff, Leonard Licht</u>.

Licht is a United States citizen who resides in Texas. (#36 ¶ 10.) In June 2021, he received a Facebook friend request from "Tina Ling," who was friends with one of his high school classmates. Licht accepted the request, and Ling soon began communicating with him on Facebook and WhatsApp. Within about a month, Ling turned the conversation to cryptocurrency investing, in which Licht had no experience. She convinced him to invest in a successful mining operation, "LuxKey." *Id*. ¶ 79.

Over several months, at Ling's instruction, Licht purchased over $2.7 million in cryptocurrency, specifically "USDT," which generally trades at a constant market rate of $1 per coin on the regulated cryptocurrency exchanges Coinbase.com and Crypto.com. *Id*. ¶ 80. At Ling's instruction, in twelve installments over several months, Licht transferred all this USDT to two digital wallets that he understood to be LuxKey. *Id*. LuxKey, however, did not exist. *Id*. ¶ 81. The two wallets were controlled by the "criminal syndicate" for which Ling was a fictious front. *Id*.[14]

---

[14] The criminal syndicate that victimized Licht is alleged to be Cambodian. *See infra*. The complaint refers to the scammers who victimized the other plaintiffs as "criminal syndicates," as well. *See* #36 ¶¶ 261-262. Plaintiffs admit, however, that they do not know if one or more syndicates are involved here. *See id*. They provide no identifying information for any other syndicates but imply that they are "international." *See, e.g.*, *id*. ¶¶ 77, 267.

Between August 2021 and June 2022, an individual posing as a LuxKey "customer support" specialist sent messages to Licht via WhatsApp on the status of his investment. The individual also sent group messages to Licht and Ling. These communications included false statements regarding the returns that Licht had earned on the investment and the need for Licht to make additional payments to LuxKey to keep his investment from becoming inactive. *Id*. ¶ 82.

In July 2022, Ling and LuxKey disappeared. Licht contacted law enforcement and retained a private blockchain investigative agency,[15] CipherBlade, to trace and recover the cryptocurrency. *Id*. ¶ 83. CipherBlade found that the two digital wallets transferred the USDT to "intermediary" ones that a Cambodian criminal syndicate controlled, and the intermediary wallets then transferred the USDT to nine Binance accounts. *Id*. ¶ 84.[16] CipherBlade concluded that the Cambodian syndicate was successful in using Binance as a cash-out point, meaning that Binance allowed the syndicate to launder Licht's USDT and convert it to fiat currency that is untraceable and unrecoverable. *Id*.

The LuxKey scheme had other victims. CipherBlade determined that between August 2021 and November 2022, the nine Binance accounts received over $40 million in USDT through 140

---

[15] Cryptocurrencies are built on public blockchains, meaning that transactions can be traced using computer forensics. (#36 ¶ 72.)

[16] Defendants proffer that Licht filed a complaint in the United States District Court for the Northern District of Texas against "Ling" and "LuxKey" related to the pig butchering scheme at issue in this case. They argue that the court may take judicial notice of Licht's admissions in the Texas case. (#56 at 17, 18; *see* #56-4); *see* #3:23-cv-01018-X, #1. There, Licht alleges, *inter alia*, that he "has been able to trace the stolen funds to specific wallets maintained at *various cryptocurrency platforms*." (#56-4 ¶ 2) (emphasis supplied); *see id*. ¶ 29 ("The forensic firm has also traced Licht's stolen funds to specific cryptocurrency wallets maintained at *a number of different cryptocurrency platforms*") (emphasis supplied). There, Licht seeks, *inter alia*, "all damages available at law or equity." (#56-4 at 6.) The Texas case is pending; Clerk's Entry of Default issued as to "Ling" and "LuxKey." #3:23-cv-01018-X, #34.

transactions traceable to the two digital wallets to which Licht transferred his USDT. *Id*. ¶ 85. Most of the USDT, $34 million, was transferred between August 2021 and July 2022. *Id*.

> 2. <u>Zhengjun Cai</u>.

Cai is a Chinese citizen who resides in California. (#36 ¶ 11.) On November 28, 2021, she met a man on WeChat who told her about his profitable investment pool. A few days later, she agreed to join by investing cryptocurrency from her digital wallet. When she paid a fee, she executed malicious code on her wallet that gave the scammers access. *Id*. ¶¶ 87-88.

Between December 2, 2021, and February 14, 2022, Cai made seven deposits of USDT into her wallet. After the first, it seemed as though her assets were secure and she was earning profit. *Id*. ¶ 89. However, on February 3, 7, and 14, three unauthorized withdrawals of cryptocurrency were made. *Id*. ¶ 90. As a result, Cai lost $741,170.21 USDT. *Id*. ¶ 91. "Through investigation on the public blockchain website etherscan.io, [she] has been able to verify that a substantial portion of her stolen assets were laundered through the Binance exchange." *Id*. ¶ 92.

> 3. <u>Daniel Chang</u>.[17]

Chang is a United States citizen who resides in California. (#36 ¶ 13.) On December 14, 2021, he was contacted by a woman on WeChat. She introduced him to an investment opportunity that she said would pay high interest. Chang sought additional information about how the investment worked, and the woman explained the process and convinced him to join and deposit USDT into his digital wallet. *Id*. ¶¶ 93-94. Likely in paying a fee, Chang executed malicious code. *Id*. ¶ 95.

---

[17] Defendants proffer that Chang and seventeen other plaintiffs (Chen, Chow, Dong, Fennane, Francis, Granovski, Green, Alicia Lau, Trevor Lau, Lobandi, Mollanji, Moskwa, Nguyen, Rothaus, Slavant, Yeo, and Zhai) have filed an arbitration against Coinbase based on these pig butchering schemes, seeking "substantially" the same damages. (#56 at 17 & n.3); *see* ##56-1, 56-2, Coinbase Arbitration documents.

Chang began making deposits of small amounts of USDT. Over the next several weeks, he made four. *Id*. ¶ 96. Initially, the investment worked as the woman had explained, and Chang believed that he would profit, so he continued making deposits, including larger ones. *Id*. ¶ 97.

Between January 16 and March 11, 2022, Chang lost $289,916 USDT from his wallet in a series of unauthorized withdrawals. *Id*. ¶ 98. "Through investigation on the public blockchain website etherscan.io, [he] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 99.

### 4. Henry Chen.

Chen is a United States citizen who resides in California. (#36 ¶ 12.) On January 17, 2022, "Jenny" contacted him on Hinge and, eventually, told him that she was earning significant income investing in cryptocurrency. *Id*. ¶ 100. She directed him to download an application for a digital wallet and open the link for the platform. Chen did so. *Id*. ¶ 101. Jenny directed him to make a purchase that would allow him to join, and Chen did so. *Id*. ¶ 102. This likely executed malicious code. *Id*.

Chen deposited $121,516 USDT into his wallet as part of the investment. *Id*. ¶ 103. Between January and March 2022, scammers withdrew all of it. *Id*. ¶ 104. "Through investigation on the public blockchain website etherscan.io, [Chen] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 105.

### 5. Dominic Chow.

Chow is a United States citizen who resides in Massachusetts. (#36 ¶ 14.) On January 19, 2022, he met "Eileen Chou" on WhatsApp who told him about a cryptocurrency investment opportunity. *Id*. ¶ 106. After about two months, Chow decided to participate. *Id*. ¶ 107. Chow

directed Chow to purchase a voucher using his digital wallet, which he did on March 8, executing malicious code. *Id.* ¶¶ 107, 108.

Between March 8 and 18, 2022, Chow deposited $280,914 USDT into his wallet for investment purposes. *Id.* ¶ 109. Scammers withdrew all of it. *Id.* ¶ 110. "Through investigation on the public blockchain website etherscan.io, Chow was able to verify that a substantial portion of his stolen assets has been laundered through the Binance exchange." *Id.* ¶ 111.

Chow contacted Binance, which responded that the wallets belonged to "SafePal," a broker with many users whose identities were unknown to Binance. *Id.* ¶ 112. Binance told Chow that it "was not responsible for the management of the assets on the broker's wallet so [it was] unable to help [Chow] track the funds further." *Id.* ¶ 113.[18]

The complaint does not specifically allege where Chow was when he met "Chou;" when he purchased the voucher; when he deposited USDT into his digital wallet; or when he communicated with Binance. *See id.* ¶¶ 106-113.

6. Chengguo Dong.

Dong is a United States citizen who resides in California. (#36 ¶ 15.) On October 26, 2021, he was approached by a man on an application. *Id.* ¶ 114. The man invited Dong to participate in an investment opportunity using funds from his digital wallet. *Id.* ¶ 115. The next day, Dong purchased a voucher, executing malicious code. *Id.* ¶ 116.

Between October 29 and November 12, 2021, Dong made several deposits of USDT into his wallet for investment purposes. *Id.* ¶ 117. On November 12, scammers drained the entire wallet.

---

[18] Plaintiffs baldly allege that Binance "routinely ignored or failed to respond to victims' proactive requests to freeze Binance accounts that forensic analyses showed were associated with the fraud schemes that stole the victims' cryptocurrency assets." (#36 ¶ 78.) Binance did not "ignore" Chow, the only plaintiff alleged to have reached out.

*Id*. ¶ 118. "Through investigation on the public blockchain website etherscan.io, Dong has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 119.

       7. <u>Amine Fennane</u>.

Fennane is a citizen and resident of France. (#36 ¶ 16.) On March 15, 2022, "Angela Andrew" contacted him on Instagram. She offered to introduce him to an investment pool, insisting that he join using his digital wallet. *Id*. ¶ 120. At Andrew's instruction, Fennane paid a fee, likely executing malicious code. *Id*. ¶ 121.

To fund the pool, Fennane deposited $160,307 USDT into his wallet. *Id*. ¶ 122. Between April 6 and May 9, 2022, scammers drained the entire wallet. *Id*. ¶ 123. "Through investigation on the public blockchain website etherscan.io, Fennane has been able to verify that a substantial portion of his stolen crypto funds were laundered through the Binance exchange." *Id*. ¶ 125.

       8. <u>Ihab Francis</u>.

Francis is a United States citizen who resides in New York. (#36 ¶ 17.) On September 18, 2021, a man contacted him on LinkedIn. The man said that he was a cryptocurrency investor and offered to explain how he made money. He also offered Francis a limited-time opportunity to earn interest in a pool using cryptocurrency in a digital wallet. *Id*. ¶ 126. Francis was directed to "join the node" and receive a voucher in his wallet, which he did, executing malicious code. *Id*. ¶ 127.

Francis made small transfers to the pool, through his wallet, on November 3 and 8, 2021. He continued to make transfers after the initial investments appeared to be yielding interest. *Id*. ¶ 128. Ultimately, he made a total of twelve, from November 3, 2021 to January 10, 2022. *Id*. ¶ 128. In a series of four swipes, $462,883.48 USDT was withdrawn from his wallet. *Id*. ¶ 130. "Through investigation on the public blockchain website etherscan.io, Francis has been able to verify that a

substantial portion of his stolen crypto assets were laundered through the Binance exchange." *Id*. ¶ 132.

        9. <u>John Gordon</u>.

Gordon is a United States citizen who resides in Florida. (#36 ¶ 18.) On June 1, 2022, "Laura" contacted him on social media. She eventually told him about her interest in cryptocurrency and her successful investment using a digital wallet. *Id*. ¶ 133. Laura directed Gordon to access the platform using his digital wallet, and he did so, at one point executing malicious code. *Id*. ¶ 134.

On June 10, 2022, Gordon began making small deposits into his wallet. *Id*. ¶ 135. After the initial investments earned the promised interest, he continued to make deposits. *Id*. ¶ 136. Between June 10 and 23, he made eight total. *Id*. ¶ 136. All of the USDT in his wallet was eventually fraudulently withdrawn. *Id*. ¶ 137. "Through the investigation on the public blockchain website etherscan.io, Gordon has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 139.

        10. <u>Shai Granovski</u>.

Granovski is a citizen and resident of Canada. (#36 ¶ 19.) On October 20, 2021, "Miriam" contacted him on Instagram and told him about a pool in which he could invest cryptocurrency. She appeared to be a Facebook friend of one of Granovski's friends. *Id*. ¶ 140. "Miriam" directed Granovksi to purchase a node to join the investment pool using funds in his digital wallet, which he did, likely executing malicious code. *Id.* ¶ 141.

To fund the pool, Granovski deposited a total of $517,477 USDT into his wallet. *Id*. ¶ 142. On December 9, 2021, scammers withdrew all of it. *Id*. ¶ 143. "Through investigation on the public

blockchain website etherscan.io, Granovski has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 144.

       11. <u>Dalton Green</u>.

Green is a United States citizen who resides in Colorado. (#36 ¶ 20.) On December 4, 2021, after hearing about an investment opportunity he and his friends believed to be legitimate, Green decided to join. *Id*. ¶ 145. He accessed the platform using his digital wallet and used funds there to purchase a voucher, likely executing malicious code. *Id*. ¶ 146.

To fund the pool, Green deposited a total of $71,096 USDT into his wallet. In December 2021, scammers withdrew all of it. *Id*. ¶¶ 147-148. "Through investigation on the public blockchain website etherscan.io, Green has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 150.

       12. <u>Michael Grilli</u>.

Grilli is a United States citizen who resides in Florida. (#36 ¶ 21.) On November 11, 2021, he met a woman on a website. She encouraged him to join a cryptocurrency pool that she said would earn significant income. *Id*. ¶ 151. The woman directed Grilli to deposit USDT into his digital wallet and open a link for the pool from the browser, which he did, executing malicious code. *Id*. ¶¶ 152-153.

Between December 2021 and March 2022, scammers stole all of the USDT Grilli had deposited into his wallet, amounting to approximately $3,718,480. *Id*. ¶ 154. "Through investigation on the public blockchain website etherscan.io, [he] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 156.

       13. <u>Iraklis Karabassis</u>.

Karabassis is a United States citizen who resides in Florida. (#36 ¶ 22.) In January 2022, he met "Hannah" on Instagram. *Id*. ¶ 157. Through correspondence and phone calls, she presented him with the opportunity to participate in a lucrative cryptocurrency pool using a digital wallet. *Id*. ¶ 158. Hannah instructed Karabassis to download the wallet application and then transfer cryptocurrency into his account. *Id*. She sent him a voucher through which he would receive a small amount of cryptocurrency. He accepted the voucher, executing malicious code. *Id*. ¶ 159.

Over the next several weeks, to participate in the pool, Karabassis deposited $1,180,750 USDT into his wallet. On March 4, 2022, scammers transferred that amount out. *Id*. ¶¶ 160-161. A month later, Karabassis deposited another $4,899 USDT believing that it would allow him to regain access to his $1,180,760 USDT and to the interest that it had earned. Scammers transferred that amount out, too. *Id*. ¶ 162. "Through investigation on the public blockchain website etherscan.io, Karabassis has been able to verify that a substantial portion of his stolen assets, proceeds of the crime, were laundered through the Binance exchange." *Id*. ¶ 163.

