# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LEONARD LICHT, ZHENGJUN CAI,
HENRY CHEN, DANIEL CHANG,
DOMINIC CHOW, CHENGGUO DONG,
IHAB W. FRANCIS, JOHN GORDON,
DALTON GREEN, MICHAEL GRILLI,
IRAKLIS KARABASSIS, TREVOR LAU,
NADER LOBANDI, JAMES MOSKWA,
ANH NGUYEN, BRIAN ROTHAUS,
GORDON SHAYLOR, RICHARD
SLAVANT, NATHANIAL THRAILKILL,
JACK YAO, and JUN ZHAI,

      Plaintiffs,

v.

BINANCE HOLDINGS LIMITED, d/b/a
BINANCE.COM, BAM TRADING
SERVICES, INC., d/b/a BINANCE.US, and
CHANGPENG ZHAO,

      Defendants.

No. 24-cv-10447-PMK-NMG

## PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Aaron M. Katz
Keira Zirngibl
Patrick Dolan
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com
kzirngibl@aaronkatzlaw.com
pdolan@aaronkatzlaw.com

Eric Rosen
Constantine P. Economides
Lance Aduba
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 0211
(617) 802-9157
erosen@dynamisllp.com
ceconomides@dynamisllp.com
laduba@dynamisllp.com

## **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES…………………………………………………………...ii

INTRODUCTION……………………………………………………………………...1

BACKGROUND………………………………………………………………………3

APPLICABLE LEGAL STANDARD…………………………………………………7

ARGUMENT…………………………………………………………………………...8

     I.     The Law of the Case Doctrine Precludes Binance's and Zhao's
           Pleadings-Stage Challenge to Personal Jurisdiction………………………………9

     II.    The Defendants' Causation Challenge Misconstrues the Law of
           Aiding and Abetting, As Well as Conspiracy Principles………………………...10

     III.   The Defendants' Argument That the Plaintiffs Lack "Domestic Injury"
           Is Foreclosed Both by the Court's Ruling on the FAC and by Supreme
           Court Precedent………………………………………………………………..13

     IV.   The SAC Adequately Alleges Aiding and Abetting Liability (Counts Two
           through Four) and Conspiracy Liability (Count Six)…………………………….15

     V.    The Court Can Swiftly Reject the Defendants' "Enterprise" Arguments………..19

CONCLUSION………………………………………………………………………..20

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Aetna Cas. Sur. Co. v. P&B Autobody*,
    43 F.3d 1546 (1st Cir. 1994)……………………………………………………*passim*

*Boyle v. United States*,
    556 U.S. 938 (2009)…………………………………………………………...20

*Busic v. United States*,
    446 U.S. 398 (1980)…………………………………………………………...12

*Central Bank of Denver v. First Interstate Bank of Denver*,
    511 U.S. 164 (1994) …………………………………………………………15, 16

*Davis v. Dawson, Inc.*,
    15 F. Supp. 2d 64 (D. Mass. 1998) …………………………………………………1

*Jaguar Cars v. Royal Oaks Motor Car Co.*,
    46 F.3d 258 (3d Cir. 1995) ………………………………………….………...2, 12

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) …………………………………………………...…12

*Marrero-Rolon v. Autoridad*,
    No. 15-cv-1167, 2015 U.S. Dist. LEXIS 134211 (D.P.R. Sept. 28, 2015)………………16

*Medical Marijuana, Inc. v. Horn*,
    2025 U.S. LEXIS 1369 (U.S. Sup. Ct. Apr. 2, 2025)…………………………………3, 15

*Miranda v. Ponce Fed. Bank*,
    948 F.2d 41 (1st Cir. 1991)……………………………………………………………13

*Monsor v. JPMorgan Chase Bank, N.A.*,
    183 F. Supp. 3d 250 (D. Mass. 2016)…………………………………………………..8, 16

*Norceide v. Cambridge Health Alliance*,
    No. 10-cv-11729, 2014 U.S. Dist. LEXIS 22806 (D. Mass. Feb. 24, 2014)………………1

*O'Brien v. Lowell Gen. Hosp.*,
    749 F. Supp. 3d 209 (D. Mass. 2024)……………………………………………1,8

*Oki Semiconductor v. Wells Fargo*,
    298 F.3d 768 (9th Cir. 2022) …………………………………………………………11

Page(s)

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Forest Labs., Inc.*,
65 F. Supp. 3d 283 (D. Mass. 2014) ………………………………………………………7

*Raanan v. Binance Holdings Ltd. et al.*,
No. 24-cv-697, 2025 U.S. Dist. LEXIS 33874 (S.D.N.Y. Feb. 25, 2025)……………*passim*

*Rosemond v. United States*,
572 U.S. 65 (2014) …………………………………………………………………13

*SEC v. Wilcox*,
663 F. Supp. 3d 146 (D. Mass. 2023) …………………………………………………16

*Trustees of Boston Univ. v. ASM Communs., Inc.*,
33 F. Supp. 2d 66 (D. Mass. 1998) …………………………………………………2, 12

*United States v. Abbas*,
100 F.4th 267 (1st Cir. 2024) …………………………………………………...4

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) …………………………………………………4, 15

*United States v. Garcia-Rosa*,
876 F.2d 209 (1st Cir. 1989) …………………………………………………16-17

*United States v. Lasseque*,
806 F.3d 618 (1st Cir. 2015) …………………………………………………5

*United States v. Riccobene*,
709 F.2d 214 (3d Cir. 1983) …………………………………………………...19

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) …………………………………………………17

*United States v. Vigneau*,
337 F.3d 62 (1st Cir. 2003) …………………………………………………..8

*Urman v. Novelos Therapeutics, Inc.*,
867 F. Supp. 2d 190 (D. Mass. 2012) …………………………………………………8

