UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEONARD LICHT, et al.,

    Plaintiffs,

    v.                                CIVIL ACTION NO. 24-10447-NMG

BINANCE HOLDINGS LIMITED, d/b/a
BINANCE.COM, et al.,

    Defendants.

REPORT AND RECOMMENDATION ON
DEFENDANTS' JOINT MOTION TO DISMISS (#84)[1]

KELLEY, U.S.M.J.

I. Introduction.

    The court considers for a second time whether civil RICO[2] claims brought by victims of "pig butchering" schemes, against two cryptocurrency exchanges and the executive calling the shots at both,[3] should proceed beyond the pleading stage. The court again concludes that they should not.

---

[1] Judge Gorton has referred this motion to the undersigned for report and recommendation. (#95.)

[2] Racketeer Influenced and Corrupt Organization Act, *see* 18 U.S.C. § 1964.

[3] Binance Holdings Limited, d/b/a Binance.com ("Binance"); BAM Trading Services, Inc., d/b/a Binance.US ("BAM"); Changpeng Zhao, former CEO of Binance who is alleged to have also controlled BAM. *See* #79, Second Amended Complaint ("SAC"), ¶ 32. These claims follow Binance's and Zhao's guilty pleas in the United States District Court for the Western District of Washington to various criminal offenses. *See* #23-cr-178 (*Binance* docket); #23-cr-179 (*Zhao* docket); *see*, *e.g.*, #79 ¶ 2; *id.* ¶ 84, n.5. Though it has no bearing on its recommendation here, the court notes that Zhao was recently pardoned. *See* https://www.justice.gov/pardon/clemency-grants-president-donald-j-trump-2025-present (last visited February 19, 2026).

II. Dismissal of the First Amended Complaint.

On February 5, 2025, the court issued an 83-page report and recommendation on the Defendants' Joint Motion to Dismiss the First Amended Complaint ("FAC"), recommending that the complaint be dismissed without prejudice. (#71.) The court assumes familiarity with that report and recommendation and will only explain its rationale briefly here. Moreover, where the court discussed at length the factual allegations in the FAC in its prior report and recommendation, here, the court discusses only those factual allegations in the SAC that bear on its recommendation on the Defendants' new Joint Motion to Dismiss.

The original plaintiffs were twenty-six United States and foreign citizens residing in the United States and abroad. Twenty of the twenty-six original plaintiffs were alleged to have been living in the United States, although some are citizens of other countries.[4] The other six original plaintiffs were alleged to have been living abroad.[5] Of the twenty original plaintiffs alleged to have been living in the United States, two were alleged to have been living in Massachusetts.[6]

---

[4] Leonard Licht (United States citizen residing in Texas); Zhengjun Cai (Chinese citizen residing in California); Daniel Chang (United States citizen residing in California); Henry Chen (United States citizen residing in California); Dominic Chow (United States citizen residing in Massachusetts); Chengguo Dong (United States citizen residing in California); Ihab Francis (United States citizen residing in New York); John Gordon (United States citizen residing in Florida); Dalton Green (United States citizen residing in Colorado); Michael Grilli (United States citizen residing in Florida); Iraklis Karabassis (United States citizen residing in Florida); Nader Lobandi (Iranian citizen residing in Massachusetts); James Moskwa (United States citizen residing in Rhode Island); Anh Nguyen (United States citizen residing in California); Brian Rothaus (United States citizen residing in Pennsylvania); Gordon Shaylor (United States citizen residing in Nevada); Richard Slavant (United States citizen residing in Louisiana); Nathanial Thrailkill (United States citizen residing in Arizona); Jack Yao (United States citizen residing in California); Jun Zhai (United States citizen residing in Washington).

[5] Amine Fennane (citizen and resident of France); Shai Granovski (citizen and resident of Canada); Alicia Lau (Lau Pui Mei) (Malaysian citizen residing in Singapore); Trevor Lau (citizen and resident of Canada); Eisi Mollanji (citizen and resident of Canada); Edmund Yeo (Yeo Yin Pin Edmund) (citizen and resident of Singapore).

[6] Chow; Lobandi.

Binance is a Cayman Islands company. BAM is a Delaware corporation which has had principal offices in California and Florida. In 2020, BAM was registered as a foreign corporation in Massachusetts. Zhao is a Chinese-born citizen of Canada domiciled in Dubai.

Binance, BAM, and Zhao moved to dismiss the FAC for lack of personal jurisdiction. The original plaintiffs argued that the court could exercise personal jurisdiction over BAM and, by extension, Binance and Zhao, under RICO.[7] They also argued that the court could exercise personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2).[8] *See* #71 at 41, n.28. The court rejected the original plaintiffs' argument that it could exercise personal jurisdiction over BAM under RICO, finding that the record on BAM's "purposeful availment" of the privilege of conducting activities in Massachusetts was insufficient. The court thus recommended that the claims against BAM be dismissed, without prejudice, for lack of personal jurisdiction. *Id*. at 55-62, 64.[9]

On the other hand, the court accepted the original plaintiffs' argument that it could exercise personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2). The original plaintiffs' claims were "related to" Binance and Zhao's contacts with the United States; those contacts

---

[7] Fed. R. Civ. P. 4(k)(1)(C) provides that serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant in a federal court "when authorized by a federal statute." *Id*. RICO has a "Venue and process" provision. 18 U.S.C. § 1965. The court adopted the majority view of this provision; it thus required that BAM satisfy the traditional forum state minimum contacts standard for the court to exercise personal jurisdiction under the provision. (#71 at 47-52.)

[8] Under Fed. R. Civ. P. 4(k)(2), among other requirements, a defendant must not be subject to the personal jurisdiction of any state's courts of general jurisdiction. Fed. R. Civ. P. 4(k)(2)(A). As a Delaware corporation with principal offices in California or Florida, BAM would not have satisfied this requirement.

[9] This recommendation implicated Count One, in part, and Count Five. Count One was a substantive RICO claim against all three Defendants. Count Five was a RICO conspiracy claim against BAM alone.

represented "purposeful availment;" and the exercise of specific personal jurisdiction was "reasonable." (#71 at 54, 62-64.)

Although the court did not recommend dismissal of Binance and Zhao for lack of personal jurisdiction, it was persuaded by two of the Defendants' six arguments under Fed. R. Civ. P. 12(b)(6). It thus recommended dismissal of the complaint in its entirety. (#71 at 82.) As required by RICO, the original plaintiffs failed to plausibly allege a sufficient causal link between the theft of their cryptocurrency by the non-party scammers and the Defendants' alleged conduct, *see id*. at 65-71, 73-80, and also as required by RICO, they failed to plausibly allege domestic injury, *see id*. at 71-73, 80-82.[10] The court expressly did not reach the Defendants' other four Rule 12(b)(6) arguments. (#71 at 65.)

The court did not recommend that dismissal enter with prejudice. The Defendants sought dismissal with prejudice for the first time in their reply and, the court reasoned, the original plaintiffs may have been able to cure the identified deficiencies. *Id*. at 82. The court did not address an informal request for leave to amend. *Id*. at 83.

The original plaintiffs objected to the court's recommendation as to the lack of personal jurisdiction over BAM. (#74 at 1-3.) They also objected to the court's recommendation as to the failure to plausibly allege domestic injury under RICO, *see id*. at 4-7, but only in part. They agreed

---

[10] Had the court not recommended dismissal of the claims against BAM for lack of personal jurisdiction, it would have recommended dismissal under Rule 12(b)(6). (#71 at 64, n.43.) The court discussed causation in connection with the remaining substantive RICO counts, i.e. Count One against Binance and Zhao and Counts Two, Three, and Four, on the assumption that the Defendants' argument did not implicate the remaining RICO conspiracy count, Count Six. *Id*. at 73, n.50. The court discussed domestic injury in connection with Count Six because that was the one claim remaining. *Id*. at 80-82. The failure to plausibly allege domestic injury of course implicated the other claims, as well. *See* #85 at 31-32, n.17; *see also* #74 at 5.

4

that the claims of the six original plaintiffs alleged to have been living abroad should be dismissed. *Id*. at 5.