14. <u>Alicia Lau (Lau Pui Mei)</u>.

Ms. Lau is a citizen of Malaysia who resides in Singapore. (#36 ¶ 23.) On May 29, 2021, "Toby" contacted her on Instagram and soon encouraged her to join a cryptocurrency pool through which he said she would earn significant income. *Id*. ¶ 164. Toby directed her to deposit USDT into her digital wallet. He then directed her to open the link to the pool in the browser and provided her with a voucher to join. *Id*. ¶ 165. When she joined, Ms. Lau gave scammers access to her wallet. *Id*. ¶ 166.

To fund the pool, Ms. Lau deposited a total of $205,744 USDT into her wallet. *Id.* ¶ 167. Between October 7 and December 2, 2021, scammers withdrew all of it. *Id*. ¶ 168. "Through investigation on the public blockchain website etherscan.io, [Ms. Lau] has been able to verify that

a substantial portion of [her] stolen assets were laundered through the Binance exchange." *Id*. ¶ 170.

15. <u>Trevor Lau</u>.

Trevor Lau is a citizen and resident of Canada. (#36 ¶ 24.)[19] In January 2022, he was contacted on Twitter by "Abby" who told him that she was earning significant income participating in a cryptocurrency pool. *Id*. ¶ 171. She directed him to download the necessary digital wallet and open the link using its browser, which he did. *Id*. ¶ 172. Once on the pool's site, she directed him to purchase a node, which he did, executing malicious code. *Id*. ¶ 173.

To fund the pool, Mr. Lau deposited a total of $250,327 USDT into his wallet. *Id*. ¶ 174. The same month that he was contacted by Abby, scammers withdrew all of it. *Id*. ¶ 175. "Through investigation on the public blockchain website etherscan.io, [Mr. Lau] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 177.

16. <u>Nader Lobandi</u>.

Lobandi is a citizen of Iran who resides in Massachusetts. (#36 ¶ 25.) In March 2022, "Aimee" contacted him on social media. She encouraged him to join a cryptocurrency pool from which she said he would earn significant income. She directed him to deposit USDT into his digital wallet, and to open a link that she provided. She also directed him to click a button to "join the node." This action allowed scammers to access and initiate transfers from his wallet. *Id*. ¶¶ 178-179.

On April 12, 2022, scammers stole all of the USDT in Lobandi's wallet, amounting to approximately $92,640 USDT. *Id*. ¶ 180. "Through investigation on the public blockchain website

_____

[19] Ms. Lau and Mr. Lau are not related. *Id*. ¶ 171.

etherscan.io, [he] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 182.

The complaint does not specifically allege where Lobandi was when he met "Aimee" or clicked the link that she provided. Nor does it specifically allege where he was when he made deposits into his wallet for pool purposes. *See id*. ¶¶ 178-182.

### 17. Eisi Mollanji.

Mollanji is a citizen and resident of Canada. (#36 ¶ 26.) On March 28, 2022, "Aiden" contacted him on Hinge. *Id*. ¶ 183. Aiden eventually told Mollanji about an opportunity to profit through targeted swing trades on a platform called "Coincheck." Aiden urged Mollanji to join, which Mollanji did, depositing $60,000 USDT into Coincheck. *Id*. ¶ 184.

Once his account reached $120,000 USDT, Coincheck's "customer service" contacted Mollanji and notified him that if he wanted to withdraw his funds, he would need to comply with its money laundering regulations and show proof that he already held $100,000 USDT. Aiden assured Mollanji that the same verification was required for all users. *Id*. ¶ 185. The representative then told Mollanji that he would need to verify the proof of funds by showing that he had funds available in a particular digital wallet. *Id*. ¶ 186. Mollanji was desperate to get his money back, so he downloaded the application, obtained the wallet, and deposited $100,471 USDT into it. *Id*.

On April 20, 2022, scammers withdrew all of the USDT from Mollanji's wallet. *Id*. ¶ 187. "Through investigation on the public blockchain website etherscan.io, [he] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 189.

### 18. James Moskwa.

Moskwa is a United States citizen who resides in Rhode Island. (#36 ¶ 27.) On October 10, 2021, he was introduced to "Tresa" on Instagram. *Id*. ¶ 190. Over several weeks, Moskwa developed a friendship with Tresa. They spoke often, and she eventually brought up cryptocurrency investments. Tresa told Moskwa that her uncle was helping her make them, and that he was a broker involved in an investment opportunity. She convinced him to obtain the necessary digital wallet and participate in the pool. Tresa eventually introduced Moskwa to her uncle to have him describe the pool. *Id*. ¶ 191.

On November 1, 2021, Moskwa obtained his wallet, and Tresa walked him through the process of purchasing a voucher on the application. He purchased the voucher using cryptocurrency that she sent him, executing malicious code. *Id*. ¶¶ 192, 193.

On November 16, Moskwa began depositing USDT into his wallet, making six deposits to participate in the pool, between that date and January 21, 2022. *Id*. ¶ 194. Between December 24, 2021, and January 21, 2022, scammers withdrew all of the USDT in his wallet. *Id*. ¶ 195. Moskwa contacted the pool's "customer service." The "agent" told Moskwa that his account was frozen and that he would have to deposit an additional $262,798 for "account risk verification" to unfreeze it and access his funds. *Id*. ¶ 196. Fearful of losing the hundreds of thousands of dollars he had already deposited, Moskwa complied, and continued to make additional USDT deposits. Those funds were also withdrawn from his wallet without his knowledge or consent. *Id*. ¶ 197. Moskwa lost $1,417,654.06 USDT. *Id*. ¶ 198. "Through investigation on the public blockchain website etherscan.io, [he] has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 199.

19. <u>Anh Nguyen</u>.

28

Nguyen is a United States citizen who resides in California. (#36 ¶ 28.) On October 16, 2021, he was contacted by "Teyana Cuffe" on Facebook who eventually told him about a cryptocurrency investment opportunity using a digital wallet. *Id*. ¶ 200. Teyana convinced Nguyen that he could earn significant profits on USDT investments through the pool and directed him to open a link to the platform he was sent and to purchase a voucher. He was told that he had to deposit USDT into his wallet to collect interest. *Id*. ¶ 201. On October 29, 2021, Nguyen did as he was instructed, executing malicious code. *Id*. ¶ 202.

Initially the pool operated as described and Nguyen appeared to earn interest on the USDT he deposited, but, also on October 29, the USDT was withdrawn by scammers. *Id.* ¶ 204. When Nguyen asked "customer service" about the withdrawal, he was informed that his assets had been contributed to a special pool to yield higher earnings and that his USDT was still in his wallet. *Id*. Nguyen was also told that he had to contribute another $200,000 USDT to regain access and earn his reward. *Id*. ¶ 205.

On November 18, 2021, Nguyen deposited additional USDT into his wallet. *Id*. Scammers immediately drained his wallet again, thus Nguyen lost a total of $222,946 USDT. *Id*. ¶ 206. "Through investigation on the public blockchain website etherscan.io, [he] has been able to verify that a significant portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 208.

20. <u>Brian Rothaus</u>.

Rothaus, an avid golfer, is a United States citizen who resides in Pennsylvania. (#36 ¶¶ 29, 209.) On April 11, 2022, under the guise of seeking golf advice, a woman contacted him on Facebook. *Id*. ¶ 209. She told him about her investments in cryptocurrency and asked him to

participate in a pool. *Id*. She directed him to obtain the necessary digital wallet and to deposit USDT into it. *Id*.

On October 26, 2022, Rothaus made one $247,456.34 USDT deposit into his wallet. The next day, he clicked a button to receive a node, executing malicious code. *Id*. ¶ 211. Later that same day, scammers stole about that amount. *Id*. ¶ 212. "Through investigation on the public blockchain website etherscan.io, Rothaus has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 214.

21. <u>Gordon Shaylor</u>.

Shaylor is a United States citizen who resides in Nevada. (#36 ¶ 30.) On December 17, 2021, "Sa Li" contacted him on Facebook. They began communicating on WhatsApp and she encouraged him to join a cryptocurrency pool, which she claimed was a safe investment opportunity. *Id*. ¶ 215. Sa Li directed Shaylor to obtain a digital wallet using a specific application and to deposit USDT into the wallet. *Id*. ¶ 216. Shaylor was then told to open the link for the pool through the browser and to purchase the node. The node executed malicious code. *Id*. ¶ 217.

To fund the pool, over nine months, Shaylor made multiple USDT deposits into his wallet. The pool reported to Shaylor that he was earning significant interest, which convinced him to follow Sa Li's advice to continue depositing more, and larger amounts. *Id.* ¶ 218.

In August 2022, scammers stole all of the USDT in Shaylor's wallet, approximately $1,200,000. *Id*. ¶ 219. "Shaylor subsequently retained the services of forensic crypto tracers who concluded with 'very strong confidence' that the scammers utilized the Binance exchange to launder the assets they stole from Shaylor." *Id*. ¶ 221.

22. <u>Richard Slavant</u>.

Slavant is a United States citizen who resides in Louisiana. (#36 ¶ 31.) On September 27, 2021, a woman contacted him on WhatsApp. Eventually, she told him that she was earning significant income on her cryptocurrency by participating in a pool. *Id*. ¶ 222. The woman directed Slavant to download an application and obtain a digital wallet, and to then open a link using the browser. He did so. The woman then directed Slavant to purchase a node. On October 8, he did so, executing malicious code. *Id*. ¶¶ 223-224.

To fund the pool, between October 9 and November 9, 2021, Slavant made four deposits of USDT into his wallet. *Id*. ¶ 225. On November 13, scammers withdrew the USDT in his wallet, costing him approximately $52,349.87 USDT. *Id*. ¶¶ 226-227. "Through investigation on the public blockchain website etherscan.io, [Slavant] [has] been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 228.

23. <u>Nathanial Thrailkill</u>.

Thrailkill is a United States citizen who resides in Arizona. (#36 ¶ 32.) On December 4, 2021, after hearing about an opportunity earning significant income from his friends, Thrailkill decided to join what he and his friends believed was a cryptocurrency pool. *Id*. ¶ 229. He accessed the platform for the pool using the application for his digital wallet on both his phone and desktop. *Id*. ¶ 230.

Between December 7 and 8, 2021, to fund the pool, Thrailkill made three deposits, totaling $100,308 USDT. *Id*. ¶ 231. He was told to accept a voucher to pay a fee. *Id*. ¶ 232. By accepting the voucher, he executed malicious code. *Id*.

On December 10, just after Thrailkill made his last deposit, scammers stole the USDT in his wallet. *Id*. ¶ 233. "Through investigation on the public blockchain website etherscan.io, [he]

has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id.* ¶ 235.

24. <u>Jack Yao</u>.

Yao is a United States citizen who resides in California. (#36 ¶ 33.) On May 30, 2022, he was introduced to a cryptocurrency investment pool opportunity by his friend, Tao Wang,[20] who had been contacted by "Li Zhu" on WeChat. *Id.* ¶ 236. After talking with Wang, Yao agreed to join. *Id.* ¶ 237. Yao deposited USDT into his digital wallet and opened the link for the pool through the browser. *Id.* ¶ 238.

To fund the pool, Yao made six deposits of USDT into his wallet. *Id.* ¶ 239. On June 29, 2022, scammers drained it. *Id.* ¶ 240. Yao contacted Wang, who told him that his wallet had also been drained. *Id.* Yao then contacted "customer service" for the pool and was told that his account had been "frozen" and that his USDT had been "transferred to a custodian account because they detected abnormal activit[y]." *Id.* ¶ 240. The "representative" told Yao that he would have to deposit additional funds into his wallet to unfreeze it. *Id.* ¶ 241. On July 7, desperate, Yao complied. His wallet was drained again. *Id.* ¶ 242.

Through withdrawals on June 29 and July 9, 2022, scammers stole all of the USDT in Yao's wallet, totaling $310,000 USDT. *Id.* ¶ 242. "Through a forensic blockchain investigation conducted by the firm CoinStructive, [he] was able to determine that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id.* ¶ 244.

25. <u>Edmund Yeo (Yeo Yin Pin Edmund)</u>.

---

[20] Wang is referred to as a "Plaintiff," *see* #36 ¶ 236, but he is not listed in either the caption or the "Parties" section of the complaint. *See* #36 at 1; *see also id.* ¶¶ 10-38.

Yeo is a citizen and resident of Singapore. (#36 ¶ 34.) On November 16, 2021, "Juli Chua" contacted him on WhatsApp. Chua eventually introduced Yeo to a pool and directed him to join using a digital wallet application. *Id*. ¶ 245. She directed him to visit the pool through the wallet browser and, on November 23, at her direction, he registered through his wallet, pressing "confirm" to purchase a voucher. *Id*. ¶ 246. This likely executed malicious code. *Id*.

To fund the pool, Yeo deposited a total of $346,652 USDT into his wallet. *Id*. ¶ 247. Between December 8, 2021 and January 7, 2022, scammers withdrew all of it. *Id*. ¶ 248. "Through investigation on the public blockchain website etherscan.io, Yeo has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 250.

26. <u>Jun Zhai</u>.

Zhai is a United States citizen who resides in Washington. (#36 ¶ 35.) On February 23, 2022, "Julie" contacted him on WeChat. She soon told him about her hobbies and that she was earning significant income participating in a cryptocurrency pool. *Id*. ¶ 251. Zhai agreed to participate. Julie directed him to download a digital wallet application and to open the link for the pool using the browser. On February 28, Zhai did so, purchasing a voucher to begin transferring funds into his wallet, executing malicious code. *Id*. ¶ 252.

Between March 2 and 22, 2022, to fund the pool, Zhai "made four deposits of $69,747 USDT into his digital wallet." *Id*. ¶ 253. On April 5, scammers withdrew all of the USDT in his wallet. *Id*. ¶ 254. "Through investigation on the public blockchain website etherscan.io, Zhai has been able to verify that a substantial portion of his stolen assets were laundered through the Binance exchange." *Id*. ¶ 256.

E. <u>Defendants' Putative Involvement in these Pig Butchering Schemes.</u>

As noted, cryptocurrency is built on public blockchains that can be traced using computer forensics. Unless the scammer can launder the cryptocurrency that they have convinced the victim to invest by converting it into fiat currency, plaintiffs allege, law enforcement will be able to locate and seize the cryptocurrency and return it to the victims. (#36 ¶ 72.) Whether scammers are able to quickly convert cryptocurrency into untraceable and unrecoverable fiat currency, plaintiffs continue, depends on their ability to use cryptocurrency exchanges with substantial liquidity. If unable to use such exchanges, scammers allegedly will find it harder, if not impossible, to cash out the cryptocurrency; instead, the cryptocurrency will be traced and seized by law enforcement. *Id*. ¶ 73.