*Williams v. Mohawk Indus.*,
465 F.3d 1277 (11th Cir. 2006)…………………………………………………...20

*Yegiazaryan v. Smagin*,
599 U.S. 533 (2023) …………………………………………………*passim*

**Statutes**                                                                                                          **Page(s)**

15 U.S.C. § 78j (Section 10, Securities and Exchange Act)………………………………...16

18 U.S.C. § 2………………………………………………………………………………..12

18 U.S.C. § 1343………………………………………………………………………….4, 10

18 U.S.C. § 1956………………………………………………………………………………10

18 U.S.C. § 1962………………………………………………………………………………10

31 U.S.C. §  5318…………………………………………………………………………….6

31 U.S.C. § 5322…………………………………………………………………………….6

## <u>INTRODUCTION</u>

The defendants' motion to dismiss the Second Amended Complaint ("SAC") largely seeks to relitigate issues that the Court already resolved in the plaintiffs' favor.  The defendants simply ignore "the well-established law of the case doctrine," which "forecloses the Court from reopening consideration of legal conclusions that were reached in an earlier stage of litigation, absent reversal of those conclusions by an appellate court."[1]  *O'Brien v. Lowell Gen. Hosp.*, 749 F. Supp. 3d 209, 213 (D. Mass. 2024) (Gorton, J.); *see also Norceide v. Cambridge Health Alliance*, No. 10-cv-11729, 2014 U.S. Dist. LEXIS 22806, at *13 (D. Mass. Feb. 24, 2014) (Gorton, J.) (holding that "dissatisfaction" with an earlier ruling is not a basis to disregard the law of the case doctrine).

The Court determined that the First Amended Complaint ("FAC") pled facts sufficient to allow the Court to exercise personal jurisdiction over defendants Binance Holdings Limited ("Binance") and Changpeng Zhao ("Zhao").  *See* Report and Recommendation, ECF No. 71, at 62 ("The court can exercise personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2)); Order, ECF No. 77, at 1 (order adopting the Report and Recommendation in its entirety).  The SAC pleads jurisdictional facts that are identical to the jurisdictional facts pled in the FAC.  The Court's prior ruling is therefore law of the case that completely resolves the personal jurisdictional issues.[2]

---

[1] Because the Court's prior decision *granted* the defendants' motion to dismiss the FAC (albeit not on every ground the defendants argued), the Court's prior decision is not  a mere "interlocutory order" to which the law of the case doctrine might not apply.  *See Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 117 (D. Mass. 1998) (stating that an order *denying* a motion to dismiss is not subject to the law of the case doctrine).  In any event, even if the defendants' recycled arguments were held to the more lenient standard applicable to a motion for reconsideration, they would not satisfy that standard either.

[2] The SAC contains no new material facts relevant to personal jurisdiction over the domestic defendant BAM Trading Services, Inc. ("BAM").  The plaintiffs acknowledge that the claims against BAM, which the SAC names as a defendant solely for appellate preservation purposes, will be dismissed for lack of personal jurisdiction.  The plaintiffs also acknowledge that Count One of the SAC is due to be dismissed under the law of the case doctrine; it too was included solely to preserve all appellate rights.

Moreover, the Court's prior ruling identified the specific pleading deficiencies in the FAC that the plaintiffs would need to fix to proceed to discovery. The SAC fixes those deficiencies. The only question for the Court is whether the SAC's fixes are adequate to state a plausible claim for relief under Federal Rule of Civil Procedure 8. The answer is yes.

**First**, with respect to the substantive RICO counts against Binance and Zhao, the SAC clearly fixes the causation-related deficiencies the Court identified. The SAC presents a straightforward causal chain between the relevant racketeering acts and the plaintiffs' injuries. The SAC specifically pleads that Binance and Zhao aided and abetted the pig butchering syndicates' wire frauds and money laundering, RICO predicate acts that obviously were but-for and proximate causes of the plaintiffs' financial injuries. The SAC's factual allegations, which either recite the admissions that Binance and Zhao made in their criminal pleas or are reasonable inferences drawn from those admissions, plausibly demonstrate Binance's and Zhao's aiding and abetting. *Cf. Raanan v. Binance Holdings Ltd. et al.*, No. 24-cv-697, 2025 U.S. Dist. LEXIS 33874, at *57-69 (S.D.N.Y. Feb. 25, 2025) (holding that the plaintiffs' complaint plausibly alleged that Binance and Zhao aided and abetted terrorist organizations that were using the Binance.com exchange to launder money used to finance their activities). The case law is clear that, when a RICO defendant aided and abetted a third party's wire fraud and money laundering, the RICO defendant is deemed to have committed those racketeering acts in his own right. *See, e.g.*, *Jaguar Cars v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 270 (3d Cir. 1995); *Trustees of Boston Univ. v. ASM Communs., Inc.*, 33 F. Supp. 2d 66, 72 n.6 (D. Mass. 1998) ("The First Circuit has held that predicate acts under RICO can include aiding and abetting mail or wire fraud." (citing *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1560 (1st Cir. 1994))). The SAC's aiding and abetting theory thus establishes a clear and direct link between the racketeering activity imputed to Binance and Zhao

as aiders and abettors (*i.e.*, the pig butchering syndicates' wire frauds and money laundering) and the plaintiffs' financial injuries.