Finally, the original plaintiffs objected to the court's recommendation as to the failure to plausibly allege but for and proximate cause under RICO. *Id*. at 7-9. The FAC alleged that the digital "LuxKey" wallets to which Licht transferred his cryptocurrency, at the request of "Tina Ling," "were simply self-custodied digital wallets controlled by the criminal syndicate." (#36 ¶ 81.) The FAC further alleged that those self-custodied digital wallets then transferred Lichts' cryptocurrency "to 'intermediary wallets' that the criminal syndicate controlled, and those intermediary wallets then transferred" his cryptocurrency "to nine Binance accounts." *Id*. ¶ 84. In addressing "difficulties in ascertaining the amount of [the original] plaintiffs' damages attributable to Binance's operation as an unlicensed, unregistered MTB [money transmitting business] and putative money laundering," the court noted the allegation of a transfer to "intermediary" wallets and asked, rhetorically: "Was the intermediary cryptocurrency exchange complying with United States law? If not, how much did that non-compliance contribute to Licht's alleged damages?" (#71 at 78) (footnote omitted).

In their objections to the report and recommendation, the original plaintiffs clarified that the reference to "'intermediary wallets'" in the FAC was not a reference to "intermediary cryptocurrency exchange[s]." They stated that the "'intermediary wallets'" were "self-custodied" digital wallets,[11] and claimed that there was no "intermediary cryptocurrency exchange" that may or may not have been complying with United States law. (#74 at 8.)

---

[11] The SAC, unlike the FAC, describes the difference between self-custodied and "hosted" digital wallets. Self-custodied digital wallets are controlled by the users. Hosted digital wallets, by contract, are owned, operated, and controlled by the cryptocurrency exchanges. (#79 ¶ 44.)

Binance and Zhao filed limited objections to the report and recommendation. Regarding the recommendation of a finding of specific personal jurisdiction over them, Binance and Zhao claimed that the court "did not analyze whether [the original plaintiffs'] claims arose out of contacts that either [Binance or Zhao] created with" the United States. (#73 at 8); *see id.* at 11.[12] Binance and Zhao further argued that any finding that the original plaintiffs' claims arose out of Binance and Zhao's United States contacts would have been inconsistent with the finding of the failure to plausibly allege RICO causation. *Id.* at 12-13.[13]

In their objections to the report and recommendation, the Plaintiffs stated that they intended to move for leave to amend the complaint. (#74 at 9-10.) On the same day that they filed their objections, February 19, 2025, they filed that motion and a proposed second amended complaint. (##75, 75-1.) In their objections to the report and recommendation, Binance and Zhao had argued that the court should have recommended dismissal of the complaint with prejudice. (#73 at 14-18.)

On February 26, 2025, Judge Gorton accepted and adopted the report and recommendation (#77) and allowed the motion for leave to amend the complaint (#78). The SAC (#79) is operative, and the Defendants have jointly moved to dismiss (#84); *see also* #85, memorandum of law; #86, opposition; #89, reply.

III. BAM and Count One.

The SAC names BAM as a defendant. (#79 ¶ 31.) Count Five in the SAC is the same as Count Five in the FAC in that it is against BAM alone, for RICO conspiracy. *Id.* ¶¶ 292-295; *compare* #36 ¶¶ 285-287. Count One in the SAC, similar to Count One in the FAC, alleges that

---

[12] Not so. The court found that "Binance and Zhao's United States contacts…[were] sufficiently related to the litigation to afford Binance and Zhao adequate protection." (#71 at 63.)

[13] Because the Defendants raise this further argument in seeking dismissal of the SAC, *see* #85 at 20-21, the court addresses it below.

Binance, BAM, and Zhao "participated in and/or directed the conduct of Enterprise #1's affairs through a pattern of racketeering activity," *see* #79 ¶ 281, where that pattern involved violations of 18 U.S.C. § 1960(a) (operation of an unregistered and unlicensed MTB) and 18 U.S.C. § 1956(a)(1)(A)(i) (money laundering), *see* #79 ¶ 267; *compare* #36 ¶¶ 264, 274.

The Plaintiffs acknowledge in response to the Defendants' new Joint Motion to Dismiss that the SAC "contains no new material facts relevant to personal jurisdiction over" BAM, and explain that BAM is named as a defendant "solely for appellate preservation purposes." They acknowledge that the claims against BAM, i.e. Count One, in part, and Count Five, will be dismissed for lack of personal jurisdiction. (#86 at 6, n.2); *see id*. at 13-14.

Presumably because Count One in the SAC is substantively similar to Count One in the FAC and Count One in the FAC was dismissed for the failure to plausibly allege RICO causation, the Plaintiffs "also acknowledge" that Count One in the SAC "is due to be dismissed under the law of the case doctrine; it too was included solely to preserve all appellate rights." *Id*. at 6, n.2; *see id*. at 14.

Accordingly, insofar as the Defendants seek dismissal of Count One and of BAM, their joint motion should be allowed as unopposed. Dismissal of BAM would result in the dismissal of Count Five, as well.

IV. <u>Personal Jurisdiction over Binance and Zhao</u>.

Binance and Zhao move to dismiss the SAC for lack of personal jurisdiction. *See* #85 at 16-21. The Plaintiffs argue that the law of the case doctrine applies and regardless, the court may

exercise specific personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2). (#86 at 14.)[14]

First, the law of the case doctrine does not apply and even if it did, the court would have the discretion to reconsider its ruling. Binance and Zhao's motion to dismiss the FAC for lack of personal jurisdiction was denied. *See* #71 at 64; #77. "A ruling denying a motion to dismiss is not the law of the case, and is not final even in the district court." *Commerce Oil Refining Corp. v. Miner*, 303 F.2d 125, 128 (1st Cir. 1962); *see Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994); *see also Harlow v. Children's Hosp.*, 432 F.3d 50, 55-56 (1st Cir. 2005) (the law of the case doctrine did not bar the federal district court from reconsidering the state court's ruling denying a motion to dismiss for lack of personal jurisdiction and the same would have been true had it been the federal district court's own ruling).

Moreover, the First Circuit has "sometimes said -- instead of an outright statement that the law of the case is not applicable to interlocutory orders at all -- that law of the case permits a lower court to review prior interlocutory orders as long as that review is not an abuse of discretion." *Harlow*, 432 F.3d at 55.

> The law of the case is a discretionary doctrine, especially as applied to interlocutory orders such as this one. … As Justice Holmes expressed it, '[T]he phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'

---

[14] The Plaintiffs have not "stak[ed] everything on the law-of-the-case argument." (#89 at 11.) The parties and court already walked this winding path. The Defendants do not claim that the relevant factual allegations in the SAC differ from those in the FAC. *See* #85 at 19; *see also* #89 at 11, n.3. To preserve the argument that the allegations in the SAC are sufficient, the Plaintiffs did not have to do more than refer to the court's prior report and recommendation finding that the allegations in the FAC were sufficient. *See* #86 at 14.

*In re Cabletron Sys.*, 311 F.3d 11, 21, n.2 (1st Cir. 2002) (internal citation omitted) (alternation in original) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)).

Anyway, the court again finds that it may exercise personal jurisdiction over Binance and Zhao under Fed. R. Civ. P. 4(k)(2). If the relevant question was whether Binance and Zhao had adequate contacts with Massachusetts, *see* #85 at 19, the answer would be "no." The Plaintiffs do not argue that Binance and Zhao had adequate contacts with Massachusetts. *See* #86 at 14. And counsel effectively certified that Binance and Zhao did not have adequate contacts with Massachusetts. *See* #57-3 ¶ 5 (Binance and Zhao are not citizens or residents of the United States and are not subject to the personal jurisdiction of any state's courts of general jurisdiction).[15] *See, e.g.*, *Securities and Exchange Comm'n v. Lee*, #24-cv-00296-ABA, 2025 WL 2781530, at *3, n. 4 (D. Md. Sept. 30, 2025) ("Jurisdiction under [Fed. R. Civ. P.] 4(k)(1) and 4(k)(2) are mutually exclusive. If a defendant has minimum contacts with a state giving rise to specific jurisdiction under that state's long-arm statute via Rule 4(k)(1), then the defendant is definitionally subject to personal jurisdiction in at least one state court, and thus ineligible for Rule 4(k)(2) jurisdiction").

The relevant question is not whether Binance and Zhao had adequate contacts with Massachusetts. Under Fed. R. Civ. P. 4(k)(2), the relevant question is whether Binance and Zhao had adequate contacts with the United States. *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 6 (1st Cir. 2018).[16] Again, the court answers that question "yes."