Moreover, plaintiffs allege, if a cryptocurrency exchange flags transactions as suspicious, freezes the scammers' accounts, and reports the suspicious transactions to FinCEN, then the scammers are prevented from cashing out, and law enforcement can seize the cryptocurrency for return to the victims. *Id*. Yet if a cryptocurrency exchange with substantial liquidity willfully fails to comply with the BSA and instead allows scammers to use the exchange as a laundering facility and cash-out point – "which is what Binance and Zhao, with the assistance of BAM, have admitted to doing" – scammers are not prevented from cashing out, leaving the victims unable to recover. *Id*.

Thus, plaintiffs' primary theory is that defendants were involved in these pig butchering schemes by making it easier for the scammers to launder plaintiffs' cryptocurrency and cash it out. If Binance had registered with FinCEN, it would have been required to comply with the BSA and it would have complied. Had it complied, the scammers that lured plaintiffs to invest would not have been able to launder plaintiffs' cryptocurrency and cash it out. Instead, the scammers' transactions would have been flagged as suspicious by Binance and their accounts would have

been frozen, allowing law enforcement to seize plaintiffs' cryptocurrency so that plaintiffs could recover. *Id*. ¶ 75.

The court considers the support in the Rule 12(b)(6) record for a conclusion that the scammers' transactions in these pig butchering schemes would have been flagged as suspicious by Binance and their accounts would have been frozen and the suspicious transactions reported to FinCEN. First, plaintiffs allege that the transactions had "tell-tale" signs that wallets were being used to launder and cash-out illicit proceeds; those signs were the "pattern of inflows" and "cash-out activities." According to plaintiffs, "any licensed [MTB] making any serious effort to comply with United States [AML] laws… easily would have caught and responded to" these signs. (#36 ¶ 74.)

Yet, notably absent from the complaint are allegations as to threshold or exemplary "pattern of inflows" and "cash-out activities" that would have alerted "any licensed [MTB] making any serious effort," that is, how many deposits or transfers or withdrawals over how much time, and in what amounts.[21] Nor are there specific allegations regarding the "pattern of inflows" and "cash-out activities" on the Binance exchange as to 25 of the 26 pig butchering schemes at issue in this case. Only the scheme involving Licht is arguably described in any meaningful detail. As to the Licht scheme, the specific allegation is that in the span of about sixteen months, the nine Binance accounts received over $40 million USDT through 140 transactions traceable to the two

---

[21] The complaint does allege that between August 2017 and April 2022, "there were direct transfers of approximately $106 million in bitcoin to Binance.com wallets from Hydra, a popular Russian darknet marketplace frequently utilized by criminals that facilitated the sale of illegal goods and services" and that the transfers "occurred over time to a relatively small number of unique addresses, which indicates 'cash out' activity by a repeat Hydra user, such as a vendor selling illicit goods or services." (#36 ¶ 55); *see* #54-7, *Binance* Statement of Facts, ¶ 57. But plaintiffs have not plausibly alleged that "tell-tale" signs for a Hydra transaction would also be "tell-tale" signs for a pig butchering transaction.

LuxKey wallets to which he transferred his USDT, with $34 million USDT transferred in about 11 months. (#36 ¶ 85.) In the absence of allegations regarding flagging and reporting thresholds, or examples of transactions flagged and reported by "any licensed [MTB] making any serious effort," the allegation that even the Licht scheme involved "tell-tale" signs is conclusory and speculative. The court does not credit it.

Moreover, as to 24 of the 26 plaintiffs, the claim regarding the amount of the stolen cryptocurrency laundered through the Binance exchange is the same – a "substantial" or "significant" portion. *See* #36 ¶ 92 (Cai), ¶ 99 (Chang), ¶ 105 (Chen), ¶ 111 (Chow), ¶ 119 (Dong), ¶ 125 (Fennane), ¶ 132 (Francis), ¶ 139 (Gordon), ¶ 144 (Granovski), ¶ 150 (Green), ¶ 156 (Grilli), ¶ 163 (Karabassis), ¶ 170 (Ms. Lau), ¶ 177 (Mr. Lau), ¶ 182 (Lobandi), ¶ 189 (Mollanji), ¶ 199 (Moskwa), ¶ 208 (Nguyen), ¶ 214 (Rothaus), ¶ 228 (Slavant), ¶ 235 (Thrailkill), ¶ 244 (Yao), ¶ 250 (Yeo), ¶ 256 (Zhai).[22] The court would be speculating if it quantified a "substantial" or "significant" portion of any amount of stolen cryptocurrency, let alone the variable amounts involved here. And plaintiffs have not plausibly alleged either that a "substantial" or "significant" portion of the highest amount, $3,718,840 USDT (Grilli, *see id*. ¶ 154) or that a "substantial" or

---

[22] The implication as to these plaintiffs is that some portions were laundered through other cryptocurrency exchanges. Plaintiffs do not allege that the other cryptocurrency exchanges were compliant with United States laws and flagged the scammers' transactions as suspicious and reported them to FinCEN.

"significant" portion of the lowest amount, $52,349.87 USDT (Slavant, *id*. ¶ 227) would have met a threshold for flagging and reporting.[23, 24]

Before Binance and Zhao pled guilty, Binance allegedly "started publicly touting its newfound dedication to legal compliance, including its work with law enforcement to crack down on pig butchering schemes…." (#36 ¶ 76.)[25] On August 23, 2023, plaintiffs continue, Binance issued a "press release" on its website entitled "Binance Reports a 100% Rise in Pig Butchering Scams and Shares Tip to Prevent Them." Binance "touted its ability to use blockchain forensics to 'identify and fight illicit actors in the crypto ecosystem,' to 'prevent criminals from benefitting from their ill-gotten gains,' and to take 'swift action by identifying and restricting the flow of illicit funds through the [Binance] platform.'" *Id*. According to plaintiffs, "Binance stated that its 'proactive investigative and monitoring work' enabled law enforcement to 'recover funds' for

---

[23] The other two plaintiffs are Shaylor and Licht. As to the Shaylor scheme, it may reasonably be inferred that all of the $1.2 million USDT, *see id*. ¶ 219, was laundered through the Binance exchange, *see id*. ¶ 221. Likewise, the complaint implies that as to the Licht, all of the $2.7 million USDT, *see id*. ¶ 80, was laundered through the Binance exchange, *see id*. ¶¶ 84-85. The court need not decide whether it can take judicial notice of Licht's putative admissions in the Texas case as to the number of cryptocurrency exchanges involved. *See supra*. Plaintiffs have not plausibly alleged that the Shaylor and Licht transactions would have met a threshold for flagging and reporting.

[24] The complaint quotes some portions of the government's *Zhao* sentencing memorandum, which is attached to the opposition. *See* #36 ¶¶ 67, 272; *see also* #57-6. The government asserted there that Binance "failed to report 'well over 100,000 suspicious transactions that it processed as a result of its deficient controls.'" (#57-6 at 20 & n.12) (citation to November 21, 2023 Treasury press release omitted). The court does not need to decide whether the government's *Zhao* sentencing memorandum is properly part of the Rule 12(b)(6) record because this statistic adds nothing to the analysis in the absence of the general and specific allegations discussed above.

[25] Before pleading guilty, Binance implemented remedial measures, which were described in the plea agreement as consideration for the government's entry into that agreement. For instance, by May 2022, Binance implemented full KYC requirements for all direct account holders (however, until at least October 2022, it allowed users to trade through "brokers" without submitting any KYC information). *See* #57-4, *Binance* Plea Agreement, ¶ 8f(iv); *see also* #57-5 ¶ 9n.

victims of pig butchering schemes that attempted to utilize the Binance exchange as a laundering facility and cash-out point." *Id*.

After Binance started complying with the BSA, United States law enforcement allegedly saw "a dramatic increase in the success of their efforts to recover cryptocurrency assets stolen from innocent victims by international fraud syndicates." *Id*. ¶ 77. Plaintiffs continue:

> In April 2023, for example, the United States Department of Justice announced that it had seized $112 million in cryptocurrency that one or more criminal syndicates had stolen from victims using pig butchering schemes. Using cryptography and forensic analysis, the Department of Justice and its forensic experts were able to unwind a huge, commingled network of transactions and follow the proceeds of the frauds to cash-out points at cryptocurrency exchanges, enabling the government to seize the proceeds before the criminals were able to cash out. This demonstrates that Binance's flagrant violations of FinCEN registration requirements and United States [AML] laws between 2017 and October 2022 had real-world consequences for everyday people like Plaintiffs, who had fallen prey to pig butchering schemes committed by international crime syndicates.

*Id*.

The complaint does not specifically identify the "cryptocurrency exchanges" referred to in this DOJ "announc[ement]." And neither the "press release" nor the "announc[ement]" are attached to it. The court doubts that these documents are properly part of the 12(b)(6) record. Regardless, the court does not find from Binance's inferential involvement in the DOJ's $112 million seizure, or any other seizure after it started complying with the BSA, that the transactions in the pig butchering schemes at issue in this case would have been flagged as suspicious by Binance and the scammers' accounts would have been frozen and the suspicious transactions reported to FinCEN. This conclusion is merely possible, not plausible.

In the opposition only, plaintiffs rely on a United States Attorney's Office for the District of Massachusetts press release, issued a few weeks before the First Amended Complaint was filed. That press release described the filing of a civil forfeiture action to recover cryptocurrency alleged

to include proceeds of a pig butchering scheme targeting a Massachusetts resident and others, specifically seeking to forfeit assets "seized from 'two accounts located at Binance....'" (#57 at 21) (citing https://www.justice.gov/usao-ma/pr/united-states-files-forfeiture-action-recover-cryptocurrency-traceable-pig-butchering (last visited February 4, 2025)). As there is no argument in the opposition that this press release is properly part of the 12(b)(6) record, the court declines to consider it. *See Douglas*, 63 F.4th at 57-58 (assuming that the abuse of discretion standard applies to the refusal to consider documents extrinsic to the complaint on a Rule 12(b)(6) motion, noting that "[p]recedent emphasizes that the exceptions the plaintiffs seeks to invoke are 'narrow,' and the district court did not abuse its discretion by declining to maneuver the attachments into those exceptions without assistance from the plaintiffs") (citing *Freeman*, 714 F.3d at 37 (treating as waived any argument that a document fit into the narrow exceptions)).[26]

    F. The RICO Claims.

        1. The enterprises.

            a. #1, #2, and #3.

"Enterprise #1" is an alleged association-in-fact enterprise between Binance and BAM, the common purpose of which was to enable Binance to operate an unlicensed, unregistered MTB under the false pretense that Binance.com was not available to United States-based users and that United States-based users would only be allowed to transact on Binance.US, enabling Binance to avoid complying with the BSA's AML provisions. (#36 ¶ 258.) The alleged pattern of racketeering

---

[26] Similarly, on the 12(b)(6) motion, the court does not consider the other article cited in the opposition but not explicitly cited in the complaint. *See* #57 at 20 (citing "Case Study: DOJ and FBI Phoenix Seize $112MM in Proceeds from Crypto-related Scams," available at: https://www.trmlabs.com/case-study/doj-and-fbi-phoenix-crypto-seizure (last visited February 4, 2025)). The court also does not consider the March 16, 2023, letter from Binance's Chief Strategy Officer to United States Senators attached to the opposition, *see* #57-7, on that motion.

activity included violations of 18 U.S.C. § 1960(a), conducting an unlicensed MTB. Plaintiffs further allege that because a violation of § 1960(a) is a predicate under RICO, § 1961(1)(B), every financial transaction that Binance conducted on its exchange was a violation of § 1956(a)(1)(A)(i) by virtue of § 1956(c)(7)(A)'s cross-reference to § 1961(1). (#36 ¶ 264.) "Enterprise #2" is an alleged association-in-fact enterprise between Zhao and the Binance and BAM employees and executives with whom Zhao conspired to violate § 1960(a), the common purpose of which was, *inter alia*, to allow Binance to operate an unlicensed, unregistered MTB. *Id*. ¶ 259. "Enterprise #3" is the so-called "Binance corporate RICO enterprise." *Id*. ¶ 260.

b. #4 and #5.[27]

"Enterprise #4" is an alleged association-in-fact enterprise between Binance, Zhao, and the criminal syndicates that engaged in fraud using Binance as a laundering facility and cash-out point. *Id*. ¶ 261. "Enterprise #5" is an alleged association-in-fact enterprise between the criminal syndicate or syndicates that defrauded plaintiffs. *Id*. ¶ 262. This enterprise allegedly engaged in a pattern of racketeering by using "international wire communications," in violation of 18 U.S.C. § 1343, and then laundering the stolen cryptocurrency through the Binance exchange, in violation of § 1956(a)(1)(A)-(B). (#36 ¶ 289.)

---

[27]  Plaintiffs allege as follows:

> But for Enterprise #4's and Enterprise #5's pattern of racketeering activity, the Plaintiffs would not have [been] targeted and victimized by the pig butchering schemes in the first place. This is because it was the presence of the unlawful Binance exchange and the welcoming 'cake' that it knowingly and purposefully offered to illicit actors that fueled the rise of the pig butchering schemes. At a minimum, however, but for Enterprise #4's and Enterprise #5's pattern of racketeering activity, the Plaintiffs would have been able to recover their stolen cryptocurrency….

(#36 ¶ 271.) The "fueled the rise" allegation is completely devoid of factual support in the complaint, and the court does not credit it.

2. Counts.

Counts One through Four allege substantive RICO claims. Count One, against Binance, BAM, and Zhao under 18 U.S.C. § 1964(c) for violations of § 1962(c), relates to Enterprise #1. (#36 ¶ 274.) Count Two, against Zhao under § 1964(c) for violations of § 1962(c), relates to Enterprise #2. (#36 ¶ 277). Count Three, against Zhao under § 1964(c) for violations of § 1962(c), relates to Enterprise #3. (#36 ¶ 280). Count Four, against Binance and Zhao under § 1964(c) for violations of § 1962(c), relates to Enterprise #4. (#36 ¶ 283).

Counts Five and Six allege RICO conspiracy. Count Five, against BAM under § 1964(c) for violations of § 1962(d), alleges that BAM "conspired with Enterprise #3's pattern of racketeering activity…." (#36 ¶ 286.) Count Six, against Binance and Zhao under § 1964(c) for violations of § 1962(d), alleges that Binance and Zhao "conspired in Enterprise #5's pattern of racketeering activity…." (#36 ¶ 290.)

IV. Motion to Dismiss for the Lack of Personal Jurisdiction.

A. Law.[28]

1. Personal jurisdiction under RICO.

In a federal question case such as this one, the direct constitutional limits on a federal court's exercise of personal jurisdiction over a defendant are set by the Due Process Clause of the Fifth, not Fourteenth, Amendment, which requires only that the defendant have the requisite minimum contacts with the United States, as opposed to the forum state. *United Elec., Radio &*

---

[28] In the opposition to the motion to dismiss, plaintiffs assert personal jurisdiction over BAM under RICO and over Binance and Zhao under RICO and Fed. R. Civ. P. 4(k)(2). *See* #57 at 9-16. To the extent that the complaint can be read to assert personal jurisdiction over defendants under other theories, those theories are waived. *See generally United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

*Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992). However, "the basis for service of process returnable to a particular court must be grounded within a federal statute or Civil Rule." *Id.*

Fed. R. Civ. P. 4(k) sets out the requirements for effectively serving a summons on a defendant in a federal court, thereby establishing personal jurisdiction. *Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 93 (1st Cir. 2022). Rule 4(k)(1) provides, in part, that

> [s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:[29]

>> (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located;

>> … or

>> (C) when authorized by a federal statute.