**Second**, the SAC alleges specific, discrete facts showing that the pig butchering syndicates knew that the plaintiffs were U.S. residents and, therefore, that the syndicates knew they were making false and fraudulent representations to U.S. residents to steal the money that those residents maintained in the U.S. (*i.e.*, targeting U.S. residents). These are the exact allegations that the Court indicated the plaintiffs would need to add to establish domestic injury under the Supreme Court's decision in *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023). *See* Report and Recommendation, ECF No. 71, at 82 (requiring the plaintiffs to plead facts from which "the court might reasonably infer that the 'international' syndicates were targeting U.S.-based victims"); Order, ECF No. 77, at 1 (adopting the Report and Recommendation in its entirety). The Supreme Court's decision earlier this month in *Medical Marijuana, Inc. v. Horn* confirms that *Yegiazaryan*'s "contextual approach" requires a court to "survey[ ] the 'injurious effects' of the defendant's conduct and pinpoint[ ] where they 'largely manifested.'" 2025 U.S. LEXIS 1369, at *17 (U.S. Sup. Ct. Apr. 2, 2025)). Here, the "injurious effects" of the pig butchering schemes "manifested" *exclusively* in the U.S. That is game, set, match for the plaintiffs on the "domestic injury" issue.

For years, Binance and Zhao managed to evade responsibility to the true victims of their criminal conduct—the innocent fraud victims such as the plaintiffs. The jig is now up. The Court should deny Binance's and Zhao's motion to dismiss and allow the case to proceed to discovery.

## BACKGROUND

The twenty plaintiffs in the SAC are victims of "pig butchering" schemes. A pig butchering scheme involves a scammer using a fake identity to befriend a victim online (typically through a social media platform such as Facebook or WhatsApp) and then, using a well-choreographed series

of false and fraudulent representations regarding cryptocurrency investments, stealing valuable cryptocurrency assets from the victim.  Pig butchering schemes are perpetrated by scammers who work in well-structured groups (referred to herein as "syndicates") and commit their wire frauds over and over again, against hundreds if not thousands of victims, in a rinse-and-repeat fashion. *See, e.g.*, Operation Level-Up: How the FBI Is Saving Victims from Cryptocurrency Investment Fraud (Feb. 13, 2025) ("These scammers are professionals—this is their job, and there are highly skilled and experienced in it.").[3]  Though the scammers may have been physically located overseas, their wire frauds are deemed to have "occurred" in the United States, because that is where their false and fraudulent electronic communications to the plaintiffs were directed and received.  *United States v. Elbaz*, 52 F.4th 593, 604 (4th Cir. 2022) ("So venue is proper where wire fraud 'occurred,' including where each wire transmission was sent and where it was ultimately received [by the victim]."); *see also United States v. Abbas*, 100 F.4th 267, 282 (1st Cir. 2024) (same).

The plaintiffs are lawful U.S. residents (either citizens or green card holders) who resided in the U.S. at all relevant times.  In classic fashion, pig butchering syndicates stole millions of dollars of cryptocurrency assets—specifically, digital tokens called USDT (commonly referred to as "Tether")—from the plaintiffs through false and fraudulent wire communications, in clear violation of 18 U.S.C. § 1343.  The plaintiffs' U.S. residency was conspicuously disclosed on the social media platforms that the pig butchering syndicates used to identify and communicate with the plaintiffs, such that the scammers knew they were targeting U.S. residents.  The assets the pig butchering syndicates stole from the plaintiffs through false and fraudulent electronic

---

[3]    *Available at* https://www.fbi.gov/news/stories/operation-level-up-how-the-fbi-is-saving-victims-fromcryptocurrency-investment-fraud.

communications were assets that the plaintiffs had maintained in the U.S. at all relevant times. *See* Second Am. Compl., ¶¶ 10-29, 44, 56, 107-258.

The final step in any pig butchering scheme's theft of a victim's cryptocurrency assets is to launder those stolen assets on a centralized cryptocurrency exchange. The laundering involves exchanging (*i.e.*, selling) the stolen cryptocurrency assets for untraceable fiat currency that is unrecoverable by law enforcement. This final step is absolutely essential to the successful completion of the fraud scheme—as essential as a getaway driver is to a bank robber. *See, e.g.*, *United States v. Lasseque*, 806 F.3d 618, 623 (1st Cir. 2015) ("It is well settled that a getaway driver aids and abets a robbery. A bank robbery would hardly be effectively if one could not successfully abscond with the fruits of the crime." (internal citation omitted)). This is because, but for the laundering, law enforcement would be able to trace and seize the stolen cryptocurrency assets, return those assets to the victim, and thereby deprive the syndicate of the fruits of its wire fraud. *See, e.g., id.*, ¶¶ 4, 52, 58, 62-64, 79, 277. This is proven by federal law enforcement's successful seizure of stolen cryptocurrency assets that pig butchering syndicates have been unable to launder. *See* Press Release, U.S. Attorney's Office for the District of Massachusetts (March 13, 2024) (announcing law enforcement seizure of over $2 million in stolen cryptocurrency that remained unlaundered in "two accounts located at Binance, a cryptocurrency exchange and custodian");[4] *see also* Second Am. Compl., ¶ 79 (describing law enforcement's seizure in April 2023 of $112 million in stolen cryptocurrency that scammers were unable to launder due to the compliance efforts of the cryptocurrency exchanges).

---

[4]    *Available    at    https://www.justice.gov/usao-ma/pr/united-states-files-forfeiture-action-recover-cryptocurrency-traceable-pig-butchering*

Because pig butchering syndicates are engaged in high-volume fraud, their successful laundering of stolen cryptocurrency assets requires the use of a highly liquid centralized cryptocurrency exchange.  This where Binance and Zhao came in.  The pig butchering syndicates that defrauded the plaintiffs laundered the stolen cryptocurrency assets on the Binance.com exchange.[5] This did not result from serendipity or accident.  To the contrary, Binance, at the direction of Zhao, purposefully strove to be as hospitable as possible to criminal enterprises that needed a cryptocurrency exchange to launder their criminal proceeds, including pig butchering syndicates.  By welcoming those criminal enterprises to the Binance.com exchange with open arms, Binance and Zhao substantially assisted those criminal enterprises' racketeering activities.