---

[15] The court previously observed that the certification of counsel was unrebutted, *see* #71 at 54, n.35, and Binance and Zhao do not attempt to rebut it now.

[16] That the exercise of personal jurisdiction comports with the Constitution and other federal law is the third and final requirement under Fed. R. Civ. P. 4(k)(2). *Plixer*, 905 F.3d at 6; *see United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 38 (1st Cir. 1999). As noted above, the certification of counsel is not rebutted and thus the second requirement is not in dispute. Binance and Zhao have not been shown to be subject to the personal jurisdiction of any state's courts of general

The Defendants argue that it was inconsistent for the court to have found both the failure to plausibly allege causation under RICO and specific personal jurisdiction because a finding of specific personal jurisdiction requires that the Plaintiffs' RICO claims arise from Binance and Zhao's contacts with the United States. (#85 at 20-21.) However, as the court emphasized in its prior report and recommendation, to exercise specific personal jurisdiction over Binance and Zhao, "a strict causal relationship between [their] United States contacts and [the original] plaintiffs' RICO claims [was] not necessary." (#71 at 63.) That principle is drawn from the Supreme Court's decision in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021):

> …Ford's causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities…. That rule indeed serves to narrow the class of claims over which a state court may exercise specific jurisdiction. But not quite so far as Ford wants. None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum.'…The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, we have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.,* proof that the plaintiff's claim came about because of the defendant's in-state conduct. …

*Id.* at 361-62 (internal citations omitted) (emphasis in original).

*Ford* involved the Fourteenth Amendment's due process limits on state courts' power to exercise personal jurisdiction over defendants. *Id.* at 358. However, the First Circuit had not formulated the minimum contacts standard differently when the due process limits were set by the Fifth Amendment, rather than the Fourteenth. *Compare Plixer*, 905 F.3d at 7 (Fed. R. Civ. P.

---

jurisdiction. The first requirement is not in dispute, either. This is a federal question case. *See Plixer*, 905 F.3d at 6.

4(k)(2): "directly arises out of or relates to") *with Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54, 59 (1st Cir. 2020) (diversity: "directly arise from or relate to"); *cf. Securities and Exchange Comm'n v. Gastauer*, 93 F.4th 1, 8-9 (1st Cir. 2024) (relying on *Ford* in federal question case); *see also King v. Bon Charge*, --- F. Supp. 3d ---, #25-cv-00105-SB, 2025 WL 3764039, at *3 (D. Del. Dec. 30, 2025) ("In the years after [Fed. R. Civ. P.] 4(k)(2) was promulgated, lower courts consistently assumed that the 'Fifth Amendment due process test for personal jurisdiction requires the same "minimum contacts" with the United States as the Fourteenth Amendment requires with a state'") (quoting *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235, 239, n.4 (5th Cir. 2022)).

The First Circuit presumably must formulate the Fifth Amendment standard differently moving forward. On June 20, 2025, the Supreme Court decided *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), where it

> decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority.

*Id*. at 16.[17]

The Supreme Court expressly did not define the Fifth Amendment's "more flexible" standard. *Id*. at 18. Nor did *Fuld* involve Fed. R. Civ. P. 4(k)(2).[18] However, lower courts have

---

[17] *Fuld* was decided after briefing on this motion was complete. The parties have not addressed it.

[18] *Fuld* involved lawsuits brought by and on behalf of American victims of terror attacks abroad, against the Palestine Liberation Organization (PLO) and Palestine Authority (PA), under the Antiterrorism Act (ATA) of 1990. *Fuld*, 606 U.S. at 7, 9. In 2019, Congress enacted the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), which provides that in ATA cases, the PLO and PA "shall be deemed to have consented to personal jurisdiction" in two specific circumstances, *see* 18 U.S.C. § 2334(e)(1); *see also* § 2334(e)(5)(A), (B). The first jurisdictional predicate relates to payments to terrorists, *see Fuld*, 606 U.S. at 8-9 (discussing 18 U.S.C. § 2334(e)(1)(A)); the second relates to the PLO and PA's activities on U.S. soil. *Id*. at 9 (discussing

recognized that *Fuld* potentially unsettles Rule 4(k)(2) precedent. *See Central Am. Bank for Econ. Integration v. Mossi*, #24-cv-2544-CRC, 2025 WL 2732731, at *8 (D. D.C. Sept. 25, 2025), *appeal filed*, No. 25-7178; *see King*, 2025 WL 3764039, at *4; *see also Enhanced US LLC v. World Aquatics*, #25-cv-7096-JMF, 2025 WL 3206662, at *5, n.3 (S.D.N.Y. Nov. 17, 2025).  Rather than attempt to define the "more flexible" standard, lower courts have applied the pre-*Fuld* minimum contacts standard under Rule 4(k)(2), and if that standard is met, have found that the "more flexible" standard is met. *King*, 2025 WL 3764039, at *4 ("if personal jurisdiction would be constitutional under the pre-*Fuld* nationwide minimum-contacts standard, then jurisdiction is *a fortiori* constitutional under *Fuld*") (citing *Central Am. Bank*, 2025 WL 2732731, at *8); *see also Rashid v. Qatar Airways Grp. Q.C.S.C.*, #25-cv-10109-ADB, 2025 WL 3687755, at *6 (D. Mass. Dec. 19, 2025) (Montreal Convention; "Plaintiffs have, therefore, made a prima facie showing that their claims 'relate to' Defendant's contacts with the United States sufficient to support jurisdiction, particularly considering the relaxed Fifth Amendment jurisdictional inquiry following *Fuld*").

---

18 U.S.C. § 2334(e)(1)(B)). Applying circuit precedent holding that the due process analyses under the Fourteenth and Fifth Amendments "parallel one another," the Second Circuit found that the PSJVTA's jurisdictional predicates involve conduct insufficient to establish personal jurisdiction. *Fuld*, 606 U.S. at 10 (quoting *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 91, 102 (2d Cir. 2023)). The circuit court denied rehearing *en banc*, though judges in dissent disagreed that "the Due Process Clause of the Fifth Amendment imposes the same limits on the jurisdiction of the federal courts that the Due Process Clause of the Fourteenth Amendment imposes on the jurisdiction of the state courts." *Id*. (quoting *Fuld v. Palestine Liberation Org.*, 101 F.4th 190, 205 (2d Cir. 2024)).

    The Supreme Court reversed. *Id*. at 25. The *Fuld* majority did "not purport to delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts" because it was enough that "whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, the PSJVTA does not transgress them." *Id*. at 18-19. The statute "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns." *Id*. at 18; *see id*. at 25.

Before *Fuld*, Binance and Zhao's claim of an inconsistency between the findings of a failure to plausibly allege RICO causation and of specific personal jurisdiction was weak; after *Fuld*, it is decidedly weaker. Yet, following the lead of other lower courts post-*Fuld*, applying pre-*Fuld* precedent, the court finds that Binance and Zhao's United States contacts relate to the Plaintiffs' RICO claims, even if the claims did not come about because of the contacts. *See Ford*, 592 U.S. at 361-62.

The crux of these RICO claims is this: Binance and Zhao wanted to attract more customers and make more money, and they believed that complying with anti-money laundering laws would cost them customers and money. Therefore Binance.com did not comply with anti-money laundering laws. A cryptocurrency exchange's non-compliance with such laws makes it easier for scammers to abscond with stolen cryptocurrency-turned-fiat-currency. So, scammers used Binance.com, including the scammers who absconded with the Plaintiffs' stolen cryptocurrency-turned-fiat-currency.

The pertinent anti-money laundering laws were United States laws, enforced by United States law enforcement and regulatory authorities. The sought-after customers and profits were United States-based customers and profits.

More importantly, Binance.com's non-compliance with United States anti-money laundering laws made it easier for scammers to abscond with the stolen cryptocurrency-turned-fiat-currency and thus invited scamming. And that non-compliance was aided by BAM's Binance.US, a United States cryptocurrency exchange. Binance and Zhao helped launch Binance.US, intending that Binance.US would draw United States law enforcement and regulatory

attention away from Binance.com's non-compliance, while Binance.com continued to attract and make money from United States-based customers. *See* #71 at 10-16.[19]

The Plaintiffs allege in the SAC that Zhao and Binance supplied a getaway car to the scammer-bank robbers. In opposition to dismissal, they compare Zhao and Binance to a getaway driver. *See* #79 ¶ 4; *see also* #86 at 10. For specific personal jurisdiction purposes, the court views BAM's Binance.US as the stolen license plate that Zhao and Binance affixed to the car, which the scammer-bank robbers drove. After reviewing surveillance footage, police followed the false license plate lead, and the scammer-bank robbers were never found. The stolen license plate is certainly "relate[d] to" the bank robbery in this scenario.[20] Binance.US is similarly "relate[d] to" these RICO claims.