*Id.*

Even in a federal question case, when a plaintiff relies on Rule 4(k)(1)(A) to establish personal jurisdiction over a defendant, the same long-arm statute plus minimum contacts with the forum state analysis applies that would apply in a diversity case or a case in state court. *See Tassinari v. Salvation Army Nat'l Corp.*, 610 F. Supp. 3d 343, 352 (D. Mass. 2022) (quoting *Nahigian v. Leonard*, 233 F. Supp. 2d 151, 158 (D. Mass. 2002)). Thus, the First Circuit has explained:

> …Rule 4(k)(1)(A) does make the due process standard of the Fourteenth Amendment applicable to federal-question claims in federal court when a plaintiff relies on a state long-arm statute for service of the summons. Rule 4(k)(1)(A) requires looking to state law to determine whether service is effective to confer jurisdiction, and 'because state law is subject to Fourteenth Amendment limitations,

---

[29] The record includes a return of service indicating service on BAM "to Corporation Service Company, 251 Little Falls Drive, Wilmington, DE…the registered service of process agent for BAM…." (#13 at 1.) Binance and Zhao, through Boston-based counsel, executed waivers of service. (##10-11.)

the minimum contacts doctrine, while imposing no direct state-by-state constraint on a federal court in a federal question case, acts indirectly as a governing mechanism for the exercise of personal jurisdiction.'

*Waters*, 23 F.4th at 94 (quoting *United Elec.*, 960 F.2d at 1086).

Massachusetts is the forum state here. Its long-arm statute provides, in part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth;
…

Mass. Gen. Laws c. 223A, § 3. Courts have more recently recognized that this statute is "'not co-extensive with what due process allows,' but contains its own specific (and narrower) statutory requirements." *Ojugbana v. Virgin Atl. Airways, Ltd.*, #24-cv-11334-FDS, 2024 WL 4681751, at *3, n.4 (D. Mass. Nov. 5, 2024) (quoting *SCVNGR, Inc. v. Punchh, Inc.*, 85 N.E.3d 50, 56, n.9 (Mass. 2017)). But arguments regarding differences between the statutory and constitutional requirements may be waived, *see Copia Comm'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 4 (1st Cir. 2016), and, in any event, any differences are immaterial if the constitutional requirements are not met, *see Rosenthal*, 101 F.4th at 95; *Motus*, 23 F.4th at 124.

The Due Process Clause of the Fourteenth Amendment requires that a defendant "'have certain minimum contacts with [Massachusetts] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"" *Rosenthal*, 101 F.4th at 95 (alteration by this court) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting

*Milliken v. Meyer*, 311 U.S. 457, 463 (1940))). This "minimum contacts" standard is flexible and fact-specific. *Id.* A court may properly exercise "general" or "specific" personal jurisdiction over out-of-state defendants. *Id.* For general jurisdiction, the plaintiff must show that the defendant maintains contacts that are "so 'continuous and systematic' as to render [the defendant] essentially at home in" Massachusetts. *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317)). For an individual defendant, the paradigm forum for the exercise of general jurisdiction is his or her domicile. *Goodyear*, 564 U.S. at 924. For a corporate defendant, the paradigm forum for the exercise of general jurisdiction is the state of incorporation or the state in which its principal place of business is located. *Chen*, 956 F.3d at 57.[30]

> For specific jurisdiction, the First Circuit has long applied a three-pronged test:
>
> First, the plaintiff's claim must directly arise from or relate to the defendant's activities in [Massachusetts]. … Second, the defendant's [Massachusetts] contacts must represent a purposeful availment of the privilege of conducting activities in [Massachusetts]. … Third, the exercise of specific jurisdiction in [Massachusetts] must be reasonable under the circumstances.

*Id.* at 59 (alterations by this court) (cleaned up) (citations omitted).

On the relatedness prong, the court "probe[s] the causal nexus between the defendant's contacts and the plaintiff's cause of action." *Vapotherm*, 38 F.4th at 260 (cleaned up) (citation

---

[30] In an "'exceptional'" case, a corporation's business operations in a forum "in which it is neither incorporated nor headquartered 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *Id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 133 n.11 (2014)). The Supreme Court has identified *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), as an example of such an exceptional case. *Chen*, 956 F.3d at 57. There, the Supreme Court concluded that general jurisdiction could be exercised over a defendant corporation in the forum state because war had forced the owner to temporarily relocate the corporation from the Philippines to the forum state, which thereafter served as the nerve center of the corporation's wartime operations. *Id.* (citation omitted).

omitted).[31] More specifically, it asks whether the plaintiff's cause of action "'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Id*. (quoting *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (emphasis omitted) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017))). The Supreme Court in *Ford* "stated that 'a strict causal relationship between the defendant's in-state activity and the litigation' is not necessary, however, it also noted that 'the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum.'" *Id*. at 261 (quoting *Ford*, 592 U.S. at 362). "The cases establish that in-state injury alone is not sufficient under the Due Process Clause to prove relatedness for tort claims." *Id*. (collecting cases); *cf. Ford*, 592 U.S. at 371 (the plaintiff's allegations that "they suffered in-state injury because of defective products that [the company] extensively promoted, sold and serviced in [the forum states]" satisfied the relatedness prong).

On the purposeful availment prong, "'there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within [Massachusetts], thus invoking the benefits and protections of its laws.'" *Rosenthal*, 101 F. 4th at 96 (alteration by this court) (quoting *Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 32 (1st Cir. 2010) (further citation omitted)). Purposeful availment focuses on the defendant's "intentionality;" the two cornerstones are "voluntariness" and "foreseeability." *Id*.; *see Chen*, 956 F.3d at 59. "Voluntariness" requires that the defendant's contacts with Massachusetts result proximately from the defendant's own actions. *Chen*, 956 F.3d at 59. "Foreseeability" means that "the defendant's conduct and connection with [Massachusetts] must be such that he should reasonably anticipate being haled

---

[31] The relatedness test is formulated differently depending on whether a cause of action sounds in tort or contract. *See id*. at 258-259. The tort formulation has been applied to RICO causes of action. *AngioDynamics, Inc. v. Clarion Med. Tech.*, #18-cv-30038-MGM, 2019 WL 10787926, at *8-9 (D. Mass. Sept. 25, 2019).

into court there." *Id*. (alteration by this court) (cleaned up) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (further citation omitted)); *see Rosenthal*, 101 F.4th at 96. "[A] finding of purposeful availment necessarily requires more than the unilateral activities of third parties." *Chen*, 596 F.3d at 59 (citing, *inter alia*, *Plixer*, 905 F.3d at 9).

> A defendant cannot be said to have purposefully availed itself of the benefits of a forum with respect to a given plaintiff when it has neither initiated any in-forum activity involving that plaintiff nor dealt with him knowing that he was located in the forum. … Simply put, jurisdiction cannot be carted from state to state, enabling a plaintiff to sue in any state to which he chooses to roam. …

*Id*. at 61-62 (citations omitted).

Evidence of "'specific targeting'" of Massachusetts residents is not the only means of showing purposeful availment. *Id*. at 59 (quoting *Plixer*, 905 F.3d at 9). "Under appropriate circumstances, a defendant corporation's regular course of sales in [Massachusetts] could make the exercise of jurisdiction foreseeable to the defendant." *Id*. (cleaned up) (quoting *Knox v. MetalForming, Inc*., 914 F.3d 685, 691 (1st Cir. 2019) (further citation omitted)). "And on the right factual record, jurisdiction might be predicated on a showing of 'plus' factors evincing a corporate defendant's deliberate attempt to serve [Massachusetts], that is, factors indicating something over and above the defendant's mere awareness that its products were entering a given market in the stream of commerce." *Id*. at 59-60 (alteration by this court) (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 111-112 (1987) (plurality opinion); *Knox*, 914 F.3d at 691-692)); *see also Rosenthal*, 101 F.4th at 96.

On the reasonableness prong, the court considers "gestalt" factors. They are: (1) the defendant's burden of appearing in Massachusetts, (2) the Commonwealth's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5)

the common interests of all sovereigns in promoting substantive social policies. *Knox*, 914 F.3d at 694. The factors are meant "to aid the court in achieving substantial justice, particularly where the minimum contacts question is very close." *Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc*., 43 F.4th 150, 166 (1st Cir. 2022) (cleaned up) (citation omitted); *see Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) ("…unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness. We think, moreover, that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction").

Alternatively, Fed. R. Civ. P. 4(k)(1)(C), as noted, provides that serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant in a federal court "when authorized by a federal statute." *Id*. RICO's "Venue and process" provision states:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas [sic] issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpena [sic] shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which

such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

Circuits are split as to whether § 1965(b) or § 1965(d) governs the exercise of personal jurisdiction over out-of-district defendants in RICO actions. *See Peters Broadcast Engineering, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 438 (6th Cir. 2022). The minority view, of the Fourth and Eleventh Circuits, holds that § 1965(d) governs service of process over out-of-district defendants, and "'provides for service in any judicial district in which the defendant is found,'" applying a nationwide contacts standard that considers "'a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state.'" *Id.* (quoting *Republic of Pan. v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942, 946-947 (11th Cir. 1997); also discussing *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997)).

The majority view, of the Second, Third, Sixth, Seventh, Ninth, Tenth, and D.C. Circuits, holds that § 1965(b) governs service of process over out-of-district defendants and applies a forum state contacts standard, not the nationwide one. *Peters Broadcast*, 40 F.4th at 438-440 (adopting majority view; discussing *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998); *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105 (3d Cir. 2020); *Lisak v. Mercantile Bancorp Inc.*, 834 F.2d 668 (7th Cir. 1987); *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir. 1986); *Cory v. Aztec Steel Bldg., Inc.*, 468 F.2d 1226 (10th Cir. 2006); *FC Inv.*

*Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 892 (D.C. Cir. 2021)).

> These circuits considered 18 U.S.C. § 1965 in its entirety to hold that the statute 'does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found.' … Rather, because '§ 1965(a) grants personal jurisdiction over an initial defendant…to the district court for the district in which that person resides, has an agent, or transacts his or her affairs,' nationwide jurisdiction hinges on whether at least one defendant has minimum contacts with the forum state.

*Id.* at 439 (first quoting *PT United*, 138 F.3d at 71; then quoting *Laurel Gardens*, 94 F.3d at 117-118). Judges in this district have adopted the majority view. *See Ryan v. Greif, Inc.*, 708 F.Supp.3d 148, 160-161 (D. Mass. 2023), *adopting report and recommendation in part*, #22-cv-40089-MRG, 2023 WL 5979711, at *13-14 (D. Mass. Sept. 1, 2023) (Hennessy, M.J.); *Kalika, LLC v. Boston & Maine Corp.*, #15-cv-14043-GAO, 2019 WL 1276099, at *1 (D. Mass. Mar. 20, 2019), *adopting report and recommendation*, *id.* at *7 (Bowler, M.J.); *World Depot Corp. v. Onofri*, #16-cv-12439-FDS, 2017 WL 6003052, at *5 (D. Mass. Dec. 4, 2017); *Ginsburg v. Dinicola*, #06-cv-11509-RWZ, 2007 WL 1673533, at *4-5 (D. Mass. June 7, 2007).

In the complaint, plaintiffs rely predominately on defendants' alleged nationwide contacts, *see* #36 ¶¶ 39-45, and actually cite a District of Rhode Island case adopting the minority view, *see id.* ¶ 40 (citing *Omni Video Games, Inc. v. Wing Co., Ltd.*, 754 F. Supp. 261, 263 (D. R.I. 1991) (adopting the reasoning of *Bridge v. Invest Am., Inc.*, 748 F. Supp. 948, 949-950 (D.R.I. 1991))); *see also World Depot*, 2017 WL 6003052, at *5 (*Bridge* adopted the reasoning of the Fourth and Eleventh Circuits). In the opposition, plaintiffs cite *PT United*, *supra*, 138 F.3d 65. (#57 at 10.) The Second Circuit, in *PT United*, was the first appellate court "to actually analyze § 1965's full text," and offer reasoning for the majority view. *Peters Broadcast*, 40 F.4th at 439 (quoting *Cory*, 468 F.3d at 1230); *see Laurel Gardens*, 948 F.3d at 117. The court would have recommended

adoption of the majority view regardless,[32] but plaintiffs' abandonment of the minority view cinches the matter.

Relying predominantly on *PT United*, plaintiffs argue in the opposition that § 1965(a) provides for *personal jurisdiction* over BAM because public records show that BAM has a registered "agent" in Massachusetts, *see* #57 at 10-11; *see also* #57-1, and BAM "transacts [its] affairs" in Massachusetts, *see id*. at 11-12.[33] *See* 18 U.S.C. § 1965(a) ("Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs"); *see also PT United*, 138 F.3d at 71 ("First, § 1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs. In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established

---

[32] For instance, the court agrees that

> reading § 1695(d) to allow service upon anyone with 'nationwide contacts' to sufficiently confer jurisdiction would render § 1965(b) superfluous. The forum-state approach ensures that no subsection is redundant: it allows the exercise of jurisdiction over nonresident defendants to the extent due process and 'the ends of justice' require only if there is another defendant with minimum contacts in the forum.

*Peters Broadcast*, 40 F.4th at 440.

[33] For this latter assertion, plaintiffs rely on the Secretary of State documents and submit a print-out from a page on the Binance.US website stating that its services "are available to customers who reside in" Massachusetts, among other states and regions. *See* #57-2 at 1. Plaintiffs also draw the court's attention to the allegations in the complaint that the court has already discounted. (#57 at 11) (citing #36 ¶¶ 42, 45). Plaintiffs assert that "[g]iven that Massachusetts is the sixteenth largest state by population and ranked second by per capital income, it strains credulity for the defendants to suggest that Massachusetts is not a significant market for BAM's digital asset marketplace." *Id*. They provide no citation for these statistics. Anyway, the court disagrees that this "strains credulity."

as to at least one defendant"). The court disagrees that § 1965(a) provides for personal jurisdiction. The Sixth Circuit in *Peters Broadcast* adopted the majority view but "with a few clarifications to ensure meaning is conferred on each subsection of that the statute," including that § 1965(a) "provides for *venue*," as opposed to personal jurisdiction:

> **Because subsection (a) is not jurisdictional, another rule – such as Federal Rule of Civil Procedure 4(k)(1)(A) and the relevant state's long-arm statute – is required to establish personal jurisdiction over an initial defendant**. Then, § 1965(b) extends personal jurisdiction through nationwide service of process over 'other parties residing in any other district,' as long as venue is proper through (a) with that initial defendant and the 'ends of justice' require it. …

40 F.4th at 440 (italics in original; bold supplied);[34] *see id*. at 441 (the "inquiry is whether § 1965, as interpreted above, conferred personal jurisdiction over [the defendants]. This requires at least one defendant with traditional forum state contacts (the defendant described by § 1965(a) **and** reached by Rule 4(k)(1)(A)) such that any number of defendants from other districts may be joined under § 1965(b)") (bold supplied).