Binance flouted U.S. anti-money laundering requirements with impunity, in flagrant violation of 31 U.S.C. § 5318(h) and 31 U.S.C. § 5322.  To conceal those anti-money laundering violations from U.S. regulators and U.S. law enforcement, Binance falsely represented— consistently, systematically, and willfully—that the Binance.com exchange was not available to U.S.-based customers and therefore not subject to U.S. anti-money laundering requirements.  *See, e.g.*, Second Am. Compl., ¶ 2 (noting Binance's and Zhao's criminal pleas).  This helped to ensure that the Binance.com exchange would remain available to criminal enterprises without interference from U.S. regulators and U.S. law enforcement.  At the specific instruction of Zhao, Binance even purposefully created "loopholes" in its account-opening process to enable customers to open Binance.com trading accounts without providing proof of identity.  *Id.*, ¶ 105(d).

By allowing pig butchering syndicates to use the Binance.com exchange to launder cryptocurrency that had been obtained through wire fraud, Binance and Zhao substantially assisted

---

[5] The SAC clarifies that the scammers *did not* launder the stolen cryptocurrency assets on any centralized exchange prior to laundering those assets on the Binance.com exchange.  *See, e.g.*, Second Am. Compl., ¶¶ 57-58, 63, 67-74.  The plaintiffs apologize to the Court that the FAC was not clear on this point.

those pig butchering syndicates' racketeering activity that injured victims such as the plaintiffs. The pig butchering syndicates needed a highly liquid, centralized cryptocurrency exchange to successfully complete their fraud schemes, and Binance and Zhao knowingly and willingly provided it. This enabled the pig butchering syndicates to complete their fraud schemes with more success and with greater frequency, which in turn provided Binance greater transaction fee revenue from the syndicates' increasingly frequent and substantial laundering transactions. *See, e.g.*, *id.*, ¶¶ 4, 7. Binance knew what it was doing. A member of Binance's so-called "compliance department" stated that Binance should hang "a banner" telling criminal enterprises to "come to binance[,] we got cake for you." *Id.*, ¶¶ 90, 101. Another senior Binance executive stated: "Like come on. They are here for crime . . . . [W]e see the bad, but we close 2 eyes." *Id.*, ¶ 105(e). Binance and Zhao had no qualms about this, because it helped make Binance.com the largest centralized cryptocurrency exchange in the world and helped make Zhao one of the richest people on the planet. *See id.*, ¶ 91.

## APPLICABLE LEGAL STANDARDS

### I.    Applicable Pleading Standard

"To survive a motion to dismiss, a [RICO] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Forest Labs., Inc.*, 65 F. Supp. 3d 283, 288 (D. Mass. 2014) (Gorton, J.) (denying motion to dismiss RICO claims). Although Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements apply to the "circumstances constituting fraud," the elements of "intent, knowledge, and other conditions of [the defendant's] mind may be alleged generally." Fed. R. Civ. P. 9(b). This includes whether the defendant possessed the knowledge sufficient to render it liable for aiding and abetting a fraud perpetrated by a third party. *See, e.g.*,

*Monsor v. JPMorgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 264, 271-272 (D. Mass. 2016) (denying motion to dismiss aiding and abetting claim where, although the bank may not have known "the precise details" of the underlying Ponzi scheme that injured the plaintiffs, the complaint allowed for a reasonable inference that a bank employee knew she was helping to facilitate "fraudulent account activity").  Moreover, Rule 9(b)'s heightened pleading requirements do not apply to the element of loss causation; instead, a complaint's allegations of loss causation need only be "plausible."  *Urman v. Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 198 (D. Mass. 2012) (Gorton, J.) (holding that "a plaintiff's loss causation theory must be plausible").

## II.    Law of the Case Doctrine

Because the Court adopted in full Judge Kelley's Report and Recommendation with respect to the FAC—and in doing so rejected the defendants' objections to Judge Kelley's decision—the Report and Recommendation constitutes the law of the case.  "The well-established law of the case doctrine forecloses the Court from reopening consideration of legal conclusions that were reached in an earlier stage of litigation, absent reversal of those conclusions by an appellate court." *O'Brien*, 749 F. Supp. 3d at 213.  The doctrine is a "'prudential principle' that seeks to avoid 'relitigation' of matters" that the court already decided.  *Id.* (quoting *United States v. Vigneau*, 337 F.3d 62, 67-68 (1st Cir. 2003)).  "There are only three narrow exceptions to the law of the case doctrine, which arise in 'exceptional circumstances': 1) where 'controlling legal authority has changed dramatically,' 2) where a party 'proffers significant new evidence' that was 'not earlier obtainable,' or 3) where the Court committed a 'blatant error' in its prior decision that will result in a 'serious injustice.'" *Id.* (quoting *Vigneau*, 337 F.3d at 68).

## **ARGUMENT**

The plaintiffs understand that, based on the law of the case, the claims against BAM (Count

One and Count Five) will be dismissed for lack of personal jurisdiction; the plaintiffs included BAM as a defendant only for appellate preservation purposes. The plaintiffs also agree that, as to Binance and Zhao, Count One is foreclosed by the law of the case; the plaintiffs included Count One in the SAC only for appellate preservation purposes. The plaintiffs therefore focus their arguments below on Counts Two through Four and Count Six.

I.      **The Law of the Case Doctrine Precludes Binance's and Zhao's Pleadings-Stage Challenge to Personal Jurisdiction.**

Binance and Zhao first argue that the Court lacks personal jurisdiction over them, dedicating nearly six pages of their brief to the issue. *See* ECF No. 85, at 8-13. The Court, however, already resolved the personal jurisdiction issue in the plaintiffs' favor by fully endorsing, over the defendants' specific written objections, Judge Kelley's conclusions that (i) the requirements of Federal Rule of Civil Procedure 4(k)(2) are satisfied with respect to Binance and Zhao, and (ii) exercising personal jurisdiction over Binance and Zhao comports with the requirements of due process. *See* Report and Recommendation, ECF No. 71, at 62 (calling the question "not close," because Binance's and Zhao's relevant contacts with the United States were "ample"); Order, ECF No. 77, at 1. The Court's prior resolution of the personal jurisdiction issue is the law of the case. Because the SAC's allegations relevant to personal jurisdiction are identical to the FAC's, the Court can reject Binance's and Zhao's personal jurisdiction challenge on law of the case grounds alone. Notably, Binance and Zhao do not offer any new arguments that the Court has not already considered and rejected, nor do they argue that an exception to the law of the case doctrine applies. Indeed, the defendants do not mention the law of the case doctrine at all.