Lastly, under *Fuld*,

…the prospect remains that the Fifth Amendment might entail a similar inquiry into the reasonableness of the assertion of the jurisdiction in the particular case…. Reasonableness…will depend in each case on an evaluation of several factors, including the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.

---

[19] In its prior report and recommendation, the court found that the *Binance* and *Zhao* plea agreements, including the statements of facts, were properly part of both the Fed. R. Civ. P. 12(b)(2) and 12(b)(6) records. (#71 at 6-7.) The court relied heavily on Binance's and Zhao's admissions. There is no reason to depart from that ruling and approach here, so the court cites to its prior report and recommendation, which cited to the statements of facts.

[20] Mindful that, at least in the Fourteenth Amendment context, "the phrase 'relate to' incorporates real limits," *see Ford*, 592 U.S. at 362, the phrase is generally broadly defined. *See*, *e.g.*, *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 383 (1992) ("The ordinary meaning of ['relating to'] is a broad one -- 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with…'") (quoting Black's Law Dictionary 1158 (5th ed. 1979)).

606 U.S. at 23 (cleaned up) (internal citation omitted). The court considered the "gestalt" factors in its prior report and recommendation, *sua sponte*. (#71 at 46-47, 64.) Binance and Zhao do not ask the court to reconsider them. *See* #85 at 19-21.

V. <u>Failure to State Plausible Claims</u>.

    A. <u>Standard</u>.

    On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the court determines whether the well-pled facts in the complaint "plausibly" state a claim.[21] In doing so, the court isolates and ignores statements that simply offer legal conclusions or merely rehash cause-of-action elements but accepts the non-conclusory, non-speculative facts as true, drawing all reasonable inferences in the plaintiff's favor. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7, 12 (1st Cir. 2011)); *see Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023); *see generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

    "Plausibly" is something more than "possibl[y]," and reviewing for the plausibility of a claim "is a 'context-specific' job that compels [a court] 'to draw on' [its] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679). Ultimately, a complaint must include enough facts, accepted as true, to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. … Where a complaint pleads facts that are 'merely consistent with' a defendant's

---

[21] Under Rule 12(b)(6), the court may consider the complaint and exhibits attached to, or documents expressly incorporated by reference in, the complaint, though certain narrow exceptions to this rule exist for documents extrinsic to the complaint. *See generally Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013). The SAC refers to an "appended" "Exhibit A." (#79 ¶ 113.) No exhibits were actually appended to the SAC.

liability, it 'stops short of the line between possibility and plausibility…." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

    B. <u>Application</u>.

    Many of the new factual allegations in the SAC concern the court's finding of a failure to plausibly allege domestic injury in the FAC, as required by RICO. The Defendants argue that the SAC still fails to plausibly allege domestic injury. (#85 at 31-34.) The court does not reach this argument, and others. To be clear, the court is not reaching arguments because it does not need to; it does not "implicitly reject[]" the arguments it expressly does not reach, as the Plaintiffs claim with respect to arguments that the court expressly did not reach in its prior report and recommendation. (#86 at 25); *see* #71 at 65.

    1. <u>Counts Two, Three, and Four</u>.

    For Counts Two, Three, and Four to proceed, under 18 U.S.C. 1964(c), the civil RICO provision relevant to all counts, the Plaintiffs must plausibly allege "a violation of" 18 U.S.C. § 1962(c), the criminal RICO provision relevant to these counts, and an injury "by reason of" the violation of § 1962(c). *See* 18 U.S.C. § 1964(c); *see also Humana Inc. v. Biogen, Inc.*, 126 F.4th 96, 100, n.4 (1st Cir. 2025).[22]

    "By reason of" requires both "but for" cause (sometimes, "factual cause" or "cause-in-fact") and "proximate" cause. *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35 (1st Cir. 2021) (cleaned up) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (plurality opinion); *Anza v.*

---

[22] A violation of § 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see Humana*, 126 F.4th at 100, n.4; *see also United States v. Velazquez-Fontanez*, 6 F.4th 205, 212 (1st Cir. 2021) (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)).

*Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). "[A] given condition or event is only a but-for cause of a subsequent outcome when the condition or event is a necessary step to produce that outcome." *Doe v. Rhode Island Interscholastic League*, 137 F.4th 34, 42 (1st Cir. 2025) (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)).

> …[I]f the elimination of the event at issue from the sequence of events would prevent the outcome altogether, it is a but-for cause. … 'In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.'

*Id*. (citations to *Bostock*, 590 U.S. at 656-57, omitted).

Regarding proximate cause, the "central question" is whether the defendant's violation of § 1962(c) "led directly" to the plaintiff's injury. *Sterling*, 990 F.3d at 35 (cleaned up) (quoting *Anza*, 547 U.S. at 461). The Supreme Court has "[t]ime and again,…reiterated that § 1964(c)'s 'by reason of' language demands 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) (quoting *Holmes*, 503 U.S. at 268). "The key word is 'direct'; foreseeability does not cut it." *Id*. (quoting *Hemi*, 559 U.S. at 12). "Rather, whenever the plaintiff's theory of causation requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'" *Id*. (quoting *Hemi*, 559 U.S. at 10).

In the First Circuit, the "directness concern" above and "three functional factors are [all] part of the proximate cause inquiry." *In re Neurontin Mktg. & Sales Prac. Litig.*, 712 F.3d 21, 36 (1st Cir. 2013) ("*Kaiser*"). The three functional factors are:

> (1) concerns about proof because the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation as distinct from other, independent, factors;… (2) concerns about administrability and the avoidance of multiple recoveries;… and (3) the societal interest in deterring illegal conduct and whether that interest would be served in a particular case….

*Sterling*, 990 F.3d at 35-36 (cleaned up) (internal citations omitted); *see Kaiser*, 712 F.3d at 35-36; *see also Holmes*, 503 U.S. at 269-70.

According to the Plaintiffs, because Counts Two, Three, and Four "expressly advance an aiding and abetting theory," that is, Binance and Zhao aided and abetted the scammers' wire fraud and money laundering, *see* #79 ¶¶ 284, 287, 290, "the only causal link that [they] must show is a link between the [scammers' wire fraud and money laundering] and [their] injuries." This is because, the Plaintiffs argue, under 18 U.S.C. § 2, the aider and abettor of an offense against the United States is punishable as the principal. (#86 at 16-17.) None of the cases that the Plaintiffs cite, *see id.* at 17-18, support the conclusion that to recover treble damages from the aider and abettor, a RICO plaintiff advancing such a theory, under 18 U.S.C. § 1964(c) for violation of § 1962(c), need only show a causal link between his injury and the principal's predicate acts. *Busic v. United States*, 446 U.S. 398 (1980), *Rosemond v. United States*, 572 U.S. 65 (2014), and *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), are not even RICO cases. *Trustees of Boston Univ. v. ASM Comm'ns*, Inc., 33 F. Supp. 2d 66 (D. Mass. 1998), and *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258 (3d Cir. 1995), are RICO cases, but neither addresses the "by reason of" requirement.[23]

Controlling Supreme Court precedent does not support the conclusion that the Plaintiffs need only show a causal link between their injuries and the scammers' wire fraud and money laundering. A RICO plaintiff can only recover under 18 U.S.C. § 1964(c) for violation of § 1962(c) "to the extent that[] he has been injured in his business or property by the *conduct constituting the*

---

[23] *Trustees* and *Jaguar Cars* bear on the Defendants' argument that under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), civil RICO liability cannot be premised on a theory of aiding and abetting predicate acts. (#85 at 40-42); *see* #89 at 22-24. This is one of those other arguments on which the court expresses no view. It assumes without deciding that civil RICO liability can be premised on a theory of aiding and abetting predicate acts.