The Sixth Circuit's reading of 18 U.S.C. § 1965(a) – as a venue provision, not providing for personal jurisdiction – is consistent with its plain text. The subsection does not refer to service of process and it states that an action "may be instituted," *see id*., language comparable to other venue provisions. *Compare*, *e.g.*, 28 U.S.C. § 1391(b) ("may be brought").

Moreover, defendants have drawn the court's attention to a recent decision of the District of New Jersey declining to issue a preliminary injunction against them for want of personal jurisdiction. (#62); *Gonzalez v. BAM Trading Srvcs., Inc.*, #2:24-cv-08521 (BRM), 2024 WL 4589791 (D. N.J. Oct. 28, 2024). Plaintiffs, in response, emphasize that the *Gonzalez* court did not

---

[34] The court added that § 1965(c) is not jurisdictional and merely describes subpoena procedure and that § 1965(d) is also not jurisdictional. *Peters Broadcast*, 40 F.4th at 441. "Subsection (d) extends to 'other process' that differs from a summons or subpoena, such as notifying a party of an injunction or an order committing a person for civil contempt of a decree." *Id*.

consider whether it could exercise personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2). (#63.) They ignore that the case, at least tacitly, undercuts their argument that this court can exercise personal jurisdiction over BAM (and thus Binance and Zhao) under RICO. In particular, the *Gonzalez* court, bound by *Laurel Gardens*, which adopted the majority view, rejected the plaintiff's *Laurel Gardens* theory, namely, that it could exercise personal jurisdiction over Binance and Zhao if doing so would satisfy the "ends of justice." *Gonzalez*, 2024 WL 4589791, at *4, n.4. That theory "hinge[d]" on finding BAM subject to its personal jurisdiction, and the *Gonzalez* court did not so find, applying the traditional forum state contacts standard. *Id*. at *8. In finding that BAM was not subject to its general jurisdiction, the *Gonzalez* court rejected reliance on BAM's corporate registration and designation of a registered agent in New Jersey. *Id*. at *7. If 18 U.S.C. § 1965(a) provides for personal jurisdiction, as opposed to venue, as plaintiffs here argue, then the fact of BAM's corporate registration and designation of a registered agent in New Jersey would have compelled the *Gonzalez* court to address whether the exercise of personal jurisdiction over Binance and Zhao in New Jersey satisfied the "ends of justice." That court did not address the "ends of justice" issue. Implicitly, and consistent with *Peters Broadcast*'s "clarification," it did not read § 1965(a) to provide for personal jurisdiction. This court likewise does not read § 1965(a) to provide for personal jurisdiction.

## 2. Personal jurisdiction under Fed. R. Civ. P. 4(k)(2).

As noted above, Fed. R. Civ. P. 4(k) sets out the requirements for effectively serving a summons on a defendant in a federal court, thereby establishing personal jurisdiction. Rule 4(k)(2) provides that

> [f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

*Id.*

Rule 4(k)(2) was created to

> …deal with a gap in personal jurisdiction noted by the Supreme Court in *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 111…(1987). Before Rule 4(k)(2) was conceived, federal courts 'borrowed' from state law when a federal statute did not otherwise provide a mechanism for service of process (regardless of the state courts' subject matter jurisdiction). Accordingly, foreign defendants who lacked single-state contacts sufficient to bring them within the reach of a given state's long-arm statute (whether by reason of the paucity of the contacts or of limitations built into the statute itself), but who had enough contacts with the United States as a whole to make personal jurisdiction over them in a United States court constitutional, could evade responsibility for civil violations of federal laws that did not provide specifically for service of process….
>
> To close this loophole, the drafters designed the new Rule 4(k)(2) to function as a species of federal long-arm statute.…

*United States v. Swiss Am. Bank, Ltd*., 191 F.3d 30, 39-40 (1st Cir. 1999) (some citations omitted).

"Rule 4(k)(2) has three requirements: (1) the cause of action must arise under federal law; (2) the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction must comport with due process." *Plixer*, 905 F.3d at 6 (citing *Swiss Am*., 191 F.3d at 38, which articulated the third requirement as follows: "the federal courts' exercise of personal jurisdiction over the defendant

must not offend the Constitution or other federal law"). As to Binance and Zhao, there is no dispute on the first and second requirements,[35] therefore, the court focuses on the third.

Under Rule 4(k)(2) in a federal question case, the due process requirements with which the federal court's exercise of personal jurisdiction must comport are those set by the Fifth, not Fourteenth, Amendment, meaning that the plaintiff must "show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." *Plixer*, 905 F.3d at 6 (cleaned up) (citation omitted). To determine whether the defendant's nationwide contacts are adequate, the court employs "the familiar 'minimum contacts' framework," discussed above. *Id*. at 7. Thus, for specific jurisdiction,

> First, the plaintiff's claim must directly arise from or relate to the defendant's activities in [the United States]. ... Second, the defendant's [United States] contacts must represent a purposeful availment of the privilege of conducting activities in [the United States]. ... Third, the exercise of specific jurisdiction in [the United States] must be reasonable under the circumstances.

*See Chen*, 956 F.3d at 59 (alterations by this court) (cleaned up) (citations omitted); *see also Plixer*, 905 F.3d at 8.

In addition to arguing that the exercise of personal jurisdiction over Binance and Zhao is "inconsistent" with due process, defendants argue that it is "inconsistent" with RICO. (#61 at 11.) Defendants neither elaborate on the latter argument nor cite any case law in support. Assuming it is not waived, the court simply notes that the argument does not appear to find support in either

---

[35] Plaintiffs bring civil RICO causes of action and thus, indisputably, they arise under federal law. *See, e.g.*, *AngioDynamics*, 2019 WL 10787926, at *8. Moreover, plaintiffs' counsel has submitted a certification that Binance and Zhao are not subject to the personal jurisdiction of any state's courts of general jurisdiction. (#57-3 ¶ 5.) Defendants' opening memorandum does not address Rule 4(k)(2), *see* #56 at 18-22, and in reply, Binance and Zhao do not argue, or proffer evidence, that they are subject to the personal jurisdiction of a state's courts of general jurisdiction, *see* #61 at 11 (addressing the third requirement only). *See generally Motus*, 23 F.4th at 127 (burden-shifting framework).

the case law or logic. *See Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940-942 (7th Cir. 2000) (rejecting the defendants' argument that exercising personal jurisdiction under Rule 4(k)(2) would be inconsistent with RICO, which authorizes nationwide, not international, service; Rule 4(k)(1)(D) (now Rule 4(k)(1)(C)) "provides for jurisdiction whenever a statute explicitly authorizes service of process. If establishing personal jurisdiction by serving process was considered inconsistent with a law which is silent on the issue, then Rule 4(k)(2) would not have any effect"); *see, e.g.*, *AngioDynamics*, 2019 WL 10787926, at *2-11 (in RICO action against a Canadian company, noting that RICO provides for nationwide, not international, service yet finding that the court could exercise personal jurisdiction under Rule 4(k)(2)).

  B. <u>Discussion</u>.

    1. <u>The court cannot exercise personal jurisdiction over BAM, and therefore Binance and Zhao, under RICO</u>.

For the reasons explained above, the court rejects plaintiffs' RICO argument as a misreading of that statute, and inconsistent with *Peters Broadcast*, which is well-reasoned and persuasive. 18 U.S.C. § 1965(a) does not provide for personal jurisdiction. Under § 1965(b), the court cannot exercise personal jurisdiction over any defendant unless plaintiffs satisfy the traditional forum state contacts standard as to an initial defendant and, as discussed below, plaintiffs have not satisfied the traditional forum state contacts standard as to the pertinent initial defendant, BAM.[36]

There is no evidence of BAM's physical presence in Massachusetts, such as offices located in or employees working remotely from the Commonwealth. The First Circuit has repeatedly

---

[36] In the complaint, plaintiffs allege general and specific jurisdiction over Binance and Zhao, mainly in the United States but also apparently in Massachusetts. (#36 ¶¶ 40-41, 43-44.) But,

grappled with the argument that virtual presence in Massachusetts proves purposeful availment of the privilege of conducting activities in the Commonwealth, including in *Rosenthal*, *supra*, 101 F.4th 90, affirming Judge Gorton's order dismissing the complaint in *Rosenthal v. Bloomingdale's, Inc.*, 686 F. Supp. 3d 36 (D. Mass. 2023). At the outset, the court notes that this is not a case involving proof that plaintiffs accessed Binance.US while in Massachusetts. To be sure, they have proffered evidence that they could have accessed Binance.US while in Massachusetts (or while in Alabama, Arizona, Arkansas, California, Colorado, Delaware, D.C., Florida Hawaii, Idaho, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Wisconsin, and Wyoming). (#57-2 at 1-2) ("Binance.US services are available to customers who reside in the following states and regions"). But the schemes here involved *the scammers'* use of *Binance.com*. Defendants purportedly intended that at least United States-based VIP users continue to access Binance.com. And BAM's *Binance.US* acted merely as the "smokescreen." *See* #36 ¶¶ 58, 66, 269.

Just two of the 26 plaintiffs, Chow and Lobandi, are Massachusetts residents. *See id*. ¶¶ 10-35. The complaint does not specifically allege that they were in Massachusetts when they were contacted by the scammers; executed the malicious code; or deposited the USDT into their digital

---

plaintiffs now submit the Rule 4(k)(2) certification that Binance and Zhao are not subject to personal jurisdiction in any state's courts of general jurisdiction. (#57-3 ¶ 5.) That would include the Commonwealth's.

wallets. The complaint does not specifically allege that Chow was in Massachusetts when he reached out to Binance. *See* #36, ¶¶ 106-113, 178-182.

Nothing on the print-out from the Binance.US website, *see* #57-2, proves that BAM solicited Massachusetts residents or knowingly profited from them. There is no evidence of television, radio, or online advertisements or other marketing materials, like brochures, that specifically targeted Massachusetts residents. No allegations concern BAM's profits from services provided in Massachusetts.

The fact that BAM registered as a foreign corporation in Massachusetts, designating Boston-based registered agents, *see* #57-1, does not prove that BAM actually solicited Massachusetts residents or knowingly profited from them.[37] A foreign corporation might register in Massachusetts in the hopes of transacting its affairs here, with those hopes ultimately being dashed. Even if the court were inclined to rely on the statistics proffered by plaintiffs in the opposition without citation, *see* #57 at 11 ("the sixteenth largest state by population and ranked second by per capita income"), its recommendation would remain the same. That Massachusetts has a swath of wealthy residents is not proof that any of them accessed Binance.US while in

---

[37] Such a proffer is usually relevant to general jurisdiction although it may also be relevant to purposeful availment. *Grice v. VIM Holdings Grp., LLC*, 280 F. Supp. 3d 258, 277 (D. Mass. 2017); *see also Gonzalez*, 2024 WL 4589791, at *7, n.6. Registering as a foreign corporation in Massachusetts and designating a registered agent here does not, "standing alone," confer general jurisdiction; that conduct merely adds "some modest" weight to the jurisdictional analysis. *Fiske v. Sandvik*, 540 F. Supp. 2d 250, 256 (D. Mass. 2008) (citing *Sandstrom v. ChemLawn, Corp.*, 904 F.2d 83, 89 (1st Cir. 1990)). Plaintiffs do not argue, and the court is aware of no binding or persuasive authority holding, that by registering and designating an agent pursuant to Mass. Gen. Laws c. 156D, § 15.03, *et seq.*, a foreign corporation consents to the exercise of general jurisdiction in Massachusetts. *Compare Simplot India LLC v. Himalaya Food Int'l Ltd.*, #23-1612 (RK) (TJB), 2024 WL 1136791, at *9-10 (D. N.J. Mar. 15, 2024) (no language in relevant New Jersey statutes referenced personal jurisdiction or consent or otherwise put a foreign corporation on notice that compliance with those statutes would subject the corporation to general jurisdiction in New Jersey).

Massachusetts or, more to the point, that BAM actively sought that they access Binance.US, with knowledge they would do so from Massachusetts.

This record of purposeful availment is similar to, if not less substantial than, the record in *Rosenthal*, *supra*, 101 F.4th 90, and that record was held insufficient.[38] The defendant in *Rosenthal*, Bloomingdales, was alleged to be an Ohio limited liability company, with a principal place of business in New York, whose sole member was alleged to be a Delaware corporation, also with a principal place of business in New York. *Id*. at 93. According to Rosenthal, a Massachusetts resident, he regularly visited Bloomingdales' website, including from Massachusetts. *Id*.[39] Bloomingdales used third-party vendors called "session replay providers" ("SRPs") to embed "session replay code" ("SRC") on its website which, without Rosenthal's knowledge, was deployed onto his internet browser when he visited Bloomingdale's website in order to intercept, record, and map his electronic communications with the website. Bloomingdales and the SRPs then used those communications to recreate Rosenthal's virtual visits and to assemble for analysis a video replay of his behavior on the website, allegedly in violation of the Massachusetts Wiretapping Act and the Massachusetts Invasion of Privacy Statute. *Id*. at 93-94.

The First Circuit rejected Rosenthal's argument that Bloomingdales "'cultivated a market in Massachusetts, sought to expand that market through the use of SRC, and benefited from that market.'" *Id*. at 96. "[T]he complaint…merely allege[d] that Bloomingdales commissioned SRPs to deploy SRC in a manner that would be recognized by the internet browsers of users located anywhere in the world (including Massachusetts)." *Id*. at 97; *see id*. at 96-97 (distinguishing *Knox*,

---

[38] Judge Thompson in *Rosenthal* issued a concurring opinion dubitante, given her concern "about where the law is in this area and where it might go…." *Id*. at 98.

[39] Rosenthal did not allege that he visited any of Bloomingdales' stores in Massachusetts. Nor did he prove that he entered his location into the website, from Massachusetts. *See id.* at 98.

914 F.3d at 692-693, which involved "a sixteen-year-long relationship between the defendant and various Massachusetts-based customers, the defendant's practice of individually approving and manufacturing machines according to the in-state customers' specifications, and its maintenance of direct connections with the customers when it came to purchasing replacement parts and obtaining assistance with troubleshooting and repairs"). Rosenthal did not provide affirmative proof that Bloomingdales purposefully deployed SRC to intentionally target users in Massachusetts:

> Although the allegations and evidence that the plaintiff does provide do show that Bloomingdales intentionally targeted the plaintiff when he happened to be in Massachusetts, they do not affirmatively prove that Bloomingdales <u>knew</u> that it was targeting him in Massachusetts.