Even if determined res nova, the Court may exercise personal jurisdiction over Binance and Zhao for the reasons stated in Judge Kelley's decision, *see* ECF No. 71, at 62-64, and the plaintiffs' opposition to the defendants' motion to dismiss the FAC, *see* ECF No. 57, at 6-10.

## II.    The Defendants' Causation Challenge Misconstrues the Law of Aiding and Abetting, as Well as Conspiracy Principles.

The defendants next argue that the SAC fails to plausibly allege a causal connection between the underlying racketeering activity and the plaintiffs' economic injuries.  *See* ECF No. 85, at 14-23.  The defendants spend most of their time knocking down strawmen that do not represent the positions that the plaintiffs are seeking to advance in the SAC.  When it comes time to address the plaintiffs' *actual* positions, the defendants only can muster half-baked, precedent-free arguments that are nonsensical and contrary to the case law, including a recent Southern District of New York decision holding that a civil complaint against Binance and Zhao sufficiently alleged that Binance and Zhao aided and abetted the terrorist activities of Hamas and the Palestine Islamic Jihad.  *See Raanan*, 2025 U.S. Dist. LEXIS 33874, at *57-69.

### A.    Counts Two through Four of the SAC Advance an Aiding and Abetting Theory With a Straightforward Chain of Causation.

As revised in the SAC, Counts Two through Four expressly advance an aiding and abetting theory of RICO liability.  Specifically, Counts Two through Four allege that Zhao and Binance aided and abetted the pig butchering syndicates' underlying crimes against the plaintiffs (*i.e.*, the scammers stealing the plaintiffs' cryptocurrency assets through false and fraudulent electronic communications in violation of 18 U.S.C. § 1343, and laundering of those assets through the Binance.com exchange in violation of 18 U.S.C. § 1956).[6]  Under First Circuit law, this is a valid theory of substantive civil RICO liability under 18 U.S.C. § 1962(c), and the SAC adequately pleads it.  *See infra* at 15-19.

---

[6] The defendants argue in passing that the SAC does not describe any money laundering activity.  *See* ECF No. 85, at 31. The pig butchering syndicates transactions on the Binance.com exchange, however, clearly constitute money laundering in violation of 18 U.S.C. § 1956(a)(1)-(3) and § 1956(h), as the transactions involved the proceeds of an underlying wire fraud.

In the context of aiding and abetting, the only causal link that a plaintiff must show is a link between the principal's criminal acts and the plaintiff's injuries. *See infra* at 11-12. Here, the defendants cannot seriously dispute that the pig butchering syndicates' wire frauds and money laundering transactions were the but-for and proximate cause of the theft of the plaintiffs' cryptocurrency assets. The wire frauds are what allowed the scammers to obtain the plaintiffs' valuable cryptocurrency assets in the first place. And the laundering of the stolen cryptocurrency assets on the Binance.com exchange (*i.e.*, selling the cryptocurrency for untraceable fiat currency) is what enabled the scammers to realize the fruits of their wire frauds, which the SAC fleshes out in considerably greater detail as compared to the FAC.[7] *See, e.g.*, Second Am. Compl., ¶ 60 (discussing why the laundering of the stolen cryptocurrency on a centralized exchange is essential to the successful completion of the fraud scheme). The plaintiffs' injuries, therefore, were not actually complete until the laundering occurred, which materially distinguishes this case from *Oki Semiconductor v. Wells Fargo*, 298 F.3d 768 (9th Cir. 2022). In *Oki*, the money laundering in which the Wells Fargo employee participated occurred *after* the plaintiff's property was stolen "*and* sold" by the armed robbers. *Id.* at 774 (emphasis added). Thus, in *Oki*, the plaintiff's injuries were completely realized *before* the laundering occurred. Moreover, in *Oki* the laundering transactions were the deposits of the cash that the armed robbers realized from their sales of the plaintiff's stolen property. *Id.* Here, by contrast, the pig butchering syndicates' laundering transactions **were the sales** of the cryptocurrency assets that they stole from the plaintiffs.

---

[7] *See, e.g.*, ECF No. 75-2, at ¶¶ 58-62. The laundering of the stolen cryptocurrency assets on a centralized cryptocurrency exchange is as essential to a pig butchering syndicate's wire fraud as getaway car is to a bank robber's theft. Without a getaway car, the bank robber cannot abscond with the money. Similarly, a scammer who steals a victim's cryptocurrency assets through a pig butchering scheme needs a centralized cryptocurrency exchange on which the scammer can sell the stolen cryptocurrency for fiat currency and from which the scammer can then initiate a withdrawal of the fiat currency proceeds of those sales. This is because, if the scammer simply remains in possession of the stolen cryptocurrency, it will be traced and seized (or, in the case of USDT tokens, "burned" by Tether Ltd.). *See, e.g.,* Second Am. Compl., ¶¶ 60-62.

The defendants assert that, in addition to plausibly alleging that they were injured by the pig butchering syndicates' wire fraud and/or money laundering offenses, the plaintiffs also "would need to establish that they would not have suffered their injuries absent [Binance's and Zhao's] aiding and abetting." ECF No. 85, at 19. As supposed support for this novel proposition, the defendants cite merely page 69 of Judge Kelley's Report and Recommendation as well as this Court's decision in *In re Celexa*, 315 F.R.D. 116, 125 (D. Mass. 2016) (Gorton, J.), neither of which have anything to do with, or even discuss, RICO aiding and abetting liability.