*violation*. As the Seventh Circuit has stated, '[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured.'" *Sedima*, 473 U.S. 496-97 (emphasis supplied) (first alteration by this court, second in original) (quoting *Haroco, Inc. v. Am. Nat'l Bank and Tr. Co.*, 747 F.2d 384, 398 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985) (per curiam)); *see also Nodine v. Textron, Inc.*, 819 F.2d 347, 348-49 (1st Cir. 1987). "[T]he compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Sedima*, 473 U.S. at 497.

In addressing RICO causation, the Supreme Court has consistently described the necessary link as one between the plaintiff's injury and "*the injurious conduct alleged*." *Holmes*, 503 U.S. at 268 (emphasis supplied); *see id.* (requiring "a showing that the defendant's violation not only was a 'but for' cause of [the plaintiff's] injury, but was the proximate cause as well"); *see Anza*, 547 U.S. at 457, 459; *Hemi*, 559 U.S. at 9; *accord Medical Marijuana*, 604 U.S. at 612.[24]

For Counts Two, Three, and Four, the "conduct constituting the violation," or "injurious conduct alleged," is the Defendants' putative aiding and abetting of the scammers' wire fraud and money laundering, not the scammers' wire fraud and money laundering. Binance and Zhao are alleged to have aided and abetted the scammers' wire fraud and money laundering through Binance's non-compliance with anti-money laundering laws. Just as it concluded that the original plaintiffs failed to plausibly allege that they were injured "by reason of" Binance and Zhao's

---

[24] In *Hemi* in particular, the Supreme Court could have articulated a standard more favorable to the new aiding-and-abetting theory, but it did not. The *Hemi* plurality declined to "extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)." 559 U.S. at 11 (emphasis in original); *see* #71 at 77-78.

operation of Binance as an unlicensed, unregistered MTB and putative money laundering, *see* #71 at 73-80 & n.52, the court concludes that the Plaintiffs have failed to plausibly allege that they were injured "by reason of" Binance and Zhao's putative aiding and abetting of the scammers' wire fraud and money laundering through Binance's non-compliance.

The court's factual analysis is unchanged. The Plaintiffs' only fact-based argument is that the SAC fleshes out the importance to the success of the pig butchering schemes that the stolen cryptocurrency be converted to fiat currency, which must occur on an exchange. The crypto-to-fiat conversion is important because cryptocurrency can be traced, frozen, seized and returned, or replaced. Fiat currency generally cannot be. (#86 at 16 & n.7.) The SAC's allegations regarding the importance of the crypto-to-fiat conversion are indeed fleshed out, but they are not new. The FAC alleged that the crypto-to-fiat conversion was important (#36 ¶ 72), and the court considered that allegation. (#71 at 34.)

The United States District Court for the Southern District of New York recently rejected the argument that the Plaintiffs make here -- they were actually injured by the crypto-to-fiat conversion. *See* #86 at 16 (the Plaintiffs' injuries were not "complete" until then); *see also* #79 ¶ 63 ("the victim's financial injury becomes permanent only when the fraudsters successfully launder their stolen funds on an exchange such as Binance.com"). In *Reca v. Flashdot Ltd.*, #24-cv-06316-GHW-SLC,[25] an unknown hacker stole millions of dollars' worth of cryptocurrency from the plaintiffs. The plaintiffs failed to recover the cryptocurrency through other litigation. They then determined that some had been sent to accounts at KuCoin, the fifth-largest cryptocurrency exchange in the world, and filed a class action complaint asserting, among other claims, a

---

[25] *Reca* is the subject of the Defendants' more recent notice of supplemental authority (#97).

substantive RICO claim against, *inter alia*, KuCoin defendants. The plaintiffs alleged that the KuCoin defendants knowingly participated in the affairs of the "KuCoin Crypto-Wash Enterprise" through a pattern of racketeering activity that included

> • committing, and aiding and abetting, acts constituting indictable offenses under 18 U.S.C. §§ 1960 (relating to illegal money transmitters), 1961(1)(E) (acts indictable under the [Bank Secrecy Act]), 1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (interstate transportation of stolen property); and
>
> • operating an unlicensed MTB in violation of 18 U.S.C. § 1960.

2025 WL 3187079, at *1, *5 (S.D.N.Y. Nov. 13, 2025) (Cave, M.J.) (citations to the amended complaint omitted), *report and recommendation adopted in part and rejected in part*, 2026 WL 82702 (S.D.N.Y. Jan. 12, 2026) (Woods, J.).[26]

In opposing dismissal, the plaintiffs "re-sorted" their allegations into two phases of injury. The first phase was the theft of the cryptocurrency by the unknown hacker, and the second phase was the laundering of the stolen cryptocurrency on the KuCoin exchange, which allegedly prevented the plaintiffs from tracking and potentially recovering their stolen cryptocurrency. The plaintiffs argued that they alleged a sufficient causal link between the loss of their ability to track and thus recover the stolen cryptocurrency and the KuCoin defendants' aiding and abetting money

---

[26] Judge Woods accepted Magistrate Judge Cave's recommendation on the relevant issue -- the failure to plausibly allege but for and proximate cause with respect to the substantive RICO claim against the KuCoin defendants. 2026 WL 82702, at *7-9. The court notes that while neither Judge Woods nor Magistrate Judge Cave cited the prior report and recommendation in this case, it was called to their attention by the KuCoin defendants. The plaintiffs attempted to distinguish it. *See* #24-cv-06316-GHW-SLC, ECF No. 66 at 19-20 (S.D.N.Y. July 29, 2025) (in moving to dismiss); ECF No. 85 at 10, n.3 (S.D.N.Y. Dec. 22, 2025) (in response to the objections to the report and recommendation); *see also* ECF No. 73 at 32 & n.12 (S.D.N.Y. Aug. 29, 2025) (opposition).

laundering offenses and operation of an unlicensed, unregistered MTB. 2025 WL 3187079, at *12.[27]

Magistrate Judge Cave found, and Judge Woods agreed, that the plaintiffs' proximate cause theory was implausible. First, implicit in the bifurcated theory was "the obvious, indisputable fact" that the inability-to-track injury (the second phase) would not exist without the theft injury (the first phase), and courts have held that concealment of the crime cannot be the proximate cause of the plaintiff's injury because the plaintiff would have suffered the same injury regardless. 2025 WL 3187079, at *13 (citing, *inter alia*, *Hemi*, 559 U.S. at 11); *see* 2026 WL 82702, at *7.

Second, with the bifurcation, the plaintiffs "f[e]ll into the hazard that the Supreme Court warned against—that courts tend 'not to go beyond the first step' in the causal chain." 2025 WL 3187079, at *13 (quoting *Holmes*, 503 U.S. at 272).

> In between what Plaintiffs label Phase 1 and Phase 2 is an indeterminate number of intervening events and circumstances that may account for Plaintiffs' inability to recover their stolen cryptocurrency… including, for example, who stole it, when, what investigation was done, when, and by whom, how quickly Plaintiffs realized the theft and attempted to track it, and whether and how they have been able to recover any of it to date.

*Id*. (cleaned up) (internal citation omitted); *see* 2026 WL 82702, at *7.

Finally, the predicate acts of operating an unlicensed, unregistered MTB and money laundering and the plaintiffs' inability to track their stolen cryptocurrency did not necessarily

---

[27] The plaintiffs raised the RICO claims against another defendant, Chainalysis. Chainalysis provided software that was intended to, and did, alert KuCoin to suspicious transactions. As to Chainalysis, the court found, in part, that the plaintiffs had failed to plausibly allege two predicate acts, relying on the Supreme Court's recent decision in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), to reject the argument that Chainalysis aided and abetted the KuCoin defendants' operation of KuCoin as an unlicensed, unregistered MTB and money laundering. *Reca*, 2025 WL 3187079, at *9-10; *see* 2026 WL 82702, at *6. Binance and Zhao rely on *Smith & Wesson*, too. *See* #93 (earlier notice of supplemental authority). But this is another one of those arguments on which the court expresses no unnecessary view.

follow from one another. 2025 WL 3187079, at *13 (citation omitted). That disconnect was apparent from the plaintiffs' allegation that KuCoin began using Chainalysis's software; the software alerted KuCoin to suspicious transactions; and the plaintiffs' cryptocurrency was subsequently stolen anyway. "[S]orting out the counterfactual scenarios in which Plaintiffs would have been able to track their cryptocurrency notwithstanding Defendants alleged RICO violations would prove speculative in the extreme." *Id*. (cleaned up) (citation omitted); *see* 2026 WL 82702, at *7.