*Id*. at 97 (emphasis in original) (citing *Motus*, 23 F.4th at 126 (in cases involving websites, foreseeability requires that defendant know "of both the existence of a potential victim and the victim's likely whereabouts")). Moreover,

> [t]he fact that Bloomingdales presumably knew that its website was being accessed by users located in Massachusetts given that it operated a nationally available website is beside the point. What is crucially lacking here is that Bloomingdales had the specific knowledge and intent that it was operating its website and its SRC on the plaintiff's Massachusetts-based browser when it allegedly gave rise to the injuries in the complaint.

*Id*. at 97, n.1 (citing *Plixer*, 905 F.3d at 8 ("[A] website operator does not necessarily purposefully avail itself of the benefits and protections of every state in which its website is accessible")).[40]

This purposeful availment record falls short of the record in *Chen*, *supra*, 956 F.3d 45, which was likewise held insufficient. There, the defendant, "USSA," maintained an online learning platform in Massachusetts, on which Chen completed coursework. *Id*. at 60. The court observed:

> As a general matter, USSA perhaps could have anticipated that Massachusetts residents (like residents of any other state) might enroll in its Distance Learning

---

[40] The First Circuit rejected Rosenthal's reliance on *Plixer*, *supra*, 905 F.3d 1, explaining that

Program and access its online learning platform from the Commonwealth. But this broad and generic degree of foreseeability is insufficient, standing alone, to rise to the level of purposeful availment with respect to Chen's claims. … When all is said and done, Chen has failed to show that USSA deliberately used its online learning platform (or any other component of its online presence) to target him while he was in Massachusetts. Nor is there any evidence that USSA's maintenance of an online learning platform resulted in its knowing receipt of significant tuition dollars from Chen while he was billeted in Massachusetts. Therefore, we cannot say that USSA purposefully availed itself of the privilege of conducting business in Massachusetts simply by virtue of maintaining an interactive online learning platform accessible in Massachusetts and all other states.

*Id.* at 60-61; *see id.* at 61 ("…the record is bereft of any evidence that USSA knew of Chen's whereabouts at the relevant times. There is simply no basis for a reasonable inference, let alone a finding, that USSA knew, prior to Chen's filing of his complaint, that he had accessed the online learning platform from Massachusetts…").

In *Chen*, two other Massachusetts-based students were enrolled in an online course and such contacts might have been relevant to the purposeful availment analysis.

The record, though, [was] utterly devoid of evidence sufficient to ground either a finding that USSA used its online presence to target these two students while they were in Massachusetts or a finding that USSA derived substantial revenue from them. For instance, the record does not reveal how these students' enrollments came about, the duration of their studies, whether they ever conducted their studies from states other than Massachusetts, or the amounts of tuition they paid. The raw fact of USSA's awareness of two Massachusetts-based students — neither of whom was seeking a degree — is insufficient to show that USSA purposefully availed itself of

---

"[t]he sole issue there…was fundamentally different from that in question here:"

The *Plixer* court was asked whether the exercise of specific personal jurisdiction over the foreign defendant in the United States violated the Due Process Clause under Federal Rule of Civil Procedure 4(k)(2). … Inasmuch as the crux of that analysis – which requires a showing that a defendant is not subject to the personal jurisdiction of any state court of general jurisdiction for purposes of Rule 4(k)(2) – is not at issue here, we decline the plaintiff's invitation to treat *Plixer* as guiding precedent for purposes of this case.

101 F.4th at 96.

the benefit of doing business in Massachusetts such that it reasonably could have expected to face suit there by Chen. …

*Id*.

Because a claim of specific jurisdiction over BAM under the traditional forum state contacts standard fails on the purposeful availment prong, the court does not address the relatedness and reasonableness prongs. *Rosenthal*, 101 F.4th at 95 ("All three criteria must be satisfied to establish specific jurisdiction over a particular defendant in a particular state").

Plainly, this record is also insufficient for the exercise of general jurisdiction over BAM in Massachusetts. BAM is a Delaware corporation headquartered in California or Florida. *See* #57-1. Therefore, Massachusetts is not the paradigm forum.

For purposes of exercising general jurisdiction over BAM in Massachusetts, this is not an exceptional case. Registration as a foreign corporation in Massachusetts is not exceptional. Neither is the mere accessibility of services to Massachusetts residents (along with the residents of 37 other state and regions). *See* #57-2. *See*, *e.g.*, *Chen*, 956 F.3d at 57-58 ("…the mere whiff of a virtual presence will not suffice. Here, it is true that USSA maintains an informational website, accessible in Massachusetts, that advertises USSA's educational offerings to prospective students. It is equally true that USSA has an interactive online learning platform that is accessible in Massachusetts and that two Massachusetts-based students were enrolled. … But nothing in the record would support a finding that these contacts with Massachusetts, whether viewed singly or in the aggregate, constitute a pattern of general business operations so unusually substantial as to render USSA 'essentially at home' in the Commonwealth") (footnotes omitted).

Plaintiffs have not met their burden as to BAM under the traditional forum state contacts standard. Accordingly, the court need not address whether the exercise of personal jurisdiction over Binance and Zhao in Massachusetts satisfies the "ends of justice," or otherwise complies with

RICO. *Peters Broadcast*, 40 F.4th at 442 ("Absent jurisdiction over one defendant pursuant to 18 U.S.C. § 1965(a) and Rule 4(k)(1)(A), no jurisdiction exists under § 1965(b)").

2. The court can exercise personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2).[41, 42]

In the complaint, as noted, plaintiffs allege both general and specific jurisdiction over Binance and Zhao in the United States. (#36 ¶¶ 40-41, 43-44.) They now argue specific, not general, jurisdiction. (#57 at 15-16.) Following plaintiffs' lead and because, under Rule 4(k)(2)'s nationwide contacts standard, the question is not close, the court will address specific jurisdiction only.

The record of Binance and Zhao's contacts with the United States is ample. Binance employed 100 people based in the United States and used United States-based servers. (#36 ¶ 40.) In the criminal case, Binance agreed to the forfeiture of the proceeds of conducting an unlicensed MTB from at least August 2017 to at least October 2022 – $1.6 billion in fees for transactions involving United States-based users. (#57-4, *Binance* Plea Agreement, ¶ 16.)

Given the importance of United States-based users to Binance's growth and revenue, *see* #57-4, *Binance* Statement of Facts, ¶¶ 18, 27; *see also* #57-5 ¶ 9f, Binance and Zhao's intent was to allow at least the United States-based VIP users to continue to access Binance.com, with BAM's

---

[41] For purposes of Rule 4(k)(2), the pertinent defendants are Binance and Zhao. The parties agree that the court cannot exercise personal jurisdiction over BAM under Rule 4(k)(2). *See* #57 at 12-16 (limiting argument); *see also* #57-3 ¶ 5 (limiting certification); *see also* #61 at 11, n.5. Moreover, as noted above, as to Binance and Zhao, only one of the 4(k)(2) requirements is in dispute – the third.

[42] The court is aware, *see* #57 at 16, that the District of Columbia recently found that, for purposes of Securities and Exchange Act causes of action and consistent with the Fifth Amendment, it could properly exercise specific jurisdiction over Zhao. *SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 65-70 (D. D.C. June 28, 2024). This court's recommendation is necessarily based on the record here, however, not the record there.

Binance.US acting as the smokescreen. Binance and Zhao approved the diversionary strategy, which they knew would include and, it may be reasonably inferred, did include "offline" contacts with United States-based VIP users. (#57-4, *Binance* Statement of Facts, ¶¶ 34, 38-40, 42-45.) They created and helped launch Binance.US, *see id*. ¶ 36, and BAM is a Delaware corporation which has had principal places of business in California and Florida, *see* #57-1. After Binance.US went live, in October 2020, "UNKWN," that is, United States-based users, still represented 17% of Binance's registered user base. (#57-4, *Binance* Statement of Facts, ¶¶ 30, 47.)

On the purposeful availment prong, this record is even more compelling than the record in *Plixer*, *supra*, 905 F.3d 1, which the First Circuit thought presented a "close" question but still held sufficient. *Id*. at 10. There, the defendant, Scrutinizer, was a German company whose online software analysis tools were available through its website internationally, and in over three-and-a-half years, were actually used by 156 United States-based customers, yielding €165,212.07 in revenue, or just under $200,000. *Id*. 4-5. The First Circuit did not know what percentage that was of Scrutinizer's total revenue, yet concluded that the company could have reasonably anticipated the exercise of specific personal jurisdiction; its "regular flow or regular course of sales" in the United States showed that it purposefully availed itself of the privilege of conducting activities within the United States. *Id*. at 10-11. $200,000 is a fraction of the $1.6 billion in fees here.

On the relatedness prong, the court emphasizes that a strict causal relationship between Binance and Zhao's United States contacts and plaintiffs' RICO claims is not necessary. Those contacts, in the court's view, are sufficiently related to the litigation to afford Binance and Zhao adequate protection. *See Vapotherm*, 38 F.4th at 260 (quoting *Ford*, 592 U.S. at 362). Notably, Binance and Zhao have not actually mounted any defense on the relatedness prong, erroneously

arguing that even under Rule 4(k)(2), their contacts with Massachusetts matter, and asserting that plaintiffs' allegedly "cursory" claim of purposeful availment "is insufficient." (#61 at 11.)

Binance and Zhao bear the burden of proving unreasonableness, *see Plixer*, 905 F.3d at 12, and they do not address the gestalt factors, *see* #61. Neither do plaintiffs, *see* #57. The court addresses them briefly. "Subjecting a defendant to a foreign legal system poses 'unique burdens' that carry 'significant weight in assessing the reasonableness' of jurisdiction." *Plixer*, 905 F.3d at 12 (quoting *Asahi*, 480 U.S. at 114). However, Binance and Zhao did "substantial" and "recurrent" business in the United States; "[a]s such [they] cannot wholly expect to escape the reach of United States courts." *Id*. (cleaned up) (citation omitted). Thus, although the first factor may point in defendants' favor, it is "somewhat diminished." *Id*. The United States has an interest in adjudicating this RICO action. Plaintiffs have an interest in obtaining effective relief in the United States. Finally, "[e]ven if the last two factors weighed against jurisdiction, this alone would be insufficient to tip the constitutional balance on the facts presented here." *Id*. at 12-13 (cleaned up) (citation omitted).

C. <u>Recommendation</u>.

The court recommends that the Rule 12(b)(2) motion be allowed as to BAM but denied as to Binance and Zhao. As to BAM, under 12(b)(2), dismissal of Count One in part and Count Five must be without prejudice. *See Rodríguez-Rivera*, 43 F.4th at 162.

V. <u>Motion to Dismiss for the Failure to State Plausible Claims</u>.[43]

Binance and Zhao (and BAM) also seek dismissal of the complaint because, they argue, plaintiffs fail to adequately plead (1) causation, *see* #56 at 22-32; (2) the existence of any

---

[43] For the reasons explained below, the claims against BAM would also be subject to dismissal under Rule 12(b)(6).

enterprise, *see id*. at 32-37; and (3) domestic injury, *see id*. at 37-39. They seek dismissal of (4) Counts One through Three because plaintiffs fail to plead a proper predicate, *see id*. at 39-41; (5) Count One because plaintiffs fail to adequately plead BAM's operation of Binance, *see id*. at 41-42; and (6) Counts Five and Six because plaintiffs fail to adequately plead a conspiracy, *see id*. at 42-43. The court need not, and does not, address all of these arguments. It agrees with the first and third.

A. <u>Law</u>.

1. <u>Causation</u>.

18 U.S.C. § 1962(c), a criminal RICO provision, makes it unlawful for any person "employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…." *Id*. The elements of this substantive RICO offense are "'(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity.'" *United States v. Velazquez-Fontanez*, 6 F.4th 205, 212 (1st Cir. 2021) (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)).

"Enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This definition is "obviously broad," encompassing "*any*..,group of individuals associated in fact…and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (emphasis in original) (citations omitted). "In addition, the RICO statute provides that its terms are to be 'liberally construed to effect its remedial purposes.'" *Id*. (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). Accordingly, the Supreme Court has "explained…that 'an enterprise includes any union or group of individuals associated in fact'

and that RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.'... Such an enterprise... 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Id.* at 944-945 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)).

"Racketeering activity" includes "any act which is indictable under" specified statutes, including 18 U.S.C. § 1343 (wire fraud); § 1956 (money laundering);[44] and § 1960 (unlicensed MTB).[45] 18 U.S.C. § 1961(1)(B). A "pattern of racketeering activity" requires "at least two acts

---

[44] This statute provides, in part, that

(a)(1) [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. ...

18 U.S.C. § 1956(a)(1)(A)-(B).

[45] This statute provides that "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both." 18 U.S.C. § 1960(a). Unlicensed" MTB means one that "affects interstate or foreign commerce in any manner or degree and –

(A) is operated without an appropriate money transmitting license in a State where

of racketeering activity…the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The two predicate acts need not be different types of predicate acts. *United States v. Rodríguez-Torres*, 939 F.3d 16, 29 (1st Cir. 2019) (citing, *inter alia*, *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 444-448 (1st Cir. 1990) (multiple acts of mail fraud can constitute a pattern of racketeering activity if they "'are related, *and*…they amount to or pose a threat of continued criminal activity'") (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (emphasis in original))).

18 U.S.C. § 1962(d), another criminal RICO provision, makes it unlawful for any person to conspire to violate, *inter alia*, § 1962(c). *Id*. To prove a RICO conspiracy, "the government must show that 'the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators "to further [the] endeavor which, if completed, would satisfy all the elements of a substantive [RICO] offense."'" *Velazquez-Fontanez*, 6 F.4th at 212 (quoting *Rodríguez-Torres*, 939 F.3d at 23 (quoting *Salinas*, 522 U.S. at 65); *see Douglas*, 63 F.4th at 55. The government is not required to prove that "each conspirator 'knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator.'" *Rodríguez-Torres*, 939 F.3d at 26, n.5

---

such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity[.]

*Id*. § 1960(b)(1).

(quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994), *abrogated on other grounds*, *Velazquez-Fontanez*, 6 F.4th at 213, n.2). Nor is the government required to prove that a defendant committed or even agreed to commit two or more racketeering acts; "[r]ather, 'the government's burden…is to prove that the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy.'" *Velazquez-Fontanez*, 6 F.4th at 213 (first citing *Salinas*, 522 U.S. at 65; then quoting *United States v. Millán-Machuca*, 991 F.3d 7, 18 (1st Cir. 2021) (further citations omitted)).

> 18 U.S.C. § 1964(c), the relevant civil RICO provision, states that
>
> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…

*Id.* The plaintiff "must allege 'a violation of section 1962…' and an injury 'by reason of' that violation…." *Humana Inc. v. Biogen, Inc.*, --- F.4th ---, 2025 WL 227530, at *4, n.4 (1st Cir. Jan. 17, 2025) (one alteration omitted). "A violation of section 1962" refers to "'*the conduct constituting the violation*;'" "[t]he RICO Act provides no cause of action to individuals injured by acts other than criminal RICO violations." *Nodine v. Textron, Inc.*, 819 F.2d 347, 348 (1st Cir. 1987) (emphasis in original) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); also citing *Haroco v. Am. Nat'l Bank and Tr. Co.*, 747 F.2d 384, 398 (7th Cir. 1984) ("[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct"), *aff'd*, 473 U.S. 606 (1985)).