The defendants' causation argument both fundamentally misapprehends how aiding and abetting liability works and is foreclosed by precedent. A defendant who aids and abets a third party's underlying criminal conduct is treated as though he committed the underlying criminal conduct in his own right. *See, e.g.*, *Busic v. United States*, 446 U.S. 398, 411 n.18 (1980) ("On these facts, [18 U.S.C.] § 2 appears to require that we treat Busic as though he used LaRoccas's gun to commit this assault."). Thus, the causation question in the context of aiding and abetting is whether the principal's underlying criminal conduct caused the plaintiff's injury, not whether the principal hypothetically would have found a way to successfully complete his crimes without the aider and abetter's assistance. *See, e.g.*, *Linde v. Arab Bank, PLC*, 882 F.3d 314, 318 (2d Cir. 2018) ("[C]ausation would not be in dispute if the bank is considered an aider and abettor of Hamas acts of terrorism . . . ."). This principle applies with full force to civil RICO. *See, e.g.*, *Trustees of Boston Univ.* 33 F. Supp. 2d at 72 n.6 (D. Mass. 1998) ("The First Circuit has held that predicate acts under RICO can include aiding and abetting mail or wire fraud." (citing *Aetna*, 43 F.3d at 1560)); *Jaguar*, 46 F.3d at 270 ("Civil RICO liability for aiding and abetting advances RICO's goal of permitting recovery from anyone who has committed the predicate offenses, regardless of how he committed them." (internal quotation marks omitted)).

The defendants also argue that the plaintiffs' aiding and abetting theory is a mere "semantic gambit" that "would render toothless the demanding proximate cause standard and lead to widespread abuse of the RICO statute." ECF No. 85, at 23. The defendants cite no precedent for this broadside attack on aiding and abetting liability. The rule that an aider and abettor "'is punishable as a principal' . . . reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission . . . [,] even if that aid relates to only one (or some) of a crime's phases or elements." *Rosemond v. United States*, 572 U.S. 65, 70, 73 (2014).

### B. Count Six Is Predicated on an Equally Straightforward Chain of Causation.

In a footnote, the defendants argue that "Count 6 fails to allege causation for the same reasons as Counts 1-4." ECF No. 85, at 15 n.14. This argument is not only undeveloped, but absurd. As an initial matter, as stated above, Counts Two through Four plead an aiding and abetting theory that presents a straightforward chain of causation that easily satisfies RICO's causation requirement. Count Six, which alleges that Binance and Zhao conspired with the pig butchering syndicates to violate RICO through the pig butchering syndicates' pattern of wire fraud and money laundering activities, presents a similarly straightforward causal chain. *See* Second Am. Compl., ¶¶ 296-299. The only causal connection that the plaintiffs must show with respect to Count Six is a causal connection between the pig butchering syndicates' wire fraud and money laundering and the plaintiffs' economic injuries. *See, e.g.*, *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 48 (1st Cir. 1991) (discussing the causal connection required in the context of a RICO conspiracy claim). The defendants cannot credibly dispute that causal connection.

### III. The Defendants' Argument That the Plaintiffs Lack "Domestic Injury" Is Foreclosed Both by the Court's Ruling on the FAC and by Supreme Court Precedent.

The defendants next argue that the SAC fails to plead "domestic injury." The defendants'

argument is completely meritless.  The twenty plaintiffs in the SAC are all U.S. residents (seventeen of whom are U.S. citizens) who resided in the U.S. at the time they received in the U.S. the false and fraudulent electronic communications from the scammers.  Second Am. Compl., ¶¶ 10-29.  Unlike the FAC, the SAC includes factual allegations that make clear that the plaintiffs' U.S. location was conspicuously shown on the social media platforms that the scammers used to identify the plaintiffs and initiate the relationships, such that it can be reasonably inferred that the scammers knew they were targeting U.S. residents.  *Id.* ¶¶ 107-258.  The SAC also includes additional factual allegations that make clear that the money and property that the scammers stole from the plaintiffs was maintained by the plaintiffs entirely in the U.S. at the time the thefts occurred.  *See* Second Am. Compl., ¶¶ 44, 56 (explaining the location of a "self-custodied" cryptocurrency wallet).  These additional factual allegations are precisely what the Court said would be necessary to show "domestic injury."  *See* Report and Recommendation, ECF No. 71, at 82; Order, ECF No. 77, at 1.  The SAC includes the essential factual allegations that the Court's prior decision said were missing from the FAC, which forecloses the defendants' argument that the SAC remains deficient on "domestic injury."

The defendants' argument also is contrary to Supreme Court precedent.  According to the defendants, the Supreme Court in *Yegiazaryan* "concluded that an injury arises domestically if the racketeering activity: (1) 'largely occurred in' the U.S.; or (2) was 'directed from *and* targeted at' the U.S." ECF No. 85, at 24 (emphasis in original; quoting *Yegiazaryan*, 599 U.S. at 549).  The portion of *Yegiazaryan* that the defendants' brief quotes is not *Yegiazaryan*'s holding, nor the legal test that *Yegiazaryan* created.  Instead, the defendants' brief quotes *Yegiazaryan*'s description of the peculiar facts of that case.  The **actual holding** of *Yegiazaryan* is that, to determine whether a plaintiff's injury is a "domestic injury," a court "should look to the circumstances surrounding the

alleged injury to assess whether it arose in the United States. . . . If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury."  599 U.S. at 543-544.  The Supreme Court recently explained that, under *Yegiazaryan*, a court must "survey[ ] the 'injurious effects' of the defendant's conduct and pinpoint[ ] where they 'largely manifested.'"  *Horn*, 2025 U.S. LEXIS 1369, at *17.