Magistrate Judge Cave also found, and Judge Woods agreed, that the plaintiffs failed to plausibly allege but for cause. The but for cause of the plaintiff's alleged loss of the ability to track their stolen cryptocurrency was the unknown hacker's theft in the first instance; had the plaintiffs' cryptocurrency not been stolen, "they would have had no reason to try to recover it." 2025 WL 3187079, at *15; *see* 2026 WL 82702, at *8-9.

The Plaintiffs have not persuasively distinguished *Reca*, and while *Reca* is not binding, it is instructive.[28] In addition, the new allegations in the SAC substantially weaken the causation argument. For instance, the Plaintiffs newly allege that around $300,000 of the roughly $740,000 in USDT[29] stolen from Cai was deposited into her scammer's Binance account. (#79 ¶ 67); *see id*.

---

[28] The Plaintiffs proffer five distinctions between this case and *Reca*, only two of which even arguably relate to the failure to plausibly allege but for and proximate cause with respect to the substantive RICO claim against the KuCoin defendants. *See* #98 at 2 (distinction #2 relates to Chainalysis); *id*. at 4 (distinction #4 relates to a RICO requirement other than causation); *id*. (distinction #5 relates to the RICO conspiracy claim). One of those proffered distinctions rests on the Plaintiffs' faulty aiding-and-abetting theory. *Id*. at 3. The second is that KuCoin's admissions in its criminal case were allegedly more circumscribed than Binance's and Zhao's admissions in their criminal cases. The Plaintiffs do not explain how Binance's and Zhao's admissions "demonstrating knowledge and intent" pertain to causation. *Id*. at 1-2.

[29] USDT is the only cryptocurrency involved in this case. It is issued by Tether, Ltd. (#79 ¶¶ 6, 47, 108, 120, 128, 135, 141-42, 149-50, 156-57, 164-65, 170-71, 178, 184-86, 191, 201, 208, 210, 215-16, 224, 233, 237, 239, 248, 255-56.)

¶ 115. What happened to most of the rest remains a mystery, although the Plaintiffs newly allege that Cai's scammer was able to deposit $982 in USDT into his Coinbase account. *Id*. ¶ 68. Coinbase was allegedly operating the "Know Your Customer" program required by the Bank Secrecy Act. *Id*. Apparently, then, the scammers were using both compliant and non-compliant cryptocurrency exchanges, undermining the claim that an exchange invites scamming through non-compliance.[30]

The Plaintiffs also newly allege that about 30% of Shaylor's stolen USDT was deposited into his scammer's Binance account. About 70% was laundered through other allegedly non-compliant exchanges, Huobi, OKX, and FTX. (#79 ¶ 74.) As the court explained in its prior report and recommendation, the inability to allege that all of the stolen cryptocurrency was laundered through the Binance.com exchange is relevant to the directness concern and the difficulty in ascertaining the amount of damages attributable to the non-compliance, that is, the first functional factor. (#71 at 79, n.54.) Did the scammers launder the majority of Shaylor's stolen USDT through the Huobi, OKX, and FTX exchanges because Huobi, OKX, and FTX's non-compliance with anti-money laundering laws was somehow more inviting than Binance's?

The Defendants previously urged the court to take judicial notice that many of the original plaintiffs had filed an arbitration against Coinbase based on these pig butchering schemes, as well as Licht's admissions in the United States District Court for the Northern District of Texas that he was able to trace his stolen USDT to multiple cryptocurrency exchanges. The court demurred. (#71 at 18, n.16; *id*. at 19, n.17; *id*. at 37, n.23; *id*. at 79, n.54.) The Defendants again urge the court to take judicial notice. (#85 at 15.) With the exception of the proceedings in the United States District Court for the Northern District of Texas, the court demurs again. Judicial notice is unnecessary.

---

[30] Moreover, the Plaintiffs have not explained the Coinbase deposit in any meaningful detail. The court cannot reasonably infer that Cai's scammer was only able to deposit $982 in USDT in his Coinbase account because of the KYC program, as the Plaintiffs imply. (#79 ¶ 68.)

The Plaintiffs have now admitted that at least a small portion of Cai's stolen USDT and the majority of Shaylor's stolen USDT was laundered through other cryptocurrency exchanges. (#79 ¶¶ 68, 74.) As to the remaining Plaintiffs, excluding Licht, the allegation in the SAC is merely that a "substantial" or "significant" portion of their stolen USDT was laundered through the Binance.com exchange.[31, 32]

Presumably, one of two things could have happened to the stolen USDT not laundered through the Binance.com exchange. It was laundered through another exchange, like some of Cai's and most of Shaylor's. Or, it was not laundered, and the scammers still have it. Either way, Binance's non-compliance was not a "necessary step" in the theft, *see Doe*, 137 F.4th at 42 (citing *Bostock*, 590 U.S. at 656), nor did it "le[a]d directly" to the theft, *see Sterling*, 990 F.3d at 35

---

[31] *See* #79 ¶ 129 (Chang); *id*. ¶ 136 (Chen); *id*. ¶ 143 (Chow); *id*. ¶ 151 (Dong); *id*. ¶ 159 (Francis); *id*. ¶ 167 (Gordon); *id*. ¶ 173 (Green); *id*. ¶ 180 (Grilli); *id*. ¶ 187 (Karabassis); *id.* ¶ 193 (Lobandi); *id*. ¶ 202 (Moskwa); *id*. ¶ 212 (Nguyen); *id*. ¶ 218 (Rothaus); *id*. ¶ 234 (Slavant); *id*. ¶ 241 (Thrailkill); *id*. ¶ 250 (Yao); *id*. ¶ 258 (Zhai). The SAC does not quantify "substantial" or "significant" except as to Gordon. About 84% of his stolen USDT was deposited into his scammer's Binance account. *Id*. ¶ 71

[32] As to Licht, the allegation in the SAC is of a "reasonable inference" that "all" of his stolen USDT was "laundered on the Binance.com exchange." (#79 ¶¶ 113-114.) Though not for the truth of the factual matters asserted, a federal court may take judicial notice of relevant proceedings in another court, including for example, to establish what issues were argued and decided. *See Barnstable Cty. v. 3M Co*., #17-cv-40002-DJC, 2017 WL 6452245, at *4 (D. Mass. Dec. 18, 2017) (citing, *inter alia*, *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990)). The court takes judicial notice that, after briefing was complete on this motion, the United States District Court for the Northern District of Texas granted default judgment for Licht, entering an award of actual damages of $2,755,000, jointly and severally against his scammers, "Tina Ling" and "LuxKey," and converting a temporary injunction. The permanent injunction freezes digital wallets at Binance and five other cryptocurrency exchanges: OKX, Huobi, FTS, Yolo, and B2C2. *Licht v. Ling*, #3:23-cv-01018-X, ECF No. 35 at 8-9 (N.D. Tex. June 5, 2025). Given the discussion below of the bolstered Tether, Ltd.-based allegations, ultimately, the court does not need to decide whether it is in fact a "reasonable inference" that "all" of Licht's stolen USDT was "laundered on the Binance.com exchange."

(quoting *Anza*, 547 U.S. at 461). The scammers stole the USDT without regard to a need to launder it or without regard to a need to launder it through the Binance.com exchange.

The inference is that the scammers do not still have the stolen USDT. The Plaintiffs assert that

> …keeping USDT in a self-custodied [digital] wallet is not a realistic option for the scammers -- if they did, the stolen USDT eventually would be found and seized by the authorities or destroyed by Tether, Ltd., and the victim would be made whole.

(#79 ¶ 63.) That brings the court to the bolstered Tether, Ltd.-based allegations. Since at least 2017, the Plaintiffs newly allege, Tether, Ltd. has had the ability to freeze stolen USDT, through "smart contracts." *Id*. ¶¶ 45-47, 60 & n.3. A victim, law enforcement, or a cryptocurrency exchange can report theft to Tether, Ltd. which can freeze the stolen USDT, blacklist the address holding it, and in some cases, "burn" the stolen USDT and issue replacement USDT to the victim. *Id*. ¶ 60; *see id*. ¶ 61.[33]

As to Licht, according to the SAC, if the USDT that he unwittingly transferred to the self-custodied digital wallets controlled by his scammers had remained in those wallets, the USDT "would have been fully recoverable by federal law enforcement." "Alternatively," because the cryptocurrency was USDT, Tether, Ltd. "could readily have frozen [it] and issued replacement USDT…." But the USDT did not remain in the self-custodied digital wallets controlled by Licht's scammers, allegedly because Binance and Zhao allowed them to open and freely use Binance accounts. *Id*. ¶ 6.