"Three Supreme Court cases interpret 'by reason of' to require that a plaintiff in a civil RICO action show that the defendant's actions were 'not only…a "but for" cause of [the plaintiff's] injury, but…the proximate cause as well.'" *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35 (1st Cir. 2021) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268

(1992); also citing *Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (plurality opinion); *Anza Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008).

The "but for" cause (also, "factual cause" or "cause-in-fact") and "proximate" cause questions are distinct. *See In re Neurontin Mktg. & Sales Prac. Litig.*, 712 F.3d 21, 34 (1st Cir. 2013) ("*Kaiser*"). "The typical question asked in determining cause-in-fact is counterfactual: would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged?" *RWB Srvcs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008); *see General Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 558-559 (6th Cir. 2022) ("Factual cause is established 'whenever a particular outcome would not have happened "but-for" the purported cause'") (quoting *Bostock v. Clayton Cty.*, 590 U.S. 644, 656 (2020)); *see also Kaiser*, 712 F.3d at 34 (framing the "but-for" causation question as whether, absent Pfizer's fraudulent marketing campaign allegedly causing Kaiser to pay for more off-label prescriptions, Kaiser would have paid for fewer off-label prescriptions); *see also*, *e.g.*, *In re Celexa and Lexapro Mktg. & Sales Prac. Litig.*, 915 F.3d 1, 12-13 (1st Cir. 2019) (evidence raised a triable issue "as to whether Forest's off-label marketing caused Painters to pay for a prescription for which it would not have otherwise paid"). In civil RICO actions, the slightly more nuanced question is whether the claimed injury would have still happened had the defendant not engaged in "the entire 'violation of section 1962.'" *RWB*, 539 F.3d at 687 (citation omitted).

Proximate cause is a "flexible concept that does not lend itself to '"a black-letter rule that will dictate the result in every case,"'" *see Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 272, n.20 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 536 (1983))), yet "[t]he 'central question'…in the RICO context 'is whether the alleged violation led

directly to the plaintiff's injuries,'" *see Sterling*, 990 F.3d at 35 (quoting *Anza*, 547 U.S. at 461).

"…[P]roximate cause…requires 'some direct relation between the injury asserted and the injurious conduct alleged.' … A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi*, 559 U.S. at 9 (quoting *Holmes*, 503 U.S. at 271). "This requirement reflects '[t]he general tendency of the law, in regard to damages at least,...not to go beyond the first step.'" *Sterling*, 990 F.3d at 35 (quoting *Hemi*, 559 U.S. at 10) (quoting *Holmes*, 503 U.S. at 271-272)).[46]

The First Circuit "has identified…'three functional factors with which to assess whether proximate cause exists under RICO.'" *Id.* (quoting *Kaiser*, 712 F.3d at 35-36 (citing *Holmes*, 503 U.S. at 269-270)). "These are (1) 'concerns about proof because 'the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the

---

[46] The plurality opinion in *Hemi* rejected the argument, in dissent, that the proximate cause requirement "turn[s] on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm:" "Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability." *Hemi*, 559 U.S. at 12; *see id.* at 14 ("*Bridge* reaffirmed the requirement that there must be 'a sufficiently direct relationship…'") (quoting *Bridge*, 553 U.S. at 657). In *Kaiser*, the First Circuit (Lynch, J.) found that *Hemi* did not compel a finding that the evidence at trial of proximate causation was insufficient, noting that it did not produce a majority on the proximate cause question and was distinguishable from *Kaiser*, and raised a policy problem not presented there. *Kaiser*, 712 F.3d at 38, n.12. Relying on *Bridge*, the court observed that Kaiser's injury (paying for the off-label prescriptions) was "a foreseeable and natural consequence of" Pfizer's scheme (fraudulent marketing campaign). *Kaiser*, 712 F.3d at 37. More recently, in *Sterling*, the First Circuit (Lynch, J.) applied the "*Hemi* analysis," finding allegations of proximate causation insufficient, without mentioning the concept of foreseeability. *Sterling*, 990 F.3d at 36-37. Courts of Appeals have recognized that "foreseeability and intention have little to no import for RICO's proximate cause test." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018) (applying *Hemi* analysis); *see Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (the focus is on "'the *directness of the relationship* between the conduct and the harm,'" not "on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was 'the *intended* consequence[] of [that] behavior'") (emphasis in original) (quoting *Hemi*, 559 U.S. at 12 (further citation omitted)); *see also General Motors*, 44 F.4th at 561, n.7 ("…foreseeability may be necessary, but it is not sufficient"); *Kaiser*, 712 F.3d at 34 ("…foreseeability is needed for, but does not end the inquiry as to, proximate causation").

violation, as distinct from other, independent, factors.'…(2) 'concerns about administrability and the avoidance of multiple recoveries,'…and (3) 'the societal interest in deterring illegal conduct and whether that interest would be served in a particular case'…." *Id.* at 35-36 (quoting *Kaiser*, 712 F.3d at 36) (further citations omitted)); *see Holmes*, 503 U.S. at 269-270; *see also Roe v. Healey*, 78 F.4th 11, 27 (1st Cir. 2023). On the third factor, "directly injured victims can generally be counted on to vindicate the law without any of the problems attendant upon suits by plaintiffs injured more remotely." *Roe*, 78 F.4th at 27 (cleaned up) (quoting *Sterling*, 990 F.3d at 35-36). "[B]oth the directness concern and the three functional factors are part of the proximate cause inquiry. Indeed, the [Supreme] Court warned that its 'use of the term "direct" should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns' of justice and administrability." *Kaiser*, 712 F.3d at 36 (first citing *Holmes*, 503 U.S. at 271-274, then quoting *id*. at 272, n.20).

2. Domestic injury.

In *RJR Nabsico, Inc. v. European Community*, 579 U.S. 325 (2016), the Supreme Court held that 18 U.S.C. § 1964(c) "requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." *RJR Nabisco*, 579 U.S. at 354; *see id*. at 346. In *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), the Court, affirming the Ninth Circuit's judgment, rejected a bright-line test based on residency like that applied by the Seventh Circuit, in favor of a context-specific test like that applied by the Ninth, Second, and Third Circuits, as more consistent with *RJR Nabisco*.[47] *Yegiazaryan*, 599 U.S. at 540-541 (quoting

---

[47] In *RJR Nabisco* itself, which involved substantive and RICO conspiracy claims, the plaintiffs had stipulated to the dismissal of damages claims for domestic injury and their remaining claims rested entirely on foreign injury, so the Court did not have to define "domestic injury." The Court reversed the Second Circuit's judgment, which had reversed the district court's order dismissing the RICO claims as impermissibly extraterritorial. 579 at 333-334, 354.

*Smagin v. Yegiazaryan*, 37 F.4th 562, 568 (9th Cir. 2022) (citing *Armada (Sing.) PTE Ltd. v. Amcol Int'l Corp*., 885 F.3d 1090 (7th Cir. 2018))); *see id.* at 544; *see also Bascuñán v. Elsaca*, 874 F.3d 806, 809 (2d Cir. 2017);[48] *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 696 (3d Cir. 2018).

The Court explained:

> …[I]n the context of RICO, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. … So understood, § 1964(c)'s focus is on the injury, not in isolation, but as the product of racketeering activity. Thus, in assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury. If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury.

*Yegiazaryan*, 599 U.S. at 544-545 (cleaned up) (citation omitted).

In the case before it, the Court "look[ed] to the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Id*. at 544 (footnote omitted);[49] *but see id*. at 545 ("…depending on the allegations, what is relevant in one

---

[48] The Second Circuit in *Bascuñán* drew a distinction between tangible and intangible property, *see* 874 F.3d at 820-821, but the Supreme Court did not, and *Yegiazaryan* has been interpreted to "apply uniformly." *Global Master Int'l Grp., Inc. v. Esmond Natural, Inc*., 76 F.4th 1266, 1273-1274 (9th Cir. 2023). *Yegiazaryan*'s context-specific test has also been applied notwithstanding that the plaintiff is United States-based, unlike the plaintiff in *Yegiazaryan* itself, who lived in Russia. *See*, *e.g.*, *Ghebreyesus v. Fed. Democratic Rep. of Ethiopia*, #2:22-cv-01717-RFB-EJY, 2023 WL 6392611, at *6 (D. Nev. Sept. 30, 2023); *cf. United States ex rel. Hawkins v. ManTech Int'l Corp*., #15-cv-2105 (ABJ), 2023 WL 12004444, at *24 (D. D.C. June 20, 2023) (in a case decided two days before *Yegiarzaryan* issued, the court found the allegations of domestic injury to be insufficient notwithstanding that the defendants were United States-based corporations and all five plaintiffs were United States citizens and four lived here; plaintiffs were hired to provide services in Kuwait, they provided services in Kuwait, and the alleged "unpaid wage" theft occurred in Kuwait).

[49] In the omitted footnote, the Court explicitly tied the consideration of "the racketeering activity that directly caused" the plaintiff's injury to the proximate cause analysis, discussed above. *Id*. at 544, n.3.

case to assessing where the injury arose may not be pertinent in another"). It found the allegations of domestic injury sufficient, summarizing: "[The plaintiff's] interests in his California judgment against [the defendant], a California resident, were directly injured by racketeering activity either taken in California or directed from California, with the aim and effect of subverting [the plaintiff's] rights to execute on that judgment in California." *Id*. at 546.

B. <u>Discussion</u>.

1. <u>Count One in part and Counts Two, Three, and Four</u>.[50]

To start, the court is not persuaded by plaintiffs' repeated refrain that causation is typically a question of fact for the jury or best addressed at the summary judgment stage. (#57 at 19, 22.) Courts routinely evaluate the sufficiency of allegations of causation in civil RICO actions at the motion to dismiss stage, sometimes finding them insufficient. *See Hemi*, 559 U.S. at 5, 7-8, 18; *Anza*, 547 U.S. at 453, 455-456, 462; *Roe*, 78 F.4th at 19, 26-28; *General Motors*, 44 F.4th at 551, 558-565; *Sterling*, 990 F.3d at 33, 35-37; *see also Boston Cab Dispatch, Inc. v. Uber Technologies, Inc*., #13-cv-10769-NMG, 2015 WL 314131, at *7-8 (D. Mass. Jan. 26, 2015) (dismissing the 18 U.S.C. § 1962(b) and (c) claims while allowing the § 1962(a) claim, for which "[t]he frame of reference for the proximate cause analysis…differs," to proceed); *see generally Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) ("Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly…. For these reasons, it would be unjust if a RICO plaintiff could defeat a motion to dismiss simply by asserting an inequity attributable to a

---

[50] The court assumes that defendants' causation-based challenge does not implicate Count Six. *See* #57 at 22, 30. If plaintiffs' theory of causation for either of the conspiracy counts were the same as its theory of causation for the substantive counts, then the conspiracy counts would fail, as well. *See*, *e.g.*, *Empire Merchants*, 902 F.3d at 147.

defendant's conduct and tacking on the self-serving conclusion that the conduct amounted to racketeering"), *abrogated on other grounds by Velazquez-Fontanez*, 6 F.4th at 213, n.2.

The court discussed one factual gap in plaintiffs' causal progression above, namely, the absence of non-conclusory, non-speculative allegations in support of a plausible conclusion that the scammers' transactions in these pig butchering schemes would have been flagged as suspicious by Binance and their accounts would have been frozen and the suspicious transactions reported to FinCEN. *See* Part.III.E *supra*. In the opposition, plaintiffs do not persuasively plug that gap by citation to non-conclusory, non-speculative allegations, *see* #57 at 19-22, and so have failed to adequately plead but-for causation. *Compare General Motors*, 44 F.4th at 561-562 (as to a theory that the defendant bribed union officials in order to give the defendant labor advantages and to deny the plaintiff similar labor advantages, the plaintiff failed to plead but-for causation, given the absence of allegations that the plaintiff would have received the advantages absent the bribes or that it was entitled to the advantages that the defendant received); *see Singh v. Illusory Sys., Inc.*, 727 F. Supp. 3d 500, 506-507, 509 (D. Del. 2024) (the plaintiffs' cryptocurrency was stolen by non-parties that exploited a coding error in a cross-blockchain bridge and the plaintiffs brought a civil RICO action against the developers, among others, alleging predicate acts of conducting an unlicensed MTB and wire fraud; the court rejected the plaintiffs' reliance on specific licensing and compliance requirements as unpled and because, regardless, the theory speculated as to what government actors may or may not have required of the defendants had they been licensed); *contrast Ryan*, 708 F. Supp. 3d at 164 (in finding that it was plausible that the state regulators would have intervened earlier to prevent the harm to the plaintiff, relying on the allegation that the regulators had previously intervened). At any rate, plaintiffs have also failed to adequately plead proximate causation.

Plaintiffs do not appear to be arguing that compared to the United States, they are in a better position to sue in relation to the operation of Binance as an unlicensed, unregistered MTB.[51] The United States was the more immediate victim of the operation of Binance as an unlicensed, unregistered MTB, a scheme which purportedly used BAM's Binance.US as a smokescreen to divert United States regulatory and law enforcement attention from Binance.com. Furthermore, criminal convictions and sentences, including jail time for Zhao, accompanied by steep financial penalties, including fines and a forfeiture order in the billions for Binance, surely serve the societal interest in deterring illegal conduct. Regardless, the Supreme Court has eschewed rigid application of a black-letter rule, and has found allegations insufficient in the absence of one of the concerns of justice and administrability. *Anza*, 547 U.S. at 459 (no risk of multiple recoveries); *see General Motors*, 44 F.4th at 559 (recognizing that *Anza* rested on only two of three factors); *but see Crimson Galeria Ltd. Partner. v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 39 (D. Mass. 2018) (denying motion to dismiss, with leave to renew; the second and third factors counseled in favor of finding proximate causation, but the directness concern and first factor did not). Here, the directness concern and concerns about proof squarely counsel in favor of dismissal.

In *Anza*, the plaintiffs sued a competitor for failing to charge requisite sales tax, purportedly allowing the competitor to lower its prices and causing lost sales for the plaintiffs. The cause of

---

[51] Rather, plaintiffs appear to be arguing that compared to the United States, they are in the better position to sue in relation to money laundering. *See* #57 at 25 ("Where stolen cryptocurrency is laundered on a cryptocurrency exchange (*i.e.*, converted into fiat currency that can never be tranced and thus never be recovered), the primary victims are the person from whom the cryptocurrency was stolen. Those victims' injuries are the natural and foreseeable consequence **of the money laundering**. And the defendants operated Binance as an illegal [MTB] **for the purpose of facilitating *that* money laundering** (Counts One, Two Three, as well as the Count Five conspiracy count), **engaging in that money laundering** (Count Four)…") (italics in original; bold supplied). Defendants, it must be noted, dispute that plaintiffs plausibly allege money laundering as a predicate act. *See* #56 at 40; *see also* #61 at 13, n.6, 15, 23-24.