Where did the plaintiffs' financial injuries largely manifest?  In the United States, of course.  No other location makes any logical sense.  The United States is where (i) the plaintiffs received the false and fraudulent electronic communications from the scammers, (ii) the plaintiffs maintained the money and property that the scammers stole from them, (iii) the plaintiffs resided when they lost millions of dollars as a result of fraud, and (iv) the scammers knew they were directing their fraudulent electronic communications.  Even if *Yegiazaryan* requires a court also to look at where the underlying wire frauds were committed (which it does not), as a matter of law a wire fraud is deemed to be *committed* in the location where the fraudulent electronic communication *is received*.  *Elbaz*, 52 F.4th at 604.  Here, that location is the United States too.

## IV.    The SAC Adequately Alleges Aiding and Abetting Liability (Counts Two through Four) and Conspiracy Liability (Count Six).

The defendants argue that the SAC does not plausibly allege that Binance and Zhao (i) aided and abetted the pig butchering syndicates' underlying wire fraud schemes and money laundering (as Counts Two through Four allege), or (ii) conspired with the syndicates to violate RICO (as Count Six alleges).  *See* ECF No. 85, at 32-35.  These arguments also lack merit.

### A.    Aiding and Abetting (Counts Two through Four)

The defendants' first argument is that civil RICO liability cannot be imposed on a defendant who aided and abetted racketeering activity committed by a third party.  In support of this argument, the defendants cite a Supreme Court decision—*Central Bank of Denver v. First*

*Interstate Bank of Denver*, 511 U.S. 164 (1994)—that addressed whether a private plaintiff could bring an aiding and abetting claim under § 10(b) of the Securities Exchange Act of 1934 and has nothing to do with RICO. The defendants acknowledge that *Central Bank* did not involve RICO and that the First Circuit has never held (or even suggested) that aiding and abetting a pattern of wire fraud and money laundering does not expose a defendant to substantive civil RICO liability. Notably, eight months **after** *Central Bank* was issued, the First Circuit confirmed that a defendant who aids and abets a third party's RICO predicate acts of wire fraud and bribery is civilly liable under RICO's substantive private right of action provision. *See Aetna*, 43 F.3d at 1560. There is no basis for the Court to find that *Aetna* was implicitly overruled by a Supreme Court decision that (i) preceded *Aetna* by eight months, (ii) did not involve RICO, and (iii) involved a statutory violation (violation of the Securities and Exchange Act) that is not at issue in the plaintiffs' claims against Binance and Zhao. *See, e.g.*, *Marrero-Rolon v. Autoridad*, No. 15-cv-1167, 2015 U.S. Dist. LEXIS 134211, at *51 n.36 (D.P.R. Sept. 28, 2015) (rejecting the exact same *Central Bank* argument that the defendants are making here).

The defendants' second argument is that the SAC does not plausibly allege that Binance and Zhao aided and abetted the pig butchering syndicates' wire fraud schemes and money laundering. This argument fails too. To plausibly allege aiding and abetting, the SAC needs only to plead facts that give rise to a reasonable inference that Binance and Zhao "knowingly or recklessly provided substantial assistance" to the underlying racketeering acts that clearly injured the plaintiffs. *SEC v. Wilcox*, 663 F. Supp. 3d 146, 161 (D. Mass. 2023) (Gorton, J.). To be liable for aiding and abetting, a defendant does not need to know the "precise details" of the underlying crimes. *JPMorgan*, 183 F. Supp. 3d at 271-272 (denying motion to dismiss); *see also United States v. Garcia-Rosa*, 876 F.2d 209, 217 (1st Cir. 1989) ("It is well established that a culpable

aider and abet[or] need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution.").  Thus, the creator and operator of an online bazaar can be guilty of aiding and abetting the illegal narcotics transactions that take place on the bazaar, notwithstanding that the buyers and sellers are anonymous, independent actors.  *See United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) (affirming aiding and abetting conviction of the creator of the dark web marketplace Silk Road).

The SAC easily satisfies the pleading requirements for aiding and abetting.  The SAC lays out in considerable detail how Binance and Zhao purposefully structured Binance's business model to be as hospitable as possible to criminal enterprises that they knew would be using the Binance.com exchange for illicit transactions, including fraud syndicates that Binance and Zhao knew needed to launder stolen cryptocurrency on a centralized cryptocurrency exchange in order to successfully complete their fraud schemes.  This included (i) intentionally avoiding performing "Know Your Customer" diligence; (ii) creating "loopholes" to allow bad actors to open up Binance.com accounts without providing proof of identity; (iii) systematically lying to U.S. regulators and law enforcement that the Binance.com exchange was not doing business in the United States, the purpose of which was to avoid having U.S. regulators and law enforcement monitor the billions of dollars of illicit transactions that Binance and Zhao knew were occurring on the Binance.com exchange; (iv) "clos[ing] 2 eyes" to the "crime" that Binance and Zhao knew was occurring on the Binance.com exchange; and (v) coaching account holders "closely associated" with "illicit activity" to open up new accounts to avoid scrutiny.  *See* Second Am. Compl., ¶¶ 84-85, 94, 96, 102, 105(e)-(f).  Binance and Zhao have *admitted* to this conduct.