---

[33] *See* #79 ¶ 61 (in November 2023, Tether, Ltd. worked with the United States Department of Justice to freeze $225 million of USDT linked to pig butchering syndicates after Tether, Ltd. was informed of the fraud by an unidentified cryptocurrency exchange that was complying with the European Union's anti-money laundering laws); *see also id*. ¶ 60, n.4 (as of December 15, 2023, Tether, Ltd., on behalf of United States law enforcement, had frozen about 326 wallets totaling approximately USDT 435 million).

These allegations present yet another causal gap.[34] First, the Plaintiffs, conspicuously, do not allege that the transfer of stolen USDT from self-custodied digital wallets to accounts on cryptocurrency exchanges, even non-compliant ones, would make it impossible for Tether, Ltd. to freeze the stolen USDT. Rather, according to the SAC, when an exchange allows scammers to transfer stolen USDT to accounts that the scammers maintain on the exchange, the exchange "impedes" the ability of Tether, Ltd. to freeze the stolen USDT. And once deposited into accounts on an exchange that is not complying with anti-money laundering laws, according to the SAC, stolen USDT is "typically" out of reach of Tether Ltd. *Id*. ¶ 62. "Impede" does not mean prevent, and "typically" does not mean always.

Even if the transfer of stolen USDT from self-custodied digital wallets to accounts on a cryptocurrency exchange did make it impossible for Tether, Ltd. to freeze the stolen USDT, a causal gap remains: "how quickly Plaintiffs realized the theft and attempted to track it." *Reca*, 2025 WL 3187079, at *13 (Cave, M.J.). Was the stolen USDT out of reach of Tether, Ltd. when the Plaintiffs realized, or should have realized, the theft?[35]

---

[34] This gap is like the "intermediary cryptocurrency exchange" gap noted by the court in its prior report and recommendation, which the Plaintiffs try to eliminate in the SAC. *See* #71 at 78 ("Was the intermediary cryptocurrency exchange complying with United States law?..."); *see also* #79 ¶ 58 ("Critically, the scammers generally do *not* send stolen USDT through other centralized exchanges before the funds arrive at the centralized exchange that they use to launder the USDT into fiat currency") (emphasis in original). Just as an intermediary exchange's ability to flag suspicious transactions would have, Tether, Ltd.'s ability to freeze stolen USDT raises directness concerns and difficulties in ascertaining the amount of damages attributable to Binance's non-compliance.

[35] Chow contacted Binance "promptly" after realizing the theft and Binance told him that it was unable to help track the funds further. (#79 ¶¶ 144-45.) It is not clear whether Tether, Ltd. would have been able to help. At least four Plaintiffs made deposits after initial thefts, thinking that doing so would allow them to regain access to their USDT. *See* #79 ¶¶ 185-86 (Karabassis); *id*. ¶¶ 198-200 (Moskwa); *id*. ¶¶ 208-10 (Nguyen); *id*. ¶¶ 246-47 (Yao).

For all the reasons above, the Plaintiffs have failed to plausibly allege but for and proximate cause as required by RICO. Counts Two, Three, and Four should be dismissed.

2. <u>Count Six</u>.

Although it recommended dismissal of Count Six for the failure to plausibly allege domestic injury as required by RICO, the court previously observed: "If [the original] plaintiffs' theory of causation for either of the conspiracy counts were the same as its theory of causation for the substantive counts, then the conspiracy counts would fail, as well." (#71 at 73) (citation omitted). Binance and Zhao argue that the Plaintiffs' theory of causation on Count Six in the SAC is the same as their theory of causation on Counts One through Four in the SAC. (#85 at 23, n.14.) The court disagrees.[36]

Count Six alleges that Binance and Zhao conspired with the enterprise that consists of the specific pig butchering syndicate(s) that stole the Plaintiffs' USDT.[37] Under 18 U.S.C. § 1964(c), the Plaintiffs must plausibly allege "a violation of" 18 U.S.C. § 1962(d), the criminal RICO conspiracy provision,[38] and an injury "by reason of" the violation of § 1962(d). *See* 18 U.S.C. §

---

[36] However, the Plaintiffs' causation theory on Count Five in the SAC appears to be the same as their causation theory on Counts One through Four in the SAC, *see, e.g.*, #79 ¶ 263, and thus were the court to exercise personal jurisdiction over BAM, Count Five would be subject to dismissal for the failure to plausibly allege RICO causation.

[37] According to the SAC, Enterprise #5 consists of "the [one or more] criminal syndicates that defrauded the Plaintiffs," *see* #79 ¶ 265; that engaged in a pattern of racketeering activity, "to wit," wire fraud and money laundering, *see id*. ¶ 273; and Binance and Zhao "conspired with Enterprise #5 to violate 18 U.S.C. § 1962(c)," *see* #79 ¶ 297.

[38] "To prove a RICO conspiracy offense, the [plaintiff] must show that 'the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators "to further the endeavor, which, if completed, would satisfy all the elements of a substantive RICO offense."'" *Velazquez-Fontanez*, 6 F.4th at 212 (brackets omitted) (quoting *United States v. Rodríguez-Torres*, 939 F.3d 16, 23 (1st Cir. 2019)). The plaintiff need not "prove that the defendant or his co-conspirators committed any overt act in furtherance of the conspiracy." *United States v. Leoner-Aguirre*, 939 F.3d 310, 317 (1st Cir. 2019).

1964(c). As to Count Six, the "conduct constituting the violation," *see Sedima*, 473 U.S. at 496, or "the injurious conduct alleged," *see Holmes*, 503 U.S. at 268, is the putative agreement with this enterprise, which engaged in the wire fraud that, nobody disputes, in fact and proximately caused the Plaintiffs' injuries. *See also Beck v. Prupis*, 529 U.S. 494, 506-507 (2000) ("a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962").

The court nevertheless recommends dismissal of Count Six because the Plaintiffs have failed to plausibly allege that Binance and Zhao "knowingly joined the conspiracy" with the enterprise that consists of the specific pig butchering syndicate(s) that stole the Plaintiffs' USDT. The Plaintiffs' exclusive argument is that proof of an agreement may be circumstantial and that the conspirator does not have to know the identities or roles of every one of his co-conspirators. (#86 at 24); *see also* #71 at 67-68 (and cases cited). That is true, but the conspirator must be aware that the conspiracy exists and have some general understanding of it. "The agreement is the *sine qua non* of a conspiracy, and this 'element is not supplied by mere knowledge of an illegal activity…, let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds.'" *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011) (18 U.S.C. § 846) (quoting *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991)); *see United States v. Ramos-Baez*, 86 F.4th 28, 67-68 (1st Cir. 2023) (criminal RICO conspiracy; the district court's instructions that the jury had to find that each defendant "'intended to agree and shared a general understanding about the crime'" and that "'[m]ere association with other persons, even persons involved in criminal activity does not, by itself, establish the existence of a conspiracy'" "made clear that the government had to prove more than either a defendant's mere presence at a place where criminal activity occurred or mere awareness of that criminal activity"); *Crimson*

*Galeria Ltd. Partner. v. Healthy Pharms, Inc.*, 337 F. Supp. 3d 20, 41-42 (D. Mass. 2018) (civil RICO conspiracy; "[n]either mere knowledge of, nor association with, the alleged conspiracy" is enough); *see also Salinas*, 522 U.S. at 65 ("…Salinas knew about and agreed to facilitate the scheme"); *accord* Pattern Criminal Jury Instructions for the District Courts of the First Circuit 4.18.371(1), "Conspiracy, 18 U.S.C. § 371; 21 U.S.C. § 846," available at https://www.med.uscourts.gov/sites/med/files/crpjiLinks.pdf ("…But the government must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime…") (last visited February 19, 2026).