Case 1:24-cv-10447-NMG    Document 71    Filed 02/05/25    Page 76 of 83

the plaintiffs' injury, the Supreme Court found, was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Anza*, 547 U.S. at 458. It was important to the Court that the competitor "could have lowered its prices for any number of reasons unconnected to the asserted pattern:"

> It may have received a cash inflow from some other source or concluded that the additional sales would justify a small profit margin. Its lowering of prices in no sense required it to defraud the state tax authority. Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts.

*Id*. at 458-459. Further, the plaintiffs'

> lost sales would have resulted from factors other than [the competitor's] alleged acts of fraud. Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiffs'] lost sales were the product of [the competitor's] decreased prices.

*Id*. at 459.

Much the same can be said here. The cause of plaintiffs' injury was a set of actions (pig butchering schemes) entirely distinct from the operation of Binance as an unlicensed, unregistered MTB (defrauding the United States), and even entirely distinct from putative money laundering. That Binance and Zhao, allegedly with the assistance of BAM, failed to comply with United States laws and, therefore, Binance.com offered a more convenient "cash out" point did not mean that the scammers necessarily would target plaintiffs, and plaintiffs' inability to recover the stolen cryptocurrency because it was converted to fiat currency may have resulted from other, independent factors. *Cf. Empire Merchants*, 902 F.3d at 142 ("…just like in *Anza*, '[t]he cause of [Empire's] asserted harms…is a set of actions [(not buying Empire liquor)] entirely distinct from the alleged RICO violations ([smuggling liquor into New York]).' … Perhaps the smuggling operation led New York retailers to purchase less liquor from Empire, but the decisions of these

various retailers not to purchase Empire's liquor were not themselves acts of racketeering. … Empire's theory of causation thus requires us to 'go beyond the first step' in the causal chain") (some citations omitted) (first quoting *Anza*, 547 U.S. at 458; then quoting *Hemi*, 559 U.S. at 10); *compare Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 772-774 (9th Cir. 2002) (in a case decided before *Anza* and *Hemi*, the court affirmed the district court's order dismissing the complaint where the defendant-bank's employee's alleged money laundering lacked any "'direct relationship'" to defendant's injury, namely, stolen semiconductors; the proximate cause of the defendant's injury was not the money laundering, but the theft by the armed robbers) (quoting *Holmes*, 503 U.S. at 269).[52]

In *Hemi*, New York City sued an out-of-state cigarette vendor for failing to file required customer information with the State, allegedly causing the City to lose tax revenue. 559 U.S. at 4-5. This causal progression was based "not just on separate *actions*, but separate actions carried out by separate *parties*:"

> The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to file the Jenkins Act reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi.

---

[52] The court assumes without deciding that plaintiffs plausibly allege money laundering as a predicate act. It can adopt similar reasoning and recommend dismissal. Plaintiffs argue that *Oki* is inapposite because, there, the money laundering occurred after the sales of the semiconductors, *see* 298 F.3d at 771, 774, whereas here, the money laundering transactions "were the sales," so to speak. (#57 at 29-30.) The court agrees with defendants, *see* #61 at 17, that the salient fact is that the money laundering occurred after the theft. No allegations here suggest that the scammers laundered the cryptocurrency and cashed it out in order to show plaintiffs that their investments were increasing in value and to convince them to purchase more cryptocurrency. Thus, plaintiffs' injury, that is, the stolen cryptocurrency, lacks the requisite "direct relationship" to the alleged money laundering.

*Id.* at 11 (emphasis in original). As to the operation of Binance as an unlicensed, unregistered MTB, the attenuation here is similar: Binance and Zhao's fraud on the third party – the United States – purportedly made it easier for a fourth party – the scammers – to cause harm to the plaintiffs, the pig butchering scheme victims. Indeed, the fourth-party scammers here only caused harm to the pig butchering scheme victims if they decided to engage in wire fraud. Binance and Zhao's obligation was to register with FinCEN, not the pig butchering scheme victims, and the victims' harm was directly caused by the scammers, not Binance and Zhao (or BAM).

Regarding difficulties in ascertaining the amount of plaintiffs' damages attributable to Binance's operation as an unlicensed, unregistered MTB and putative money laundering, consider the Licht scheme. Plaintiffs do not allege that Licht transferred the USDT to Binance wallets. Rather, that USDT went from the supposed "LuxKey" wallets then to "intermediary" ones and finally to the nine Binance accounts. (#36 ¶¶ 80, 84.) Was the intermediary cryptocurrency exchange complying with United States law? If not, how much did that non-compliance contribute to Licht's alleged damages?[53] Plaintiffs do not explain how Binance's non-compliance with United States laws or putative money laundering would have contributed to the intermediary cryptocurrency exchange's non-compliance. Thus, the chain of causation "had to pass through the independent actions of at least [one] independent part[y] – [the intermediary cryptocurrency exchange]." *General Motors*, 44 F.4th at 563 (as to a theory that the bribe led to increased labor costs, the chain "had to pass through the independent actions of at least two independent parties – the [defendant's] and [plaintiff's] workforces. … And that gives rise to difficulties in assessing

---

[53] If the intermediary cryptocurrency exchange was complying with United States law and the USDT nevertheless was transferred, that only weakens plaintiffs' already speculative claim of but-for causation.

and apportioning fault, concerns central to the [Supreme] Court's decisions in *Anza* and *Holmes*")
(alterations by this court); *contrast In re Ranbaxy Generic Drug Application Antitrust Litig.*, #19-md-02878-NMG, 2019 WL 6341298, at *10-11 (D. Mass. Nov. 27, 2019) (the United States Food
and Drug Administration's regulatory activity was not an independent factor where, the court
determined in "*Meijer I*," the defendant's scheme affected the pace of the activity); *see* "*Meijer I*,"
#15-cv-11828-NMG, #52, at 37 ("On these facts, the FDA's pace was certainly affected by
Ranbaxy's obfuscation, and the delay was a natural and foreseeable consequence. The FDA could
not review the TA any sooner, because Ranbaxy had hidden the relevant information....") (D.
Mass. June 16, 2016) (Kelley, M.J.), *report and recommendation adopted*, #15-cv-11828-NMG,
#80 (D. Mass. Sept. 7, 2016); *contrast also Kaiser*, 712 F.3d at 39 (exercise of medical judgment
was not an independent factor where Pfizer's fraudulent marketing campaign relied on the
expectation that doctors would base their prescribing decision in part on that marketing).[54]

To the extent that plaintiffs are arguing that *Kaiser* is on par with this case (as opposed to
merely providing the "roadmap" for the proximate cause analysis, *see* #57 at 25), it is not. There,

---

[54] The complaint does not describe the other pig butchering schemes in meaningful detail, but if
other cryptocurrency exchanges were involved before a "substantial" or "significant" portion of
the USDT was laundered through the Binance exchange, then those schemes present the same
difficulties in ascertaining the amount of plaintiffs' damages attributable to Binance's operation as
an unlicensed, unregistered MTB and putative money laundering. To be clear, the court is not
convinced there is a risk of multiple recoveries because most plaintiffs do not, or cannot, allege
that all the stolen cryptocurrency was laundered through the Binance exchange or because some
plaintiffs are pursuing claims related to these pig butchering schemes against other defendants. *See*
#61 at 16. The *Holmes* Court was concerned with "apportioning damages among plaintiffs
removed at different levels of injury from the violative acts." 503 U.S. at 269. This record presents
another possibility – that Binance will pay damages to the same plaintiffs, not plaintiffs removed
at different levels of injury, that should be paid by other defendants. Yet, the court agrees with
defendants, *see* #56 at 29-30, that plaintiffs' failure, or inability, to allege that all of the stolen
cryptocurrency was laundered through the Binance exchange is relevant to the directness concern
and first factor.

the plaintiff, which paid for the off-label prescriptions, was the immediate victim of the defendant's fraudulent marketing campaign. *Kaiser*, 712 F.3d at 37-38. Here, plaintiffs were the immediate victim of the scammers' pig butchering schemes, and the scammers are not defendants.

In *Bridge*, which plaintiffs do clearly argue is on par with this case, *see* #57 at 26, there was no more immediate victim than the plaintiffs, the losing bidders at a county auction during which the defendants allegedly violated a one-bidder rule by using shadow bidders. *Bridge*, 553 U.S. at 642-644. The county received the same revenue regardless of who won the bids. *Hemi*, 559 U.S. at 14-15. But, unlike in *Anza*, *Hemi*, and here, in *Bridge*, "there [were] no independent factors that account[ed] for [the plaintiffs'] injury." *Bridge*, 553 U.S. at 658.

Because plaintiffs have failed to plausibly allege causation, the court recommends dismissal of Count One in part, Count Two, Count Three, and Count Four.

    2. <u>Count Six</u>.

Count Six alleges a conspiracy between Binance and Zhao and Enterprise #5, *see* #36 ¶ 290,[55] that is, the criminal syndicates that defrauded plaintiffs, engaging in a pattern of racketeering activity by using "international wire communications," in violation of 18 U.S.C. § 1343, and then laundering the stolen cryptocurrency assets, *see* #36 ¶¶ 262, 289. Plaintiffs imply that like the Cambodian syndicate that victimized Licht, *see id.* ¶¶ 83-84, the syndicates (or syndicate) that victimized the other 26 plaintiffs are (is) "international," *see id.* ¶ 77.

Six plaintiffs are foreign citizens living abroad, *see* #36 ¶ 16 (Fennane), ¶ 19 (Granovski),

---

[55] Actually, it alleges that Binance and Zhao "conspired in Enterprise #5's pattern of racketeering activity." (#36 ¶ 290; *see id.* ¶ 262); *see also id.* ¶ 286 (Count Five). Defendants argue that a conspiracy is an agreement between a co-conspirator and other co-conspirators, not an agreement between a co-conspirator and conduct. (#56 at 42-43); *see also* #61 at 25-26. In response, plaintiffs accuse defendants of "playing 'grammar police.'" (#57 at 41.)

¶ 23 (Ms. Lau), 24 (Mr. Lau), ¶ 26 (Mollanji), ¶ 34 (Yeo), while 20 are United States or foreign citizens living here, *see id*. ¶ 10 (Licht), ¶ 11 (Cai), ¶ 13 (Chang), ¶ 12 (Chen), ¶ 14 (Chow), ¶ 15 (Dong), ¶ 17 (Francis), ¶ 18 (Gordon), ¶ 20 (Green), ¶ 21 (Grilli), ¶ 22 (Karabassis), ¶ 25 (Lobandi), ¶ 27 (Moskwa), ¶ 28 (Nguyen), ¶ 29 (Rothaus), ¶ 30 (Shaylor), ¶ 31 (Slavant), ¶ 32 (Thrailkill), ¶ 33 (Yao), ¶ 35 (Zhai).

The court agrees with defendants that plaintiffs have failed to adequately allege domestic injury. As to the six foreign citizens living abroad, the question is not close. These foreign plaintiffs assert that the reasonable inference from the complaint is that their cryptocurrency was in the United States when it was stolen because they used Coinbase, "a publicly-traded U.S. company." (#57 at 37); *see* #36 ¶ 80 (USDT generally trades at a constant market rate of $1 per coin on the regulated cryptocurrency exchanges Coinbase.com and Crypto.com). As defendants note, *see* #61 at 23, n.16, the foreign plaintiffs cite nothing for this assertion. The court is not inclined to do counsel's work and does not find that it is reasonable to infer that the foreign plaintiffs' cryptocurrency was in the United States when it was stolen because Coinbase is a publicly-traded U.S. company. Nor do the foreign plaintiffs plausibly allege that they had reason to expect that United States law would protect their cryptocurrency. They claim to be the victims of "international wire communications" by one or more "international" syndicates, and presumably expected to enjoy their anticipated profits abroad. *Compare Percival Partners, Ltd. v. Nduom*, 99 F.4th 696, 698, 702-704 (4th Cir. 2024) (affirming the district court's order dismissing the complaint where the plaintiffs were Ghanaian investors who placed their funds with a Ghanian firm and expected them to be distributed as microloans within the African continent and then returned to them in Ghana, before they were stolen from the Ghanian firm by the defendants, members of a Ghanian family domiciled in the United States; the funds only made their way to

United States-based bank accounts and shell companies through the unilateral, laundering conduct of the defendants, so plaintiffs had no reason to expect that United States law would protect them).

The domestic plaintiffs present a closer question, but the recommended result is the same. The racketeering conduct that directly caused their injuries was "international wire communications" by one or more "international" syndicates, and these scammers presumably meant to enjoy their illicit proceeds abroad. The domestic plaintiffs do not allege that information identifying them as United States-based was available on the internet, such that the court might reasonably infer that the "international" syndicates were targeting United States-based victims.

As discussed above, there is an insufficiently direct relationship between the stolen cryptocurrency and putative money laundering. *See* Part V.B.1 *supra*. Binance is a Cayman Island corporation, and there is no claim that the stolen cryptocurrency made its way to the United States. Nor is there any well-pled allegation that the stolen cryptocurrency originated in the United States.

Finally, the domestic plaintiffs allege that they live here, not specifically where they felt the effects of the "international wire communications" by the "international" syndicate(s), and the *Yegiazaryan* Court rejected the defendant's bright-line test that economic injuries are necessarily felt where one lives. 599 U.S. at 543-544, 548.

C. Recommendation.

The court recommends that the Rule 12(b)(6) motion be allowed as to Binance and Zhao. This dismissal, of Count One in part and Counts Two, Three, Four, and Six, should be without prejudice. Defendants sought dismissal with prejudice only in their reply. *See* ##55 at 2, 56 at 43, 61 at 26. Further, plaintiffs may be able to cure the deficiencies discussed above.

Just as the court need not consider arguments made for the first time in reply, *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 23, n.6 (1st Cir. 2021) (citing

*United States v. Tosi*, 897 F.3d 12, 15 (1st Cir. 2018)), it need not grant an informal request for leave to amend, which plaintiffs have made here, *see* #57 at 41 & n.12; *see also State Teachers Retirement Sys. of Ohio v. Charles River Laboratories Int'l, Inc.*, #23-cv-11132-DJC, 2024 WL 3258293, at *17 (D. Mass. July 1, 2024) (collecting cases), *appeal pending*, # 24-1705.

VI. <u>Summary</u>.

The complaint should be dismissed in its entirety, without prejudice.

VII. <u>Review by the District Judge</u>.

Any party who objects to this Report and Recommendation must, pursuant to Fed. R. Civ. P. 72(b), file specific written objections with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation. The objections must specifically identify the portion of this Report and Recommendation to which objections are made and state the basis for such objections. The failure to comply with Rule 72(b) will preclude further appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *see also Henley Drilling Co. v. McGee*, 36 F.3d 143, 150 (1st Cir. 1994).


February 5, 2025                                          /s/ M. Page Kelley
                                                         M. Page Kelley
                                                         United States Magistrate Judge