Recently, Judge Koeltl (SDNY) held that Binance's and Zhao's conduct constituted aiding and abetting the terrorist activities of Hamas and the Palestine Islamic Jihad.  *See Raanan*, 2025

U.S. Dist. LEXIS 33874, at *57-69.  The complaint in *Raanan* was, like the complaint here, predicated on the factual admissions that Binance and Zhao made as part of their criminal pleas, supplemented by additional factual allegations made by other federal enforcers in related complaints and consent decrees.  Judge Koeltl concluded that the plaintiffs' complaint "sufficiently alleges that the defendants were generally aware that they were playing a role in international terrorism at the time when Hamas and PIJ (and their affiliates) were transacting on the Binance platform." *Id.* at *58.  Viewing the allegations in the light most favorable to the plaintiffs, Judge Koeltl concluded that the allegations "support a plausible inference that the defendants were generally aware that they were playing a role in Hamas's and PIJ's overall illegal activity." *Id.* Judge Koeltl rejected the defendants' argument that their "alleged wrongdoing" was merely a non-actionable "failure to act." *Id.* at *61.  Judge Koeltl found that the defendants' alleged conduct was an "intentional eva[sion]" of regulatory requirements, done for the purpose of "fostering a financial ecosystem on which illicit actors . . . transacted freely." *Id.* at *61-62.  "[T]he defendants took affirmative actions to enable terrorist groups to transact on the Binance platform," including "'international circumvention of KYC'" and "launch[ing] a customer due diligence program that 'by design still contained massive gaps to allow criminal activity to take place.'" *Id.* at *63 (quoting complaint).  Judge Koeltl compared Binance and Zhao to a "morphine distributor who may be liable as a conspirator of an illicit operation to which it mailed morphine far in excess of normal amounts." *Id.* at *65 (internal quotation marks omitted).

All of Judge Koeltl's conclusions apply equally here.  The SAC is replete with allegations showing that Binance, at Zhao's specific direction, adopted a "compliance" model that systematically would enable illicit actors, including fraud syndicates that Binance and Zhao knew needed to launder stolen assets on a centralized cryptocurrency exchange, to transact on the

Binance.com exchange without interference or oversight from U.S. regulators and U.S. law enforcement. The SAC also plausibly alleges that Binance and Zhao knew the extraordinary volume of illicit transactions occurring on the Binance.com exchange. Further, the Second Amended Complaint plausibly alleges that the transactions on the Binance.com exchange involving the plaintiffs' stolen cryptocurrency assets bore all the hallmarks of illicit laundering of fraudulently obtained assets. Nothing more is required at this stage.

### B.    Conspiracy (Count Six)

The defendants argue in passing that the SAC fails to plausibly allege that Binance and Zhao conspired with the pig butchering syndicates to violate RICO. *See* ECF No. 85, at 35. This argument fails for the same reasons that the defendants' arguments regarding aiding and abetting fail. At bottom, the defendants' argument is that it is implausible that they conspired with scammers whose identities the defendants purposefully avoided learning (because they designed the Binance.com exchange to allow customers to open accounts without providing any identification documents). This is not the law. "Proof of agreement in a RICO proceeding may be established by circumstantial evidence to the same extent permitted in traditional conspiracy cases. It is well-established that one conspirator need not know the identities of all his co-conspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." *See United States v. Riccobene*, 709 F.2d 214, 225 (3d Cir. 1983).

## V.    The Court Can Swiftly Reject the Defendants' "Enterprise" Arguments.

The defendants argue that the SAC fails to "plead the existence of any enterprise . . . ." ECF No. 85, at 2, 26-31. The defendants made these same arguments with respect to the FAC. Although Judge Kelley's Report and Recommendation did not expressly address the defendants' "enterprise" arguments, Judge Kelley's decision did not even hint that the defendants' "enterprise"

arguments might have some merit (which they do not).  The Court should reject the defendants'
attempt to relitigate the same frivolous legal arguments that Judge Kelley refused to endorse (and
thus implicitly rejected) in her ruling, which the Court adopted in full.

In any event, the defendants' arguments are meritless.  The plaintiffs previously addressed
at length the same exact "enterprise" arguments that the defendants make in their motion to dismiss
the SAC.  *See* Plaintiffs' Mem. in Opp. to Defendants' MTD First Am. Compl., ECF No. 57, at
24-29.  The points the plaintiffs made in that prior brief continue to apply here.  Enterprise #2 is
Zhao and the other Binance and BAM employees, officers, and executives that collectively
structured and operated Binance to facilitate customers' illicit activity.  Enterprise #3 is Binance
itself (a corporate enterprise).[8]  Enterprise #4 is Zhao, Binance, and the pig butchering syndicates
with which Zhao and Binance conspired.  Enterprise #5 refers to the pig butchering syndicates
themselves.[9]  The allegations in the SAC—including the allegations regarding Binance's and
Zhao's purposeful efforts to facilitate criminal enterprises' use of the Binance.com exchange for
illicit transactions—plausibly demonstrate that each of the alleged enterprises had the ascertainable
structure, longevity, and common purpose that *Boyle v. United* States, 556 U.S. 938 (2009), and
its progeny require.  *See* ECF No. 57, at 24-29; *see also Williams v. Mohawk Indus.*, 465 F.3d
1277, 1285-1286 (11th Cir. 2006) ("[T]here has never been any requirement that the 'common
purpose' of the enterprise be the sole purpose of each and every member of the enterprise.").

### CONCLUSION

Except for dismiss the claims against BAM and Count One, the defendants' motion to
dismiss should be DENIED.

---

[8] Enterprise #3 is the RICO enterprise for Count Three.  The sole defendant in Count Three is Zhao.

[9] Enterprise #1 is only relevant to Count One, which the plaintiffs agree is due to be dismissed under the
law of the case doctrine.  Enterprise #1 is therefore not relevant here.

Respectfully submitted,

Dated: April 17, 2025

/s/ Aaron M. Katz
Aaron M. Katz
Keira Zirngibl
Patrick Dolan
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com
kzirngibl@aaronkatzlaw.com
pdolan@aaronkatzlaw.com

Eric Rosen
Constantine P. Economides
Lance Aduba
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
(617) 802-9157
erosen@dynamisllp.com
ceconomides@dynamisllp.com
laduba@dynamisllp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this memorandum was served on opposing counsel via the CM/ECF system on April 17, 2025.

*/s/ Aaron M. Katz*