The Plaintiffs have plausibly alleged that Binance and Zhao knew that scammers could and did use Binance.com. *See, e.g.*, 79 ¶¶ 90, 92, 101; *see also* #71 at 13-14 (citing *Binance* and *Zhao* plea agreements, statements of facts). But the claim is not an agreement between Binance and Zhao and an enterprise consisting of scammers in general.[39] The claim is that there was an agreement between Binance and Zhao and the enterprise consisting of the specific pig butchering syndicate(s) that stole the Plaintiffs' USDT. The Plaintiffs have not plausibly alleged that, during the pendency of the pig butchering schemes, Binance and Zhao knew of those specific scammers or thefts.[40] *Compare, e.g., Reyes v. Zion First Nat. Bank*, #10-cv-345-JRS, 2012 WL 947139, at *8-10 (E.D. Pa. Mar. 21, 2012) (dismissing civil RICO conspiracy claim against the banks alleged to have laundered the money stolen from the plaintiff and putative class members by the non-party fraudulent telemarketers; noting the absence of allegations that the banks communicated either

---

[39] Were that the claim, causation would indeed be in question.

[40] Chow contacted Binance post-theft, but there is no suggestion that Binance falsely told him that it was unable to help track the funds further.

with the fraudulent telemarketers or with the defendant-financial institutions that actually withdrew the money from the accounts on behalf of the fraudulent telemarketers).

Rather, the Plaintiffs assert that Binance and Zhao purposefully avoided learning the identities of the scammers by allowing customers to open accounts without providing identification documents. (#86 at 24.) Presumably, they would also argue that Binance and Zhao purposefully avoided learning that specific accounts were conducting suspicious transactions by failing to monitor transactions. *See*, *e.g.*, #79 ¶ 89. But they have not developed this argument adequately, and the court deems it waived. *See generally United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

A kind of "willful blindness" argument would not have succeeded in any event.[41] The court previously declined to credit the allegation that the relevant transactions bore tell-tale signs of money laundering as speculative and conclusory. Only the Licht scheme was described in any meaningful detail in the FAC and regardless, the original plaintiffs did not include allegations regarding flagging and reporting thresholds, or examples of transactions flagged and reported by

---

[41] Given that the factual allegations in the SAC do not support such an argument, the court does not address the legal basis for it. *See United States v. Coviello*, 225 F.3d 54, 71 (1st Cir. 2000) ("…the willful blindness instruction related to whether the defendants knew that the property was stolen, not to joining the conspiracy. As such, the instruction was proper") (citing, *inter alia*, *United States v. Brandon*, 17 F.3d 409, 453, n.75 (1st Cir. 1994) ("The willful blindness instruction in this case had to do with the finding that 'defendant acted knowingly' and not with a finding that defendant willfully joined the conspiracy;" "agree[ing] with the Seventh Circuit that a willful blindness instruction can be permissible with respect to a conspiracy charge") (citing, *inter alia*, *United States v. Kehm*, 799 F.2d 354, 362 (7th Cir. 1986) ("awareness of a high probability of something, coupled with avoidance of further knowledge for fear of what you will learn, is the sort of 'knowledge' to which the law refers. When knowledge is disputed, an ostrich instruction may help the jury understand that legal knowledge of something is not necessarily the same as a conscious awareness of a certainty of a thing")))).

cryptocurrency exchanges complying with the laws that the Defendants were flouting.  (#71 at 35-36.)

In the SAC, the Plaintiffs describe only the Cai, Gordon, and Shaylor schemes in further detail, *see* #79 ¶¶ 67-76, although they claim that the transactions are "illustrative" of the rest, *see id*. ¶ 66. The Plaintiffs include diagrams of the movement of Cai's, Gordon's, and Shaylor's stolen USDT through their scammers' self-custodied, "*i.e.*, off-exchange," digital wallets before the USDT was deposited into their scammers' Binance accounts. *Id*. ¶¶ 6, 67, 71, 73. The Plaintiffs also include what the court presumes are screenshots from a publicly available blockchain tracing tool, depicting transactions after the USDT was deposited into their scammers' Binance accounts. *Id*. ¶¶ 69, 72, 74. The information in the screenshots is not adequately explained. Nor is it the proper subject of judicial notice. But the court gleans as follows:

One wallet associated with the Cai scheme (with the address including 1184) was involved in two "OUT" transactions, of 40,000 USDT and 9,4000 USDT, on January 22 and 23, 2022. On January 25, the wallet apparently received "IN" 100,000 USDT; sent "OUT" 50,000 USDT; received "IN" 4,944 USDT; sent "OUT" 55,011 USDT; and received "IN" 50,000 USDT. *Id*. ¶ 69.

Between July 21 and July 26, 2022, one wallet associated with the Gordon scheme (with the address including 8C82) conducted eight total "IN" or "OUT" transactions, involving from 57 USDT to 320,000 USDT. Most notably, it appears that on July 21, the wallet received "IN" 320,000 USDT. Within 30 minutes, it had sent "OUT" 320,000 USDT, in three separate transactions. On July 26, the wallet received "IN" 116,279 USDT. It sent "OUT" 116,436 USDT a few minutes later, in one transaction. *Id*. ¶ 72.

Finally, the court infers that one wallet associated with the Shaylor scheme (with the addressing including D347) received "IN" 392,155 USDT on May 10, but within about five hours, sent "OUT" 392,156 USDT, in six transactions. *Id*. ¶ 74.

Whether the court has interpreted the screenshots correctly or not, critical information is missing. The Plaintiffs again baldly assert that these transactions include tell-tale signs of money laundering, *see id*. ¶¶ 69, 72, 74, but they include no examples of transactions flagged by cryptocurrency exchanges complying with the laws that the Defendants were flouting, so that the court might compare specific, flagged transactions to the relevant transactions in this case. The court cannot reasonably infer from well-pled facts that there were in fact "flags" with respect to the relevant transactions in this case, so it cannot reasonably infer that the Defendants deliberately avoided the flags and thus may have been willfully blind to the specific scammers or thefts. *See United States v. Epstein*, 426 F.3d 431, 440 (1st Cir. 2005) ("'In determining whether the facts suggest the type of deliberate avoidance warranting an instruction, [the court] must consider whether the record evidence reveals "flags" of suspicion that, uninvestigated, suggest willful blindness'") (quoting *Coviello*, 225 F.3d at 70 (further citation omitted)); *see also United States v. Azubike*, 564 F.3d 59, 66 (1st Cir. 2009) ("Direct evidence of willful blindness is not required; what is needed are sufficient warning signs that call out for investigation or evidence of deliberate avoidance of knowledge"). Count Six should be dismissed.

VI. <u>Recommendation</u>.

The Defendants' Joint Motion to Dismiss (#84) should be allowed as follows:

These six original plaintiffs should be dismissed: Fennane; Granovski; Alicia Lau; Trevor Lau; Mollanji; Yeo.

Without opposition, BAM is subject to dismissal for lack of personal jurisdiction.

Without opposition, Count One is subject to dismissal for the failure to plausibly allege RICO causation.

Counts Two, Three, and Four should be dismissed for the failure to plausibly allege RICO causation. Assuming personal jurisdiction over BAM, Count Five would be subject to dismissal for the failure to plausibly allege RICO causation. Because the SAC did not cure this defect in the FAC and the court is not persuaded that the defect can be cured, the court recommends that Counts One through Five be dismissed with prejudice. *See*, *e.g.*, *Aldabe v. Cornell Univ.*, 296 F. Supp. 3d 367, 377 (D. Mass. 2017), *aff'd*, No. 17-2180, 2018 WL 7917918, at *1 (1st Cir. Dec. 7, 2018); *see also*, *e.g.*, *Reca*, 2026 WL 82702, at *16.

The court is not persuaded that the Plaintiffs, on a third attempt, can plausibly allege that Binance and Zhao knowingly joined the conspiracy with the enterprise that consists of the specific pig butchering syndicate(s) that stole the Plaintiffs' USDT. Thus it recommends that Count Six be dismissed with prejudice.

VI. <u>Review by the District Judge</u>.

Any party who objects to this Report and Recommendation must, pursuant to Fed. R. Civ. P. 72(b), file specific written objections with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation. The objections must specifically identify the portion of this Report and Recommendation to which objections are made and state the basis for such objections. The failure to comply with Rule 72(b) will preclude further appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *see also Henly Drilling Co. v. McGee*, 36 F.3d 143, 150 (1st Cir. 1994).

February 20, 2026                                    /s/M. Page Kelley
                                                     M. Page Kelley
                                                     United States Magistrate Judge